1  LOUISA EBERLE (SBN 320803)
   Sierra Club
2  1536 Wynkoop St. Suite 200
   Denver, CO 80202
3  (415) 977-5765
   louisa.eberle@sierraclub.org
4  ANDREA ISSOD (SBN 230920)
   Sierra Club
   2101 Webster Street, Suite 1300
5  Oakland, CA 94612
   (415) 977-5544
6  andrea.issod@sierraclub.org
   **Counsel for Plaintiff Sierra Club**
7
   PATTON DYCUS (*pro hac vice* application to be filed)
8  Environmental Integrity Project
   315 W. Ponce de Leon Avenue, Suite 842
   Decatur, GA 30030
9  (404) 446-6661
   pdycus@environmentalintegrity.org
10 **Counsel for Plaintiff Environmental Integrity Project**

11 EMILY DAVIS (SBN 314152)
   Natural Resources Defense Council
   111 Sutter Street, 21st Floor
12 San Francisco, CA 94104
   (415) 875-6100
13 edavis@nrdc.org
   **Counsel for Plaintiff Natural Resources Defense Council**

14              UNITED STATES DISTRICT COURT

15       FOR THE NORTHERN DISTRICT OF CALIFORNIA

                    OAKLAND DIVISION
16
   SIERRA CLUB                          )
17 2101 Webster St., Ste. 1300          )
   Oakland, CA 94612,                   )
                                        )
18 ENVIRONMENTAL INTEGRITY PROJECT      )   Civ. No. _____
   1000 Vermont Ave., NW, Ste. 1100     )
19 Washington, DC 20005,                )
                                        )   **COMPLAINT FOR INJUNCTIVE**
   and                                  )   **AND DECLATORY RELIEF**
20 NATURAL RESOURCES DEFENSE COUNCIL    )
   111 Sutter St., 21st Fl              )
21 San Francisco, CA 94104              )
   Plaintiffs,                          )
22                                      )
   v.                                   )
23                                      )
   MICHAEL REGAN, in his official capacity as )
   Administrator,                       )
24 U.S. Environmental Protection Agency, )
   1200 Pennsylvania Ave., NW           )
25 Washington, DC 20460,                )
   Defendant.                           )
26

                         **COMPLAINT**

**INTRODUCTION**

1.      This is a "deadline suit" seeking to compel the U.S. Environmental Protection Agency ("EPA"), through Defendant EPA Administrator Michael Regan, to fulfill delayed nondiscretionary duties to correct unlawful loopholes in Clean Air Act state implementation plans ("SIPs").  The loopholes at issue cover periods of "startup, shutdown, and malfunction" ("SSM") at industrial facilities. The Administrator's failure to perform these nondiscretionary duties particularly impacts vulnerable environmental justice communities, which often face increased, dangerous exposure to air pollution during SSM events.

2.      Industrial facilities can release unusually high quantities of air pollution over short periods of time during SSM events, and the pollution emitted during these events often exceeds a facility's allowable pollution limits under the Clean Air Act—or at least those limits applicable during "normal" operations. Many SIPs, however, contain unlawful loopholes that either exempt facilities from complying with pollution limits during SSM events, or allow facilities to invoke affirmative defenses to civil, monetary penalties for any such violations. As a result, operators have had little to no incentive to reduce air pollution during SSM events.

3.      The pollution resulting from SSM events can jeopardize public health and quality of life in nearby communities, which are often predominantly low-income, communities of color, or both. Even short periods of exposure to pollutants such as sulfur dioxide and particulate matter (or soot) can have significant health impacts including impaired lung function and aggravation of asthma.

4.      In 2015, EPA finalized a rule—the "SSM SIP Call"—that required 45 different states and air districts to submit, by November 22, 2016, SIP revisions correcting SSM loopholes, which for decades have unlawfully allowed huge amounts of harmful air pollution to be emitted into neighboring communities without consequence. SSM SIP Call, 80 Fed. Reg. 33,840, 33,847

**COMPLAINT**

(June 12, 2015). Specifically, in the SSM SIP Call, EPA correctly concluded that these loopholes—including automatic and discretionary exemptions from applicable emission limits, enforcement discretion provisions that may bar enforcement by EPA or citizens for excess emissions, and affirmative defense provisions that can bar civil penalties for violations of limits during SSM events—flatly violated the Clean Air Act and EPA's then-existing SSM policy. *Id.* at 33,845. EPA determined that issuing the SSM SIP Call to 45 states and air districts would "assure that these SIPs comply with the fundamental requirements of the [Clean Air Act] with respect to the treatment of excess emissions during periods of SSM." *Id.*

5.      Under the Clean Air Act's SIP Call provision, whenever EPA "finds that the applicable implementation plan … is substantially inadequate to … comply with any requirement" of the Act, the "Administrator shall notify the State of the inadequacies, and may establish reasonable deadlines (not to exceed 18 months after the date of such notice) for the submission of … plan revisions" to correct such inadequacies. 42 U.S.C. § 7410(k)(5). In keeping with this requirement, the June 2015 SSM SIP Call required states to submit to EPA corrective SIP revisions removing unlawful SSM affirmative defense and exemption provisions by November 22, 2016. SSM SIP Call, 80 Fed. Reg. at 33,840.

6.      Within six months of the deadline to submit a revision, EPA must determine whether each state has submitted an administratively complete plan revision. 42 U.S.C. § 7410(k)(1)(B). Here EPA's deadline to make such determinations was May 22, 2017 but many states and air districts have still not submitted a SIP revision in response to the 2015 SSM SIP Call. Where, as here, states fail to submit a SIP revision within six months after the revision is due, there is no SIP revision submittal that may be deemed administratively complete, and EPA must therefore find that the states "failed to submit" a complete plan revision in response to the SIP Call. *Id.* § 7410(c)(1)(A)-(B); *see also* SSM SIP Call, 80 Fed. Reg. at 33,930. EPA is in

violation of this mandatory duty to find that the following states and air districts have failed to submit a plan revision in response to the SSM SIP Call: Alabama, Arkansas, California - San Joaquin Valley Air Pollution Control District, District of Columbia, Illinois, North Carolina – Forsyth County, Ohio, Rhode Island, South Dakota, Tennessee – Shelby County (Memphis), Washington – Energy Facility Site Evaluation Council, and Washington – Southwest Clean Air Agency.

7.      Before any SIP can be revised, EPA must approve that revision. 42 U.S.C. § 7410(k)(3) ("The plan revision shall not be treated as meeting the requirements of this chapter until the [EPA] Administrator approves the entire plan revision as complying with the applicable requirements of this chapter."). EPA has a mandatory duty to take final action on SIP revision submittals within 12 months of those submittals becoming administratively complete. 42 U.S.C. § 7410(k)(2)-(4). EPA is in violation of this mandatory duty for the following 29 states and air districts: Alaska, Arizona, Arizona – Maricopa County, California – Eastern Kern Air Pollution Control District, California – Imperial County Air Pollution Control District, Colorado, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maine, Michigan, Minnesota, Missouri, Mississippi, Montana, New Jersey, New Mexico, New Mexico – Albuquerque-Bernalillo County, North Dakota, Oklahoma, South Carolina, Tennessee, Virginia, Washington, and West Virginia.

8.      Plaintiffs continue to be injured by the increased air pollution from SSM events— pollution that is made worse by EPA's failure to perform its mandatory duties to implement the SSM SIP call, which, if performed, would lead to the removal of SSM loopholes from state plans.

9.      Accordingly, Plaintiffs THE SIERRA CLUB, NATURAL RESOURCES DEFENSE COUNCIL, and ENVIRONMENTAL INTEGRITY PROJECT bring this action against Defendant, MICHAEL REGAN, in his official capacity as EPA Administrator, to compel him to perform his mandatory duties with respect to the SSM SIP Call.

**COMPLAINT**

1

**JURISDICTION**

2

10.     This case arises under the Clean Air Act's citizen suit provision. 42 U.S.C. §

3

7604(a)(2). Therefore, the Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331

4

(federal question jurisdiction) and 42 U.S.C. § 7604(a)(2) (citizen suits for failure to perform

5

a non-discretionary duty required by the Clean Air Act).

6

11.     An actual controversy exists between the parties. This case does not concern

7

federal taxes, is not a proceeding under 11 U.S.C. §§ 505 or 1146, and does not involve the

8

Tariff Act of 1930. Thus, this Court has authority to order the declaratory relief requested under

9

28 U.S.C. § 2201. If the Court orders declaratory relief, 42 U.S.C. § 7604 (Clean Air Act citizen

10

suit), and 28 U.S.C. §§ 1361 (action to compel an office of the United States), 2201 (declaratory

11

relief), 2202 (declaratory judgment) authorize this Court to issue injunctive relief.

12

**NOTICE**

13

12.     In accordance with 42 U.S.C. § 7604(b)(2), and 40 C.F.R. Part 54, on May 10,

14

2021, Plaintiffs mailed to Defendant by certified mail, return receipt requested, written notice

15

of intent to sue regarding the violations alleged in this Complaint. *See* Ex. A. EPA received the

16

notice letter by no later than May 14, 2021. *Id*. More than the 60 days required under 40 U.S.C.

17

§ 7604(b)(2) have passed since EPA received this "notice of intent to sue" letter. EPA has not

18

remedied the violations alleged in this Complaint.

19

13.     The only response Plaintiffs have received from Defendant is a clarification that

20

one state (New Jersey) had in fact submitted a SIP revision in response to the SSM SIP Call,

21

contrary to the information Plaintiffs had compiled through Freedom of Information Act

22

requests to EPA and conveyed in the notice letter. Defendant confirmed that it has not issued

23

any decisions approving (in part or in full), conditionally approving, or disapproving the New

Jersey SIP revision.

**COMPLAINT**

14.     In an abundance of caution, on August 2, 2021, Plaintiffs mailed to Defendant by certified mail, return receipt requested, a clarifying notice providing updated tables that moved New Jersey from the table of states without a SIP revision submitted (Table 1) to the table of state SIP revisions that EPA has failed to act upon (Table 2). *See* Ex. B. This clarification letter did not materially change the notice provided to Defendant by the May 10, 2021, letter because the original letter "apprised EPA of its putative obligations under the Act and accorded it ample opportunity to take whatever steps it saw as appropriate" before litigation commenced. *Ctr. for Biological Diversity v. E.P.A.*, 794 F. Supp. 2d 151, 156 (D.C. Cir. 2011); *see also San Francisco BayKeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1155 (9th Cir. 2002) (finding notice sufficient under the Clean Water Act's similar notice provision where it "provide[d] enough information that the defendant [could] identify and correct the problem").

15.     Despite notice sufficient to inform Defendant of its failure to act to address the unsubmitted and pending SIP revisions, Defendant has neither approved or disapproved of the New Jersey SIP revision, taken any action to address the failure of the other 12 states and air districts to submit SIP revisions, or taken steps to approve or disapprove any of the other 29 currently-pending, administratively "complete" SIP revisions. Therefore, a present and actual controversy exists.

**VENUE AND INTRADISTRICT ASSIGNMENT**

16.     Defendant EPA resides in this judicial district. This civil action is brought against an officer of the United States acting in his official capacity, and a substantial part of the events or omissions giving rise to the claims in this case occurred in the Northern District of California. Some of the claims in this Complaint concern EPA's failure to perform mandatory duties with regard to Arizona and several California air districts. EPA Region 9, which is responsible for

**COMPLAINT**

Arizona and California, is headquartered in San Francisco. Thus, several of the events and omissions at issue in this action occurred at EPA's Region 9 headquarters in San Francisco. In addition, Plaintiff Sierra Club is headquartered in Oakland. Accordingly, venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

17.     For the same reason, intradistrict assignment is proper in the Oakland Division. *See* N.D. Cal. L.R. 3-2.

## PARTIES

18.     Plaintiff SIERRA CLUB is the oldest and largest grassroots environmental organization in the United States, with 759,318 members nationally. Sierra Club's mission is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's resources and ecosystems; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives. Sierra Club performs this mission through advocacy, litigation, and educational outreach to its members and state chapters. Sierra Club and its members are greatly concerned about the effects of air pollution on human health and the environment and have a long history of advocacy to eliminate SSM loopholes.

19.     Plaintiff ENVIRONMENTAL INTEGRITY PROJECT ("EIP") is a national nonprofit organization existing and organized under the laws of the District of Columbia. EIP is dedicated to advocating for more effective enforcement of environmental laws. EIP has three goals: (1) to provide objective analyses of how the failure to enforce or implement environmental laws increases pollution and affects public health; (2) to hold federal and state agencies, as well as individual corporations, accountable for failing to enforce or comply with environmental laws; and (3) to help local communities obtain the protection of environmental laws.

**COMPLAINT**

20.     Plaintiff NATURAL RESOURCES DEFENSE COUNCIL ("NRDC") is a national nonprofit environmental and public health organization incorporated under the laws of the State of New York, and with hundreds of thousands of members nationwide. NRDC's mission is to safeguard the Earth: its people, its plants and animals, and the natural systems on which all life depends.

21.     Defendant MICHAEL REGAN is the Administrator of the EPA. In that role Administrator Regan has been charged by Congress with the duty to administer the Clean Air Act, and to take required regulatory actions according to the deadlines established by the Act, including the mandatory duties at issue in this case.

## LEGAL AND FACTUAL BACKGROUND

22.     Congress enacted the Clean Air Act to "speed up, expand, and intensify the war against air pollution in the United States with a view to assuring that the air we breathe throughout the Nation is wholesome once again." H.R. Rep. No. 1146, 91st Cong., 2d Sess. 1,1, 1970 U.S. Code Cong. & Admin. News 5356, 5356; *see also* 42 U.S.C. § 7401(b)(1) (establishing that a purpose of the Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population"); *id.* § 7401(c) (stating that a "primary goal" of the Act is "pollution prevention"); *id.* § 7401(a)(2) ("[T]he growth in the amount and complexity of air pollution brought about by urbanization, industrial development, and the increasing use of motor vehicles, has resulted in mounting dangers to the public health and welfare.").

23.     The Act is based on a cooperative-federalism model wherein states are empowered to create SIPs to meet and maintain national ambient air quality standards set by EPA, but EPA retains ultimate authority to ensure those SIPs comply with the Act. 42 U.S.C. § 7410(a)(2)(A). When a state fails to submit a SIP to the agency, or when EPA disapproves a

**COMPLAINT**

SIP, *see id.* §§ 7410(k), (l), EPA must promulgate its own plan. *Id.* § 7410(c)(1). The Act also requires EPA to issue a "SIP call" directing a state to revise its SIP whenever EPA finds the SIP is "substantially inadequate" to "comply with any requirement of" the Act. *Id.* § 7410(k)(5). The Act further provides: "The Administrator shall notify the State of the inadequacies and may establish reasonable deadlines (not to exceed 18 months after the date of such notice) for the submission of such plan revisions." *Id.*

24.     On June 12, 2015, in response to a petition for rulemaking by Sierra Club, EPA took final action finding that "certain SIP provisions in 36 states (applicable in 45 statewide and local jurisdictions) are substantially inadequate to meet [Clean Air Act] requirements," and EPA therefore issued the "SSM SIP Call," requiring 45 states and air districts to submit to EPA state plan revisions removing those unlawful provisions within 18 months, by November 22, 2016. SSM SIP Call, 80 Fed. Reg. at 33,840. EPA also committed to "to review and act upon the SIP submissions as promptly as resources will allow, in order to correct these deficiencies in as timely a manner as possible." *Id.* at 33,931.

25.     Under the Clean Air Act, within six months of the deadline to submit a SIP or SIP revision, EPA must determine whether any state plan or revision is administratively complete. 42 U.S.C. § 7410(k)(1)(B).

26.     If a state fails to submit any required SIP or SIP revision by the deadline, there is no submittal that may be deemed administratively complete, and EPA must make a determination stating that the state failed to submit the required SIP. 42 U.S.C. § 7410(k)(1)(B); SSM SIP Call, 80 Fed. Reg. at 33,930.

27.     If a state files a SIP submittal by the deadline, and EPA fails to make a finding that the submittal is incomplete within six months after receipt of a SIP submission, the submission is "deemed by operation of law" to meet the minimum statutory criteria for

completeness. 42 U.S.C. § 7410(k)(1)(B). EPA has a mandatory duty to—within 12 months of when a SIP submittal is deemed administratively complete—take final action on the submittal by approving it, disapproving it, conditionally approving it, or approving it in part and disapproving it in part. 42 U.S.C. § 7410(k)(2)-(4). In other words, unless EPA determines the submittal is administratively incomplete within the first six months, EPA must issue a decision approving (in part or in full), conditionally approving, or disapproving (in part or in full) a proposed SIP revision within 18 months of its submittal. Here, EPA did not determine that any state's submittal in response to the SSM SIP Call was administratively incomplete within six months of submission.

28.     If EPA disapproves a SIP submittal or makes a finding that a state has failed to submit a complete SIP revision by the deadline for submittal, EPA has a mandatory duty to promulgate a Federal Implementation Plan or approve a corrected state plan within two years that will protect communities from air pollution during SSM events, as required under the Act. 42 U.S.C. § 7410(c). For states and air districts that have submitted proposed SIP revisions, EPA will be required to determine whether the submitted revisions have removed unlawful SSM affirmative defense and exemption provisions and otherwise comply with the Clean Air Act. EPA's approval would ensure the SIP revisions become effective, and EPA's disapproval would trigger EPA's mandatory obligation to prepare Federal Implementation Plans that remove these unlawful provisions.

## PLAINTIFFS' INJURIES

29.     EPA's failure to timely perform the mandatory duties described in this Complaint adversely impacts Plaintiffs and their members. In particular, members of Plaintiffs Sierra Club and NRDC live, work, spend time outdoors, and breathe air near facilities that emit harmful air pollution during SSM events that are subject to state loopholes. EPA's inaction prolongs poor air

**COMPLAINT**

quality conditions that adversely affect or threaten Plaintiffs' members' health. EPA's inaction delays actions mandated by the Act that would protect Plaintiffs' members from these harmful air quality conditions. Members routinely face dangerous and disruptive upset events at nearby plants, including "flaring" from petroleum refineries and petrochemical facilities, and large plumes of black smoke with noxious odors.  Members inhale the resulting harmful air pollution and experience physical effects, such as headaches, dizziness, nausea, and burning sensations in the nose and throat. Because Plaintiffs' members are deeply concerned about the health impacts of persistent exposure to harmful SSM air pollution, they refrain from or curtail activities that they previously enjoyed, diminishing their quality of life.

30.     The SSM loopholes that EPA has failed to act upon make it more difficult for Plaintiffs themselves to carry out their missions of protecting the health and wellbeing of Plaintiffs' members and the larger public from air pollution. As a result of EPA's failure to timely fulfill the mandatory legal obligations described here, 41 states and air districts have unlawful SIPs that allow SSM exceedances. Consequently, Plaintiffs' members and the public continue to be exposed to elevated levels of pollution, harming their health, forcing them to reduce their time outside, and impairing their use and enjoyment of their homes, communities, and nearby recreation opportunities.

31.     EPA's failure to take appropriate action has also deprived Plaintiffs and their members of procedural rights and protections to which they would otherwise be entitled, including, but not limited to: the right to participate in federal rulemakings regarding revisions to SIPs subject to the SSM SIP Call; the right to judicially challenge any final SIP revision that  is contrary to the requirements of the Clean Air Act; and the right to enforce requirements of the Act for timely preparation and implementation of plans in response to EPA's SSM SIP Call Rule. *See generally* 42 U.S.C. § 7607 (providing for notice, public comment, and the right to

judicial review of implementation plans).

32.     EPA's failure to perform its mandatory duty to correct the SSM loopholes also makes it exceedingly difficult for Plaintiffs to protect the public and Plaintiffs' members from air pollution through "citizen suit" enforcement actions under Clean Air Act § 304, 42 U.S.C. § 7604. While the SSM loopholes remain in state plans, Plaintiffs cannot fully enforce the Clean Air Act to curb pollution and protect public health in some cases, and enforcement is prohibitively expensive and risky in other cases because of the loopholes. Timely implementation of the SSM SIP Call is critical because pollution from SSM events will continue to harm Plaintiffs and their members until EPA approves amended SIPs—or issues "Federal Implementation Plans" for those states that fail to submit corrective SIP revisions. The above injuries will continue until the Court grants the relief requested herein and EPA takes the necessary action to fix the unlawful SSM loopholes. The requested relief will redress Plaintiffs' injuries by ensuring EPA complies with its mandatory obligations under the Act by a date certain in the near future.

33.     Under all of the possible outcomes of EPA's actions on the overdue SIPs described above (preparing a Federal Implementation Plan, approving SIPs that remove the SSM provisions, and/or disapproving SIPs to trigger the next deadline), EPA would be required to expeditiously issue or approve a plan revision that will help reduce harmful SSM pollution and allow Plaintiffs to enforce Clean Air Act requirements, thereby benefiting public health and improving Plaintiffs' members' quality of life and Plaintiffs' ability to participate in the required procedure.

**COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**CLAIMS FOR RELIEF**

**CLAIM ONE**

**(Failure to issue findings of failure to submit in response to SSM SIP**

**Call for Alabama, Arkansas, California – San Joaquin Valley Air**

**Pollution Control District, District of Columbia, Illinois, North**

**Carolina – Forsyth County, Ohio, Rhode Island, South Dakota,**

**Tennessee – Shelby County, Washington – Energy Facility Site**

**Evaluation Council, Washington – Southwest Clean Air Agency)**

34.     Plaintiffs incorporate by reference paragraphs 1 through 33.

35.     The 2015 SSM SIP Call required states to submit their state plan revisions to EPA

within 18 months, by November 22, 2016. SSM SIP Call, 80 Fed. Reg. at 33,840.

36.     The following 12 states and air districts have not submitted SIP revisions in

response to the SSM SIP Call: Alabama, Arkansas, California - San Joaquin Valley Air Pollution

Control District, District of Columbia, Illinois, North Carolina – Forsyth County, Ohio, Rhode

Island, South Dakota, Tennessee – Shelby County (Memphis), Washington – Energy Facility Site

Evaluation Council, and Washington - Southwest Clean Air Agency.

37.     More than six months have passed since these SIP revisions were due to be

submitted.

38.     EPA has not issued findings of failure to submit for these states and air districts.

39.     Therefore, EPA is in violation of its mandatory duty to issue findings of failure to

submit pursuant to 42 U.S.C. § 7410(k)(1)(B) for the following 12 states and air districts:

Alabama, Arkansas, California - San Joaquin Valley Air Pollution Control District, District of

Columbia, Illinois, North Carolina – Forsyth County, Ohio, Rhode Island, South Dakota,

Tennessee – Shelby County (Memphis), Washington – Energy Facility Site Evaluation Council,

**COMPLAINT**

1    and Washington - Southwest Clean Air Agency.

2                              **CLAIM TWO**

3    **(Failure to take final action on SIP submittals for 29 states and air districts)**

4        40.    Plaintiffs incorporate by reference paragraphs 1 through 39.

5        41.    The 29 states and air districts listed in the below table submitted SIP revisions in

6    response to the SSM SIP Call on the dates listed in the table:

7

| State/County | Date of Submitted SIP Revision |
|---|---|
| Alaska | January 5, 017 |
| Arizona | November 17, 2016 |
| Arizona - Maricopa County | November 18, 2016 |
| California – Eastern Kern Air Pollution Control District | December 6, 2016 |
| California – Imperial County Air Pollution Control District | March 28, 2016 |
| Colorado | November 21, 2016 |
| Delaware | November 26, 2016 |
| Florida | November 22, 2016 |
| Georgia | November 17, 2016 |
| Indiana | November 14, 2016 |
| Kansas | November 22, 2016 |
| Kentucky | November 17, 2016 |
| Louisiana | November 22, 2016 |
| Maine | May 25, 2019 |
| Michigan | February 7, 2017 |
| Minnesota | November 22, 2016 |
| Missouri | November 28, 2016 |
| Mississippi | November 17, 2016 |
| Montana | June 6, 2016 |
| New Jersey | November 30, 2017 |
| New Mexico | October 13, 2016 |
| North Carolina* | November 22, 2016 |
| North Dakota | October 26, 2016 |
| NM - Albuquerque-Bernalillo County | October 17, 2016 |
| Oklahoma | November 7, 2016 |
| South Carolina | November 4, 2016 |
| Tennessee | November 18, 2016 |

| Texas* | November 18, 2016 |
|---|---|
| Virginia | August 1, 2016 |
| Washington | October 25, 2019 |
| West Virginia | June 29, 2016 |

*States that submitted multiple proposals*

42.     It has been more than 18 months since the states and air districts listed in the above table above have submitted SIP revisions in response to the SSM SIP Call.

43.     EPA has not taken final action, pursuant to 42 U.S.C. § 7410(k)(2)-(4), on the state and air district plan revisions listed in the above table.

44.     Accordingly, EPA is violation of its mandatory duty under 42 U.S.C. § 7410(2)-(4) to take final action on the SIP submittals listed in the above table within 12 months of the submittals being administratively complete.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.     Declare that the Administrator is in violation of the Clean Air Act with regard to his failure to perform each mandatory duty listed above;

B.     Issue an injunction requiring the Administrator to perform his mandatory duties listed above by certain dates;

C.     Retain jurisdiction of this matter for purposes of enforcing and effectuating the Court's order;

D.     Grant Plaintiffs their reasonable costs of litigation, including attorneys' fees; and,

E.     Grant such further relief as the Court deems just and proper.

Dated:     September 8, 2021          Respectfully submitted,

**COMPLAINT**

1

2          /s/ Louisa Eberle
           Louisa Eberle
           Sierra Club
3          1536 Wynkoop St., Suite 200
           Denver, CO 80202
4          (415) 977-5753
           louisa.eberle@sierraclub.org
5
           Andrea Issod
6          Sierra Club
           2101 Webster St., Suite 1300
7          Oakland, CA 94612
           (415) 977-5544
8          andrea.issod@sierraclub.org

9          *Counsel for Sierra Club*

10         /s/ Patton Dycus
           Patton Dycus (*pro hac vice* application to be filed)
11         Environmental Integrity Project
           315 W. Ponce de Leon Ave., Suite 842
12         Decatur, GA 30030
           (404) 446-6661
13         pdycus@environmentalintegrity.org

14         *Counsel for Environmental Integrity Project*

15         /s/ Emily Davis
           Emily Davis
16         Natural Resources Defense Council
           111 Sutter St., 21st floor
17         San Francisco, CA 94104
           (415) 875-6100
18         edavis@nrdc.org

19         *Counsel for Natural Resources Defense Council*

20

21

22

23

**COMPLAINT**

Sierra Club et al. v. EPA Complaint
Exhibit A

May 10, 2021

Michael S. Regan, Administrator
U.S. Environmental Protection Agency
Office of the Administrator, Mail Code: 1101A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460
regan.michael@epa.gov

*Via Certified Mail and Email*

> Re:   **60-Day Notice of Intent to Sue the U.S. Environmental Protection Agency for Failure to Perform Nondiscretionary Duties to Implement the 2015 SSM SIP Call Rule under the Clean Air Act**

Dear Administrator Regan:

This letter is submitted on behalf of Sierra Club, Environmental Integrity Project, and Natural Resources Defense Council ("NRDC"), to provide notice under 42 U.S.C. § 7604(b) of our intent to sue for "a failure of the Administrator [of the U.S. Environmental Protection Agency] to perform any act or duty under [the Clean Air Act] which is not discretionary with the Administrator." 42 U.S.C. § 7604(a)(2). This notice is provided to you in your official capacity as Administrator of the U.S. Environmental Protection Agency ("EPA") as a prerequisite to bringing a civil action. 42 U.S.C. § 7604(b)(2); 40 C.F.R. Part 54. As detailed below, EPA has failed to undertake mandatory duties to implement the startup, shutdown, and malfunction ("SSM") state implementation plan ("SIP") Call, 80 Fed. Reg. 33,840 (June 12, 2015), and prohibit dangerous air pollution spikes from SSM events at industrial facilities. This is a serious environmental justice issue that EPA has recognized disproportionately affects communities of color and low-income communities.

EPA should immediately fulfill these mandatory duties to make good on the Administration's promise to protect fenceline communities. The massive bursts of air pollution during SSM events profoundly affect nearby and downwind community members, harming their health and gravely diminishing their quality of life. Personal stories recounting the real-world consequences of SSM events are well-documented and recognized by EPA. *See e.g.*, 80 Fed. Reg. at 33,850 & n.21 ("the results of automatic and discretionary exemptions in SIP provisions, and of other provisions that interfere with effective enforcement of SIPs, are real-world consequences that adversely affect public health.").

Through SIPs containing unlawful exemptions and affirmative defense provisions, states have allowed large polluters to violate Clean Air Act emission limitations and pollute surrounding communities during SSM events with impunity. In 2015, the Obama-Biden administration issued a nationwide rule making clear that state-created affirmative defenses, director's discretion provisions, and exemptions are not consistent with the Clean Air Act and issued a "SIP Call" requiring 36 states to eliminate these unlawful provisions. 80 Fed. Reg. 33,840. In doing so EPA relied on the D.C. Circuit's decisions in *Sierra Club v. EPA*, 551 F.3d

1019, 1027-28 (D.C. Cir. 2008), and *NRDC v. EPA*, 749 F.3d 1055, 1062-64 (D.C. Cir. 2014), which confirmed that the Act prohibits SSM exemptions and affirmative defenses, respectively. *See*, *e.g.*, 80 Fed. Reg. at 33,874, 33,880. Since 2017, however, progress has stalled on the important work of implementing the SIP Call.

Removing SSM loopholes will build on important work the Obama-Biden administration began and help deliver cleaner air and safer neighborhoods for overburdened communities across the country.

## I.   FAILURE TO MAKE FINDING OF FAILURE TO SUBMIT FOR THIRTEEN STATES AND AIR DISTRICTS

The 2015 SSM SIP Call required states to submit their revised state plans to EPA within 18 months, by November 22, 2016. 80 Fed. Reg. at 33,840.

After states submit proposed SIPs to EPA, the next step is for EPA to determine whether a SIP submittal is administratively complete. 42 U.S.C. § 7410(k)(1)(B). If, six months after a submittal is due, a state has failed to submit any required SIP submittal, and there is no submittal that may be deemed administratively complete, EPA must make a determination that the state failed to submit the required SIP submittal. *Id.* This determination is referred to as a "finding of failure to submit."

As detailed in Exhibit 1 at Table 1, thirteen states and air districts have ignored the SSM SIP Call mandate and have not submitted SIP revisions to EPA in response to the SIP Call.[1] More than six months have passed since the November 22, 2016 due date for these submittals, yet EPA has not issued the statutorily mandated finding of failure to submit. EPA must immediately issue a finding of failure to submit for these states and air districts. 42 U.S.C. § 7410(k)(1)(B).

## II.   FAILURE TO APPROVE OR DISAPPROVE STATE IMPLEMENTATION PLAN SUBMISSIONS FOR 28 STATES AND AIR DISTRICTS

As shown in Exhibit 1 at Table 2, EPA has also failed to take final action upon 28 state or air district proposals submitted in response to the SIP Call.[2] If EPA fails to make a completeness finding six months after receipt of a SIP submission, the submission is "deemed by operation of law" to meet the minimum statutory criteria. 42 U.S.C. § 7410(k)(1)(B). Once that happens, EPA must act within 12 months to approve in part or in full, conditionally approve, or disapprove the

---

[1] *See* Exhibit 1 at Table 1. These states and air districts are Alabama, Arkansas, California – San Joaquin, District of Columbia, Illinois, North Carolina – Forsyth County, New Jersey, Ohio, Rhode Island, South Dakota, Tennessee – Shelby, and two Washington state air districts.

[2] *See* Exhibit 1 at Table 2. These states and air districts are Alaska, Arizona, Arizona – Maricopa, California – Eastern Kern, California – Imperial, Colorado, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maine, Michigan, Minnesota, Missouri, Mississippi, Montana, North Dakota, New Mexico, New Mexico – Albuquerque-Bernalillo, Oklahoma, South Carolina, Tennessee, Virginia, Washington, and West Virginia.

SIP revision. *See* 42 U.S.C. § 7410(k)(2)-(4). More than 18 months have passed since these 28 responsive SIP revisions were submitted. *See* Exhibit 1 at Table 2. Yet EPA has not taken any final action on them. EPA must act swiftly to review and take final action upon those state proposals for compliance with the 2015 SIP Call.

Many of the state's proposed responses to the SIP Call did not comply with the SIP Call rule's requirements and are not consistent with the Clean Air Act. In acting on the state proposals, Sierra Club urges EPA to take a close look at all proposed SIP revisions and, in doing so, consider comments submitted by environmental and community groups on the proposed SIP submittals, as well as EPA's own comments. For your convenience, attached are Sierra Club's comments on the proposed SSM SIP Call submittals for Alaska, Arizona, Delaware, the District of Columbia, Georgia, Louisiana, Minnesota, Mississippi, North Carolina, Oklahoma, Texas, and West Virginia, and EPA's comments on the proposed SSM SIP Call submittals for Colorado, Georgia, Mississippi, and West Virginia (*see* Exhibit 2). Attached are also the NAACP's comments on the Mississippi proposed SSM SIP Call submittal and Environmental Integrity Project's comments on the Texas proposed SSM SIP Call submittal.

As required by 40 C.F.R. § 54.3, the persons giving notice are:

Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612

Environmental Integrity Project
1000 Vermont Avenue, NW, Suite 1100
Washington, DC 20005

Natural Resources Defense Council
40 West 20th Street, 11th floor
New York, NY 10011

While EPA regulations require this information, please direct all correspondences and communications regarding this matter to the undersigned counsel.

The above-listed organizations hereby give notice of their intent to file suit 60 days from the postmark of this letter to compel EPA to perform its mandatory duties under the Clean Air Act and promptly issue a finding of failure to submit to the 13 states and air districts that have ignored the SSM SIP Call mandate, and act to approve or disapprove the 28 SIP revisions submitted in response to the SSM SIP Call. We would welcome the opportunity to discuss the basis for this notice letter and explore options for resolution of these claims without litigation. If that is of interest to EPA, please contact the undersigned counsel.

Thank you for your prompt attention to this matter.

3

Sincerely,

/s/ Andrea Issod
Andrea Issod
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5544
andrea.issod@sierraclub.org

*Counsel for Sierra Club*

/s/ Patton Dycus
Patton Dycus
Environmental Integrity Project
315 W. Ponce de Leon Avenue, Suite 842
Decatur, GA 30030
(404) 446-6661
pdycus@environmentalintegrity.org

*Counsel for Environmental Integrity Project*

/s/ Emily Davis
Emily Davis
Natural Resources Defense Council
111 Sutter Street, 21st floor
San Francisco, CA 94104
(415) 875-6100
edavis@nrdc.org

*Counsel for Natural Resources Defense Council*

Exhibit 1

Table 1: States That Did Not Respond to the 2015 SIP Call

| State/County | Submitted Proposal to EPA (Y/N) |
|---|---|
| Alabama | No |
| Arkansas | No |
| CA – San Joaquin | No |
| District of Columbia | No |
| Illinois | No |
| North Carolina - Forsyth | No |
| New Jersey | No |
| Ohio | No |
| Rhode Island | No |
| South Dakota | No |
| Tennessee - Shelby (Memphis) | No |
| Washington – EFSEC | No |
| Washington - SWCAA | No |

Table 2: States with Submitted SIP Proposals but No Final Rule

| State/County | Submitted Proposal to EPA (Y/N) | Date of Submitted SIP Proposal | Federal Register Notice |
|---|---|---|---|
| Alaska | Yes | 1/5/2017 | N/A |
| Arizona | Yes | 11/17/2016 | Approval of Arizona Air Plan Revisions, Arizona Department of Environmental Quality and Maricopa County Air Quality Department, 82 FR 13084 (Mar. 09, 2017) |
| Arizona - Maricopa | Yes | 11/18/2016 | Approval of Arizona Air Plan Revisions, Arizona Department of Environmental Quality and Maricopa County Air Quality Department, 82 FR 13084 (Mar. 09, 2017) |
| California – Eastern Kern | Yes | 12/6/2016 | Approval of California Air Plan Revisions, Eastern Kern Air Pollution Control District and Imperial County Air Pollution Control District, 82 FR 20295 (May 01, 2017) |
| California - Imperial | Yes | 3/28/2016 | Approval of California Air Plan Revisions, Eastern Kern Air Pollution Control District and Imperial County Air Pollution Control District, 82 FR 20295 (May 01, 2017) |
| Colorado | Yes | 11/21/2016 | N/A |
| Delaware | Yes | 11/26/2016 | N/A |
| Florida | Yes | 11/22/2016 | N/A |
| Georgia | Yes | 11/17/2016 | N/A |
| Indiana | Yes | 11/14/2016 | N/A |
| Kansas | Yes | 11/22/2016 | N/A |
| Kentucky | Yes | 11/17/2016 | N/A |
| Louisiana | Yes | 11/22/2016 | N/A |
| Maine | Yes | 05/21/2019 | N/A |
| Michigan | Yes | 2/7/2017 (Commitment to comply w/ SIP Call submitted on 11/15/2016) | N/A |
| Minnesota | Yes | 11/22/2016 | N/A |
| Missouri | Yes | 11/28/2016 | N/A |
| Mississippi | Yes | 11/17/2016 | N/A |
| Montana | Yes | 7/6/2016 | Montana Administrative Rule Revisions: 17.8.334, 82 FR 16770 (Apr. 06, 2017) |
| North Carolina | Yes | 11/22/2016 | N/A |
| North Dakota | Yes | 10/27/2016 | N/A |
| New Mexico | Yes | 10/13/2016 | N/A |
| NM - Albuquerque-Bernalillo | Yes | 10/17/2016 | N/A |
| Oklahoma | Yes | 11/7/2016 | N/A |

| South Carolina | Yes | 11/4/2016 | N/A |
|---|---|---|---|
| Tennessee | Yes | 11/18/2016 | N/A |
| Texas | Yes | 11/18/2016 | N/A |
| Virginia | Yes | 8/1/2016 | N/A |
| Washington | Yes | 10/25/2019 | N/A |
| West Virginia | Yes | 6/29/2016 | N/A |

Exhibit 2

## Comments on Proposed SSM SIP Call Submittals

| Comments | State | Date | Page |
|---|---|---|---|
| Sierra Club | Alaska | 10/14/16 | 001 |
| Sierra Club | Arizona | 10/20/16 | 005 |
| Sierra Club | Arizona, Maricopa County | 4/10/17 | 008 |
| EPA Region 8 | Colorado | 11/12/15 | 012 |
| Sierra Club | Delaware | 10/25/16 | 019 |
| Sierra Club | District of Columbia | 3/24/17 | 031 |
| Sierra Club, GreenLaw | Georgia | 5/4/16 | 045 |
| Sierra Club, GreenLaw (provided as Exhibit 1 to 5/4/16 GA Comments) | Georgia | 3/8/16 | 050 |
| EPA | Georgia | 5/11/16 | 063 |
| Sierra Club, Louisiana Environmental Action Network, Concerned Citizens of Murphy | Louisiana | 8/3/16 | 067 |
| Sierra Club | Minnesota | 11/9/16 | 079 |
| Sierra Club | Mississippi | 9/15/16 | 088 |
| EPA Region 4 | Mississippi | 9/16/16 | 097 |
| NAACP | Mississippi | 9/26/16 | 100 |
| Sierra Club | Mississippi | 10/6/16 | 107 |
| Sierra Club (without attachments) | North Carolina | 8/1/16 | 111 |
| Sierra Club | Oklahoma | 1/20/16 | 121 |
| Sierra Club | Texas | 8/8/16 | 131 |
| Environmental Integrity Project | Texas | 8/2/16 | 133 |

| EPA Region 3 | West Virginia | 7/28/16 | 141 |
|---|---|---|---|
| Sierra Club (without attachments) | West Virginia | 8/1/16 | 144 |



Submitted via email to rebecca.smith@alaska.gov

October 14, 2016

RE:    **Sierra Club Comments on Alaska's Proposal to Revise 18 AAC 50.240(b), Excess
Emissions Regulations and Removal of 18 AAC 50.240 from SIP**

## I.    INTRODUCTION

Sierra Club appreciates the opportunity to provide these comments concerning Alaska's proposal to amend its State Implementation Plan (SIP) in response to EPA's SSM SIP Call.

Power plants and other facilities can emit massive amounts of particulate matter and other pollutants during periods of startup, shutdown, or malfunction.  Indeed, as part of its SSM SIP Call rulemaking, EPA recognized the practical consequences of SSM exemptions, noting "one malfunction that was estimated to emit 11,000 pounds of [sulfur dioxide] SO2 over a 9-hour period when the applicable limit was 3,200 pounds per day."  Memorandum dated Feb. 4, 2013, to EPA Docket No. EPA-HQ-OAR-2012-0322 at 23, *available at* https://www3.epa.gov/airquality/urbanair/sipstatus/docs/ssm_memo_021213.pdf.  These large SSM pollution exceedances can occur many times each year.  After reviewing data from numerous power plants as part of the Mercury and Air Toxics rulemaking, EPA found that the "average" electric generating unit (EGU) had between 9 and 10 startup events per year between 2011 and 2012, and that many EGUs had "over 100 startup events in 2011 and over 80 in 2012." Assessment of startup period at coal-fired electric generating units – Revised, at p. 4 (Nov. 2014).  Given the huge emissions possible during startup and shutdown, reducing startup and shutdown emissions from fuel-burning sources, including power plants, should be a priority for ADEC.

## II.    EPA's SSM SIP CALL

EPA's SSM SIP Call requires 36 states, including Alaska, to remove from their SIPs exemptions and affirmative defenses that allow industrial facilities to pollute the air without consequences when those facilities start up, shut down, or experience malfunctions.  80 Fed. Reg. 33,840 (June 12, 2015).  EPA found that SIPs with provisions that exempt emissions during such events—like Alaska's current SIP— are substantially inadequate to meet Clean Air Act requirements.  *Id*.  In addition to requiring the 36 states whose SIPs contain these exemptions and affirmative defense provisions to remove these provisions from their SIPs, the SIP Call also revises EPA's policy for SIP provisions addressing excess emissions during SSM events. *Id*. The SIP Call allows states 18 months to submit revised SIPs to EPA, which is the maximum time allowable under the statute.  *Id*. at 33,848; 42 U.S.C. § 7410(k)(5).

1

The SIP Call increases protections for communities against harmful air pollution from industrial facilities.  EPA expects that "revision of the existing deficient SIP provisions has the potential to decrease emissions significantly in comparison to existing provisions,… encourage sources to reduce emissions during startup and shutdown and to take steps to avoid malfunctions, should provide increased incentive for sources to be properly designed, operated and maintained in order to reduce emissions at all times, … [and] has the potential to result in significant emission control and air quality improvements." *Id.* at 33,955-56.  Importantly, beyond the legal deficiencies in the provisions, "the results of automatic and discretionary exemptions in SIP provisions, and of other provisions that interfere with effective enforcement of SIPs, are real-world consequences that adversely affect public health.  *Id.* at 33,850.

Because facilities subject to the Clean Air Act can emit massive amounts of particulate matter, sulfur dioxide, nitrogen oxide, and other harmful air pollution during periods of start-up, shutdown, and malfunction, it is imperative that Alaska include strong SIP provisions governing emissions during these periods to protect fence-line and other communities.  Indeed, EPA expects that "revision of the existing deficient SIP provisions has the potential to decrease emissions significantly in comparison to existing provisions" because these required revisions will "encourage sources to reduce emissions during startup and shutdown and to take steps to avoid malfunctions, . . . [and] should provide increased incentive for sources to be properly designed, operated and maintained in order to reduce emissions at *all* times."  80 Fed. Reg. at 33,955-56 (emphasis added).  SSM exemptions, like those in the current Alaska SIP, have "real-world consequences that adversely affect public health," and removing those exemptions "has the potential to result in significant emission control and air quality improvement."  *Id.* at 33,850, 33,956.

Excessive pollution during SSM events from large facilities has devastating impacts on surrounding communities, which are often low-income communities and/or communities of color.  Indeed, SSM loopholes—whether incorporated in SIP provisions or in operating permits—undermine the emission limits found in SIPs and operating permits, threaten states' abilities to achieve and maintain compliance with NAAQS, and endanger public health and public welfare.  These provisions also undermine other requirements of the Act, including Prevention of Significant Deterioration increments, nonattainment plans, and visibility requirements.  In addition, SSM loopholes create a disparity among states, where some states provide facilities with an unfair economic advantage through SSM loopholes as compared to facilities located in states that do not have SSM loopholes.  This creates precisely a "race to the bottom" incentive structure that the Clean Air Act is designed to prevent.

## III. COMMENTS ON ADEC'S PROPOSAL

As ADEC correctly recognizes, EPA's SSM SIP Call found that 18 AAC 50.240 is substantially inadequate to meet Clean Air Act requirements.  80 Fed. Reg. at 33973.  The easiest and cleanest way for Alaska to comply with the SIP Call and the Act is to remove the provision from the SIP, as it is proposing to do here.  Removing the unlawful provision will ensure that the normal SIP limits that are designed to protect air quality and comply with the Act's requirements would apply during all times.  As EPA has made clear, it should be technically feasible for most sources to "meet the same emission limitation" during *both* "steady-state" and startup/shutdown periods.  80 Fed. Reg. at 33,915

2

ADEC proposes to modify 18 AAC 50.240 in the state rules and add language that the provision applies only to ADEC enforcement action.  Enforcement discretion provisions are consistent with the Act and EPA guidance as long as they are not overly broad and would not interfere with enforcement by the EPA or by other parties through a citizen suit.  80 Fed. Reg. at 33980.  The Act grants EPA explicit enforcement authority under section 113, and to citizens under section 304.  Thus, whether or not the state decides to bring an enforcement action, the EPA and citizens have independent statutory authority to enforce violations of the Act.  *Id*. at 33,981.  Additionally, "[p]otential for enforcement by the EPA or through a citizen suit provides an important safeguard in the event that the state lacks resources or ability to enforce violations and provides additional deterrence." *Id*.  Thus, the state can cabin its own discretion to bring enforcement action for excess emission events, but it cannot limit EPA or citizen suit enforcement in any manner.  *Id*.  Additionally, states cannot adopt "overly broad" enforcement discretion provisions because such provisions conflict with section 110(a)(2) of the Act, which requires states to have adequate enforcement authority.  *Id*.

ADEC's proposed enforcement discretion provision states that:

(b) Excess emissions violations that the department determines to be unavoidable under this section are not subject to penalty by the department. This section does not limit the department's power to enjoin the emission or require corrective action.

The state's proposal may be overly broad because the provision limits its own discretion in seeking penalties once it makes a finding that excess emissions violations are unavoidable.  Additionally, the provision could potentially be read to imply that EPA and citizens cannot bring such action.  To ensure such confusion does not occur, consistency with the law, and EPA approval, ADEC should include explicit language that these provisions do not affect or apply to enforcement by EPA or citizens.

Additionally, ADEC did not include all the criteria recommended by EPA in Section 1.10(A) (Upsets) or 1.10(C) (Unplanned Maintenance).  EPA recommended the following criteria be included in enforcement discretion provisions:

 (1) To the maximum extent practicable the air pollution control equipment, process equipment or processes were maintained and operated in a manner consistent with good practice for minimizing emissions;

(2) Repairs were made in an expeditious fashion when the operator knew or should have known that applicable emission limitations were being exceeded. Off-shift labor and overtime were utilized, to the extent practicable, to ensure that such repairs were made as expeditiously as practicable;

(3) The amount and duration of the excess emissions (including any bypass) were minimized to the maximum extent practicable during periods of such emissions;

(4) All possible steps were taken to minimize the impact of the excess emissions on ambient air quality; and

(5) The excess emissions are not part of a recurring pattern indicative of inadequate design, operation or maintenance.

Exhibit 2
004

*Id*. at 33981.  ADEC should consider adding these additional criteria to ensure a thorough and robust decision-making process in enforcement actions.

Thank you for the opportunity to submit these comments.  Please do not hesitate to contact me with any questions or to discuss the matters raised in these comments.

Sincerely,
/s/Andrea Issod
Andrea Issod
Sierra Club Environmental Law Program
2101 Webster St., Suite 1300
Oakland, CA 94612
andrea.issod@sierraclub.org
415-977-5544



Submitted via email to ivers.matthew@azdeq.gov

October 20, 2016

**RE:   Sierra Club Comments on Arizona's Proposal to Remove R18-2-310 from Arizona's SIP**

## I.   INTRODUCTION

Sierra Club appreciates the opportunity to provide these comments concerning Arizona's proposal to amend its State Implementation Plan (SIP) in response to EPA's SSM SIP Call.

Power plants and other facilities can emit massive amounts of particulate matter and other pollutants during periods of startup, shutdown, or malfunction.  Indeed, as part of its SSM SIP Call rulemaking, EPA recognized the practical consequences of SSM exemptions, noting "one malfunction that was estimated to emit 11,000 pounds of [sulfur dioxide] $SO_2$ over a 9-hour period when the applicable limit was 3,200 pounds per day."  Memorandum dated Feb. 4, 2013, to EPA Docket No. EPA-HQ-OAR-2012-0322 at 23, *available at* https://www3.epa.gov/airquality/urbanair/sipstatus/docs/ssm_memo_021213.pdf.  These large SSM pollution exceedances can occur many times each year.  After reviewing data from numerous power plants as part of the Mercury and Air Toxics rulemaking, EPA found that the "average" electric generating unit (EGU) had between 9 and 10 startup events per year between 2011 and 2012, and that many EGUs had "over 100 startup events in 2011 and over 80 in 2012." Assessment of startup period at coal-fired electric generating units – Revised, at p. 4 (Nov. 2014).  Given the huge emissions possible during startup and shutdown, reducing startup and shutdown emissions from fuel-burning sources, including power plants, should be a priority for ADEQ.

## II.   EPA's SSM SIP CALL

EPA's SSM SIP Call requires 36 states, including Arizona, to remove from their SIPs exemptions and affirmative defenses that allow industrial facilities to pollute the air without consequences when those facilities start up, shut down, or experience malfunctions.  80 Fed. Reg. 33,840 (June 12, 2015).  EPA found that SIPs with such provisions—like Arizona's current SIP— are substantially inadequate to meet Clean Air Act requirements.  *Id*.  In addition to requiring the 36 states whose SIPs contain these exemptions or affirmative defense provisions to remove these provisions from their SIPs, the SIP Call also revises EPA's policy for SIP provisions addressing excess emissions during SSM events.  *Id*.  The SIP Call allows states 18 months to submit revised SIPs to EPA, which is the maximum time allowable under the statute. *Id*. at 33,848; 42 U.S.C. § 7410(k)(5).

Exhibit 2
006

Because facilities subject to the Clean Air Act can emit massive amounts of particulate matter, sulfur dioxide, nitrogen oxide, and other harmful air pollution during periods of start-up, shutdown, and malfunction, it is imperative that Arizona include strong SIP provisions governing emissions during these periods to protect fence-line and other communities.  Indeed, EPA expects that "revision of the existing deficient SIP provisions has the potential to decrease emissions significantly in comparison to existing provisions" because these required revisions will "encourage sources to reduce emissions during startup and shutdown and to take steps to avoid malfunctions, … [and] should provide increased incentive for sources to be properly designed, operated and maintained in order to reduce emissions at *all* times." *Id.* at 33,955-56 (emphasis added).  Importantly, beyond the legal deficiencies in the provisions, "the results of automatic and discretionary exemptions in SIP provisions, and of other provisions that interfere with effective enforcement of SIPs, are real-world consequences that adversely affect public health." *Id.* at 33,850.  Removing SSM exemptions and affirmative defenses, like those in the current Arizona SIP, "has the potential to result in significant emission control and air quality improvement." *Id.* at 33,850, 33,956.

Excessive pollution during SSM events from large facilities has devastating impacts on surrounding communities, which are often low-income communities and/or communities of color.  Indeed, SSM loopholes—whether incorporated in SIP provisions or in operating permits—undermine the emission limits found in SIPs and operating permits, threaten states' abilities to achieve and maintain compliance with NAAQS, and endanger public health and public welfare.  These provisions also undermine other requirements of the Act, including Prevention of Significant Deterioration increments, nonattainment plans, and visibility requirements.  In addition, SSM loopholes create a disparity among states, where some states provide facilities with an unfair economic advantage through SSM loopholes as compared to facilities located in states that do not have SSM loopholes.  This creates precisely a "race to the bottom" incentive structure that the Clean Air Act is designed to prevent.

## III. COMMENTS ON ARIZONA'S PROPOSAL

As ADEQ correctly recognizes, EPA's SSM SIP Call found that R18-2-310 is substantially inadequate to meet Clean Air Act requirements.  80 Fed. Reg. at 33972-3.  The easiest and cleanest way for Arizona to comply with the SIP Call and the Act is to remove the provision from the SIP, as it is proposing to do here.  Removing the unlawful provision will ensure that the normal SIP limits that are designed to protect air quality and comply with the Act's requirements would apply during all times, and that sources would be fully liable under the Act for violations of such limits, including civil penalties.  As EPA has made clear, it should be technically feasible for most sources to "meet the same emission limitation" during *both* "steady-state" and startup/shutdown periods.  80 Fed. Reg. at 33,915.

Retaining the affirmative defense provisions in state law is not problematic as long as the state law provisions are not worded in such a way to undermine the state's enforcement authority.  80 FR at 33855-56.  As EPA explained in the SSM SIP Call,

the state could not create affirmative defense provision that in effect undermines its legal authority to enforce SIP requirements. Section 110(a)(2)(C) requires states to have a program that provides for enforcement of the state's SIP, and enforcement discretion

provisions that unreasonably limit the state's own authority to enforce the requirements of the SIP would be inconsistent with section 110(a)(2)(C).The EPA's obligations with respect to SIPs include determining whether states have adequate enforcement authority.

*Id*.

Thank you for the opportunity to submit these comments.  Please do not hesitate to contact me with any questions or to discuss the matters raised in these comments.

Sincerely,
/s/Andrea Issod
Andrea Issod
Sierra Club Environmental Law Program
2101 Webster St., Suite 1300
Oakland, CA 94612
andrea.issod@sierraclub.org
415-977-5544



Submitted via regulations.gov

April 10, 2017

RE:　**Docket ID No. EPA–R09– OAR–2017–0041**: EPA's Proposal to Approve Removal of the
SSM Affirmative Defense Provisions from Arizona and Maricopa County SIPs

## I.　INTRODUCTION

Sierra Club appreciates the opportunity to provide these comments concerning EPA's
proposal to approve revisions to Arizona and Maricopa County State Implementation Plan (SIPs)
in response to EPA's recently finalized rulemaking: State Implementation Plans: Response to
Petition for Rulemaking; Restatement and Update of EPA's SSM Policy Applicable to SIPs;
Findings of Substantial Inadequacy; and SIP Calls To Amend Provisions Applying to Excess
Emissions During Periods of Startup, Shutdown and Malfunction, 80 Fed. Reg. 33840 (June 12,
2015) (SSM SIP Call).  Sierra Club applauds EPA, Arizona, and Maricopa County for removing the
unlawful affirmative defense provisions from Arizona and Maricopa County SIPs.

## II.　EPA's SSM SIP CALL

Power plants and other facilities can emit massive amounts of particulate matter and
other pollutants during periods of startup, shutdown, or malfunction. Indeed, as part of its SSM
SIP Call rulemaking, EPA recognized the practical consequences of SSM exemptions, noting
"one malfunction that was estimated to emit 11,000 pounds of [sulfur dioxide] SO2 over a 9-
hour period when the applicable limit was 3,200 pounds per day." Memorandum dated Feb. 4,
2013, to EPA Docket No. EPA-HQ-OAR-2012-0322 at 23, available at
https://www3.epa.gov/airquality/urbanair/sipstatus/docs/ssm_memo_021213.pdf.  These
large SSM pollution exceedances can occur many times each year.  After reviewing data from
numerous power plants as part of the Mercury and Air Toxics rulemaking, EPA found that the
"average" electric generating unit (EGU) had between 9 and 10 startup events per year
between 2011 and 2012, and that many EGUs had "over 100 startup events in 2011 and over 80
in 2012." Assessment of startup period at coal-fired electric generating units – Revised, at p. 4
(Nov. 2014).

EPA's SSM SIP Call requires 36 states, including Arizona, to remove from their SIPs
exemptions and affirmative defenses that allow industrial facilities to pollute the air without
consequences when those facilities start up, shut down, or experience malfunctions. 80 Fed.
Reg. 33,840. EPA found that SIPs with such provisions—like Arizona's current SIP— are

1

Exhibit 2
009

substantially inadequate to meet Clean Air Act requirements. Id. In addition to requiring the 36 states whose SIPs contain these exemptions or affirmative defense provisions to remove these provisions from their SIPs, the SIP Call also revises EPA's policy for SIP provisions addressing excess emissions during SSM events. *Id*. The SIP Call allows states 18 months to submit revised SIPs to EPA, which is the maximum time allowable under the statute. *Id*. at 33,848; 42 U.S.C. § 7410(k)(5).

The SIP Call increases protections for communities against harmful air pollution from industrial facilities. Indeed, EPA expects that "revision of the existing deficient SIP provisions has the potential to decrease emissions significantly in comparison to existing provisions" because these required revisions will "encourage sources to reduce emissions during startup and shutdown and to take steps to avoid malfunctions, … [and] should provide increased incentive for sources to be properly designed, operated and maintained in order to reduce emissions at all times." *Id*. at 33,955-56 (emphasis added). Importantly, beyond the legal deficiencies in the provisions, "the results of automatic and discretionary exemptions in SIP provisions, and of other provisions that interfere with effective enforcement of SIPs, are real-world consequences that adversely affect public health." *Id*. at 33,850. Removing SSM exemptions and affirmative defenses, like those in the current Arizona SIP, "has the potential to result in significant emission control and air quality improvement." *Id*. at 33,850, 33,956.

SSM loopholes—whether incorporated in SIP provisions or in operating permits—undermine the emission limits found in SIPs and operating permits, threaten states' abilities to achieve and maintain compliance with NAAQS, and endanger public health and public welfare. These provisions also undermine other requirements of the Act, including Prevention of Significant Deterioration increments, nonattainment plans, and visibility requirements. In addition, SSM loopholes create a disparity among states, where some states provide facilities with an unfair economic advantage through SSM loopholes as compared to facilities located in states that do not have SSM loopholes. This creates precisely a "race to the bottom" incentive structure that the Clean Air Act is designed to prevent.

## III. COMMENTS ON EPA'S PROPOSAL

EPA's SSM SIP Call found that the SSM affirmative defense provisions in Arizona's SIP, ADEQ R18-2-310, and in the Maricopa County SIP, MCAQD Regulation 3, 140, are substantially inadequate to meet Clean Air Act requirements. Specifically, the Arizona and Maricopa County SIPs contain unlawful affirmative defense provisions that operate to alter or affect the jurisdiction of federal courts in the event of an enforcement action, contrary to the enforcement structure of the Act in section 113 and section 304. *See Natural Res. Def. Council v. EPA*, 749 F.3d 1055, 1063 (D.C. Cir. 2014) (NRDC); *accord U.S. Sugar Corp*., No. 11-1108 at *33 (affirmative defenses are "impermissible intrusion on the judiciary's role.").

In *NRDC*, 749 F.3d at 1062-64, the D.C. Circuit Court of Appeals held that it is the *courts*, not EPA or the states, that have jurisdiction to determine the civil penalties that apply in judicial proceedings brought against any entity that violates "an emission standard or limitation under

this chapter, 42 U.S.C. § 7604(a)(1)." *NRDC*, 749 F.3d at 1063-64 (emphasis). This holding logically excludes any other entity from determining those civil penalties by creating an affirmative defense that prevents the courts from applying penalties pursuant to the statutorily prescribed factors, 42 U.S.C. § 7413(e)(1).

EPA's proposal to approve Arizona's plan to remove the unlawful provisions from the SIP is the easiest and cleanest way for Arizona to comply with the SIP Call and the Act. Removing the unlawful provisions will ensure that the normal SIP limits that are designed to protect air quality and comply with the Act's requirements would apply during all times, and that sources would be fully liable under the Act for violations of such limits, including civil penalties. As EPA has made clear, it should be technically feasible for most sources to "meet the same emission limitation" during both "steady-state" and startup/shutdown periods. 80 Fed. Reg. at 33,915.

Retaining the affirmative defense provisions in state law (*i.e.,* outside of the SIP) is not problematic as long as the state law provisions are not worded in such a way to undermine the state's enforcement authority.  80 Fed. Reg. at 33,855-56. As EPA explained in the SSM SIP Call,

the state could not create affirmative defense provision that in effect undermines its legal authority to enforce SIP requirements. Section 110(a)(2)(C) requires states to have a program that provides for enforcement of the state's SIP, and enforcement discretion provisions that unreasonably limit the state's own authority to enforce the requirements of the SIP would be inconsistent with section 110(a)(2)(C). The EPA's obligations with respect to SIPs include determining whether states have adequate enforcement authority.

Thank you for the opportunity to submit these comments.  Please do not hesitate to contact me with any questions or to discuss the matters raised in these comments.


Sincerely,

/s/Andrea Issod                                         /s/ Barbara H. Warren
Andrea Issod                                         Barbara H. Warren, MD, MPH
Sierra Club Environmental Law Program      Director
2101 Webster St., Suite 1300                   Physicians for Social Responsibility
Oakland, CA 94612                                 Arizona Chapter
andrea.issod@sierraclub.org
415-977-5544

Sandy Bahr
Chapter Director
Sierra Club – Grand Canyon Chapter
514 W Roosevelt St
Phoenix, AZ  85003
sandy.bahr@sierraclub.org
(602) 253-8633

/s/ Rick Moore
Rick Moore
Clean Energy and Efficiency Director
Grand Canyon Trust



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 8**
1595 Wynkoop Street
Denver, CO  80202-1129
Phone 800-227-8917
www.epa.gov/region08

Ref: 8P-AR                    **NOV 1 2 2015**

William Allison, Director
Air Pollution Control Division
Colorado Dept. of Public Health and Environment
4300 Cherry Creek Dr. South
Denver, Colorado 80246

RE:    EPA Region 8 Comments on Colorado's Draft Revisions to Affirmative Defense Provisions in
Common Provisions Regulations II.E. and II.J.

Dear Mr. Allison:

Thank you for the opportunity to provide comments on the state of Colorado's draft SIP
revisions to address the EPA's final rule, "Response to Petition for Rulemaking; Restatement and
Update of EPA's SSM Policy Applicable to SIPs; Findings of Substantial Inadequacy; and SIP Calls To
Amend Provisions Applying to Excess Emissions During Periods of Startup, Shutdown and
Malfunction" ("SSM SIP Call"), 80 FR 33840 (June 12, 2015).

The EPA's original proposal for the SSM SIP Call, 78 FR 12460 (Feb. 22, 2013) ("SSM SIP
Call Proposal"), proposed to call Colorado's SIP with regard to affirmative defense provisions for
excess emissions during startup and shutdown. Our subsequent supplemental proposal, 79 FR 55920
(Sept. 17, 2014) ("SSM SIP Call Supplemental Proposal"), proposed to call Colorado's SIP with regard
to affirmative defense provisions for excess emissions during startup, shutdown, and malfunctions. The
final SSM SIP Call finalized the EPA's determination under section 110(k)(5) of the Clean Air Act
("CAA" or "Act") that Colorado's existing affirmative defense provisions in sections II.E and II.J of
Colorado's Common Provisions are substantially inadequate to comply with the requirements of the Act.

We want to acknowledge that these existing affirmative defense provisions were originally
approved by the EPA into the Colorado SIP in 2006 (II.J) and 2008 (II.E) after a collaborative effort by
the state that included the EPA, and that the SSM SIP Call for these provisions is the result of the EPA's
subsequent changes in interpretation of the requirements of the Act. These changes in interpretation are
the result of the EPA's reevaluation of the legal basis for affirmative defenses in SIP provisions in light
of the legal reasoning of a recent court decision. As explained in detail in the SSM SIP Call
Supplemental Proposal and the final SSM SIP Call, the EPA has now determined that affirmative
defense provisions in SIPs are inconsistent with the legal requirements of the CAA.

Our comments are detailed below. Our preliminary assessment is that the draft SIP revision
contains a number of issues that call into question whether it can be approved by the EPA. In forming
our preliminary assessment, we have initially reviewed Colorado's August 20, 2015 rulemaking

1

Exhibit 2
013

package, including supporting materials such as the Memorandum of Notice, the pre-hearing and rebuttal statements from parties to the rulemaking that the Air Pollution Control Division (APCD) has provided to the EPA, and the revised rule language provided in the APCD's rebuttal statement. However, we will not reach any final conclusions until the state of Colorado completes its rulemaking process and provides a formal submission of the intended SIP revision containing the final language to the EPA, after which the EPA will conduct its own notice and comment rulemaking. In that separate EPA rulemaking process, we will consider any comments concerning the intended SIP revision under discussion in light of the CAA and the EPA's guidance interpreting the CAA for SIP provisions.

## 1. Applicable Requirements for Colorado's SIP Revision in Response to the SSM SIP Call

Section 110(a) requires that states have SIPs that provide for implementation, maintenance, and enforcement of the NAAQS and that meet applicable requirements of the CAA. Under section 110(k), the EPA must approve SIP submissions that meet all of the applicable requirements of the CAA and disapprove those that do not. Similarly, section 110(l) of the Act prohibits the EPA from approving a SIP revision that would interfere with (among other things) any applicable requirement of the Act.

One applicable requirement is provided by section 110(a)(2)(A) of the Act, which requires every SIP to "include enforceable emission limitations and other control measures, means, or techniques." Similarly, section 110(a)(2)(C) requires states to have programs for enforcement of SIP requirements, including those of section 110(a)(2)(A). The EPA has provided general guidance on our intended interpretation of enforceability under section 110(a)(2)(A), including the following:

- Memorandum from J. Craig Potter, Thomas L. Adams, Jr. and Francis S. Blake to Air Division Directors, Regions I – X, entitled "Review of State Implementation Plans and Revisions for Enforceability and Legal Sufficiency" ("1987 Enforceability Memorandum") (September 23, 1987)[1]
- "General Preamble for the Implementation of Title I of the Clean Air Act Amendments of 1990," ("General Preamble") 57 FR 13498, 13556, 13568 (April 16, 1992)

In general, SIP provisions can be enforced under sections 113 and 304 of the Act (as well as under state law). Thus, a SIP revision that interferes with enforceability of SIP requirements under sections 113 and 304 may also interfere with the requirements of sections 110(a)(2)(A) and 110(a)(2)(C). The SSM SIP Call Proposal, SSM SIP Call Supplemental Proposal, and the SSM SIP Call discuss how affirmative defenses for excess emissions in SIPs create a substantial inadequacy in the SIP with respect to the requirements of sections 113 and 304 and the enforcement structure of the CAA more broadly. In part, the EPA has adopted the legal reasoning of the D.C. Circuit in *NRDC v. EPA*, ("*NRDC*"), 749 F.3d 1055, 1063 (D.C. Cir. 2014), in finding that affirmative defense provisions are contrary to the enforcement structure of the Act. As the EPA explained:

A judicial decision by the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) in *NRDC* v. *EPA* concerning the legal basis for affirmative defense provisions in the EPA's own regulations caused the Agency to reconsider the legal basis for any affirmative defense provisions in SIPs, regardless of the type of events to which they apply, the criteria they may contain or the types of judicial remedies they purport to limit or eliminate.

---

[1] A copy of this memorandum is attached to this comment letter.

SSM SIP Call, 80 FR at 33851.

> Affirmative defense provisions by their nature purport to limit or eliminate the authority of
> federal courts to find liability or to impose remedies through factual considerations that differ
> from, or are contrary to, the explicit grants of authority in section 113(b) and section 113(e).
> These provisions are not appropriate under the CAA, no matter what type of event they apply to,
> what criteria they contain or what forms of remedy they purport to limit or eliminate.

SSM SIP Call, 80 FR at 33981. However, the fact that the logic of the *NRDC* decision provides part of
the basis for the EPA's interpretation of the Act does not mean that a state's SIP revision in response to
the SSM SIP Call can be "narrowly tailored" merely to address the *NRDC* decision. While the EPA's
interpretation of the Act with respect to the lack of any legal basis for affirmative defenses in SIPs is
informed by the *NRDC* decision, it is the EPA's interpretation of the applicable requirements of the Act
(and not the *NRDC* decision) that would govern our notice-and-comment rulemaking on Colorado's SIP
revision.

As we explained above, when Colorado submits a SIP revision to address the SSM SIP call, the
EPA would then have the authority and responsibility to determine through notice-and-comment
rulemaking whether the SIP revision would interfere with applicable requirements of the Act as
interpreted by the EPA. These legal requirements of the CAA include the enforcement structure of the
CAA, as provided in section 304 and section 113, and as recently interpreted by the D.C. Circuit. As
explained below, our preliminary view is that the draft SIP revision might interfere with several
requirements of the Act, regardless of whether or not it is "narrowly tailored" to address the *NRDC*
decision.[2]

## 2. The Draft SIP Revision May Interfere with Sections 110(a)(1), 110(a)(2)(A), 110(a)(2)(C), 113, and 304 of the Act

The EPA's guidance on enforceability in SIPs under section 110(a)(2)(A) states, among other
things, that SIP provisions should be "clear," "unambiguous," "enforceable in practice," and
"sufficiently specific so that a source is fairly on notice as to the standard [of conduct] it must meet."
General Preamble, 57 FR at 13568; 1987 Enforceability Memorandum at 8. Based on the EPA's
intended interpretation of section 110(a)(2)(A) as expressed in our guidance, our preliminary view of the
draft SIP revision is that it may interfere with section 110(a)(2)(A) (and consequently 110(a)(2)(C) as
well). We are concerned that a SIP provision that states that it may or may not be adopted or considered
by a federal court at the court's discretion may not put sources fairly on notice as to the possible penalty
consequences of noncompliance with emission limits. It also appears that the provision may interfere
with enforceability in practice, given that it could create additional (and unnecessary) issues that parties
to an enforcement action might have to brief and a court to decide, in much the same way that an
ambiguous provision for another, substantive requirement could create additional (and unnecessary)
issues to brief and decide. This concern would be exacerbated by language stating that a court may
"adopt" the State's affirmative defense, as it is unclear how a court can do so while carrying out its
obligation to consider the mandatory statutory penalty factors enumerated in section 113(e) of the Act.

---

[2] The EPA notes statements in the rulemaking record for Colorado's proposed revisions about the cooperative federalism
structure of the Act. Our comments about the EPA's role in reviewing Colorado's SIP revision are, in our preliminary view,
consistent with that structure. *See Okla. v. U.S. EPA*, 723 F.3d 1201, 1207-10 (10th Cir. 2013), *cert. denied*, 134 S. Ct. 2662
(2014); *see also* SSM SIP Call, 80 FR at 33876-79.

In our preliminary view, rebuttal statements from industry and APCD to the effect that the draft SIP revision would improve clarity are mistaken; the simple method to improve clarity for a court as to the scope of Colorado law versus federal law would be to remove the affirmative defense entirely from the SIP.[3]

The draft SIP revision may interfere with section 113 of the Act in another significant way. If it were approved into the Colorado SIP, it might be misunderstood to apply to the EPA's administrative actions under section 113 of the Act regarding administrative penalties for violation of the SIP. *See* CAA sections 113(a)(1)(B), (a)(2)(B),and (d)(1)(A). As stated in the SSM SIP Call:

> The EPA agrees that states may elect to revise their existing deficient affirmative defense provisions to make them "enforcement discretion"-type provisions that apply only in the context of administrative enforcement by the state. Such revised provisions would need to be unequivocally clear that they do not provide an affirmative defense that sources can raise in a judicial enforcement context or against any party other than the state. Moreover, such provisions would have to make clear that the assertion of an affirmative defense by the source in a state administrative enforcement context has no bearing on the additional remedies that the EPA or other parties may seek for the same violation in federal administrative enforcement proceedings or judicial proceedings.

SSM SIP Call, 80 FR at 33866. The draft SIP revision does not appear to make clear that it does not apply to federal administrative enforcement proceedings. In addition, if the draft SIP revision were taken to apply to the EPA's administrative penalty actions, it is unclear how a federal court could review those actions in potential subsequent proceedings given that the federal court would supposedly not be bound by the SIP revision. See CAA sections 113(d)(4) and (d)(5).

The draft SIP revision may also interfere with section 304 of the Act. As stated by the D.C. Circuit Court of Appeals:

> Section 304(a) creates a private right of action, and as the Supreme Court has explained, "the Judiciary, not any executive agency, determines 'the scope' — including the available remedies — 'of judicial power vested by' statutes establishing private rights of action." Section 304(a) is in keeping with that principle. By its terms, Section 304(a) clearly vests authority over private suits in the courts, not EPA. As the language of the statute makes clear, the courts determine, on a case-by-case basis, whether civil penalties are "appropriate."

*NRDC*, 749 F.3d at 1063 (citations omitted). Thus, the EPA appears to lack authority not only to approve provisions that purport to tell a federal court what it must do, but also to approve provisions such as in the draft SIP revision that purport to tell a federal court what it may do. Instead, in deciding whether civil penalties may be appropriate, a federal court would (in our preliminary view) be bound by section 113(e) of the Act, as interpreted by the courts (not the EPA), and by the evidence before the court that has been admitted under the Federal Rules of Evidence as (among other things) relevant to the civil penalty issue. The D.C. Circuit Court of Appeals also stated:

---

[3] In our preliminary view, our concerns here are similar to those discussed in *US Magnesium, LLC v. U.S. EPA*, 690 F.3d 1157, 1170 (10th Cir. 2012) ("The EPA stated, … 'we think the reasonable course is to eliminate any uncertainty about reserved enforcement authority by requiring the State to revise or remove the unavoidable breakdown rule from the SIP.' In light of the potential conflicts between Utah's SIP and the EPA's reasonable interpretation of the CAA requirements, seeking revision of the SIP was prudent, not arbitrary or capricious.") (citations omitted).

> When a private suit is filed, the defendant can argue that penalties should not be assessed, based on the factors in Section 113(e)(1) such as the defendant's "full compliance history and good faith efforts to comply." EPA can support that argument as intervenor or amicus, to the extent such status is deemed appropriate by the relevant court. But under the statutory scheme, the decision whether to accept the defendant's argument is for the court in the first instance, not for EPA.

*Id.* (citations omitted). Similarly, the state of Colorado can support a defendant's argument that penalties should not be assessed by a court through intervention or an amicus brief. If a state feels a need to assert its own views in enforcement actions brought by the EPA or other parties, it has the ability to do so. In short, the *NRDC* decision appears to stand for the larger principle that the state of Colorado and the EPA have no authority to opine on (regardless of how it might be couched in terms of discretion) what a federal court may or may not do under section 113(e), except through standard judicial procedures (i.e., intervention or amicus brief).

Finally, under section 110(a)(1) of the Act, SIPs must "provide for implementation, maintenance, and enforcement of" primary and secondary NAAQS. As explained above, the draft SIP revision may interfere with enforceability of the SIP and therefore interfere with section 110(a)(1)'s requirements. In addition, section 110(a)(1) shows that the purpose of the SIP generally is to implement, maintain, and enforce the NAAQS, and, similarly under section 172(c)(1), to attain the NAAQS in nonattainment areas.[4] Even if the draft SIP revision is modified to avoid interfering with the EPA's administrative enforcement authority under section 113, there does not appear to be an appropriate and rational basis for submitting what may be considered by Colorado to be state-only provisions for adoption into the SIP, just as (for example) state-only odor regulations, which are unrelated to implementation, maintenance, and enforcement of the NAAQS, would typically not be appropriate for adoption into the SIP. It appears the only effect of including the provisions in the SIP would be to give the appearance that the state-only provisions have somehow been endorsed by the EPA through approval and therefore should be adopted by a federal court, which is not an appropriate basis for the EPA's approval. As previously explained, the EPA interprets the CAA to preclude affirmative defense provisions in SIPs and retention of a "state-only" affirmative defense in a SIP provision could easily lead to misunderstandings by regulated entities, regulators, the public, and the courts. This potential for SIP provisions to lead to confusion and to impede the legitimate exercise of the right to pursue enforcement of SIP requirements, including penalties for CAA violations, is an important reason why "state only" provisions should not be included in SIPs. With respect to industry and APCD rebuttal statements that adoption into the SIP would serve the purpose of clarifying Colorado state law for the public and for federal courts, we note two points. First, as mentioned above it appears that the clearest way to make the point about what is state-only versus federally-enforceable would be not to include state-only provisions in the SIP at all. Second, if additional clarity is desired, state-only provisions can be placed in a designated state-only section of a source's title V operating permit.[5]

---

[4] There are certain other programs specified in the CAA for inclusion in the SIP, such as protection of visibility in National Parks and certain Wilderness Areas, *see* CAA section 110(a)(2)(J), that do not specifically address attainment of the NAAQS, but the inclusion of such programs in the SIP should not change the general point made here.

[5] *See generally* "White Paper for Streamlined Development of Part 70 Permit Applications," U.S. EPA, Office of Air Quality Planning and Standards (July 10, 1995) (noting need for "careful segregation of terms implementing the Act from State-only requirements.").

In reviewing the documents provided by APCD, we note that Sierra Club submitted a prehearing statement that recommended specific changes to the rules. It is our preliminary view that these recommended changes would not fully address the EPA's concerns. First, it appears that the Sierra Club's changes only address federal court proceedings under sections 113 and 304; thus the changes do not appear to address the issue of the EPA's administrative proceedings under section 113. Second, the changes do not appear to address the issue of whether it is appropriate for a state-only provision such as this one to be approved into the SIP. Third, the changes do not appear to address the issue that an EPA approval of the SIP revision that does not remove the affirmative defense provisions from the SIP might be misunderstood to reflect the EPA's endorsement of Colorado's state-only provisions and therefore interfere with enforcement under sections 113 and 304. Fourth, the EPA believes that the Sierra Club's suggested revisions purport to tell a federal court what it cannot do (that is, it cannot adopt an affirmative defense), which, as the D.C. Circuit has stated, Congress has decided should exclusively be the province of the federal judiciary. Finally, the changes do not appear to address the issue of possible inconsistency with the EPA's intended interpretation of enforceability requirements under 110(a)(2)(A) as expressed in guidance. Likewise, our preliminary view of the changes proposed by APCD in their rebuttal statement is that they do not appear to address any of the issues identified above.

## 3. The Rulemaking Record Discusses Other Approaches That May Be Preferable.

As explained in the SSM SIP Call, the EPA interprets the CAA to provide states with broad discretion to determine how best to revise existing SIP deficiencies in response to that action, so long as those revisions comply with CAA requirements for SIP provisions. The EPA notes that in the rulemaking record for the draft SIP submission, the APCD presented alternative approaches for addressing the SSM SIP Call. We want to take this opportunity to provide input on those potential alternative approaches.

One alternative listed in the rulemaking record is elimination of the existing affirmative defense provisions, both from the existing SIP and from state law. This approach would be consistent with CAA requirements, and consistent with the EPA's guidance in the SSM Policy. By eliminating the deficient provisions from the SIP, such a SIP submission would not suffer from the concerns we express above and we anticipate it would be more easily approved, subject to completion of our own notice and comment rulemaking process. We do not anticipate that elimination of the affirmative defenses from state law, as well as from the SIP, would have any impact on the EPA's evaluation of the SIP revision.

Another alternative listed in the rulemaking record is elimination of the existing affirmative defense provisions from the existing SIP, but retention of those provisions in state law. Again, this approach would be consistent with CAA requirements, and consistent with the EPA's guidance in the SSM Policy. Indeed, the EPA specifically addressed this potential approach in the SSM SIP Call. See SSM SIP Call, 80 FR at 33855-56. This approach may also alleviate concerns expressed in the rulemaking record regarding certain Colorado statutory provisions relating to SSM. We note that the statutory provisions do not appear to require Colorado to submit any particular regulations for adoption into the SIP. A SIP revision following this approach would not raise the same concerns we express above and we anticipate that it would be more easily approved, subject to completion of our own notice and comment process. As noted in the SSM SIP Call, such state law provisions should not be worded in such a way as to preclude enforcement by the state for violations of CAA requirements, because this could be problematic for other reasons. Id. However, our preliminary assessment is that the existing affirmative defense provisions would not raise this concern.

A third potential alternative listed in the rulemaking record is elimination of the existing affirmative defense provisions and replacement of the provisions with an enforcement discretion provision. As the APCD noted, a properly drafted enforcement discretion provision could use criteria similar to those of the existing affirmative defense provisions, but provide them as criteria that state enforcement officials could use to guide the exercise of enforcement discretion. Presuming that such a provision clearly and unequivocally applies only to the state's exercise of enforcement discretion, this would be consistent with CAA requirements, and consistent with the EPA's guidance in the SSM Policy. SSM SIP Call, 80 FR at 33980-81.With respect to this alternative, removal of the affirmative defense provisions would meet the requirements of the SSM SIP Call. Creation of an enforcement discretion type provision is not required, but would be consistent with the CAA and consistent with the EPA's guidance in the SSM Policy. SIP revisions following this approach would not raise the same concerns we express above and we anticipate that they would be more easily approved, subject to completion of our own notice and comment process.

The fourth alternative listed in the rulemaking record is elimination of the existing affirmative defense provisions coupled with subsequent SIP revisions to create alternative emission limitations that apply during certain modes of source operation. This approach would meet the requirements of the SSM SIP Call by eliminating the affirmative defense provisions. Presuming that the alternative emission limits ultimately developed are consistent with CAA requirements, as explained in the EPA's guidance in the SSM Policy, the SIP revisions creating alternative emission limits would likewise be an appropriate approach. The EPA emphasizes that states are not required to create alternative emission limitations, but may elect to do so in appropriate circumstances. We have provided guidance concerning development of such alternative emission limitations. SSM SIP Call, 80 FR at 33980. SIP revisions following this approach would not raise the same concerns we express above and we anticipate that it would be more easily approved, subject to completion of our own notice and comment process.

We appreciate your request that we be involved in the development of the response to the SSM SIP Call and this opportunity to provide our preliminary views on the draft SIP revision.  We hope that this process will result in a SIP revision that will be consistent with the CAA and EPA guidance, so that the requirements of the SSM SIP call can be addressed promptly and efficiently for the benefit of all affected parties.  We believe that this process will lead to better protection of public health and the environment in Colorado.

We will provide any assistance needed by APCD to resolve the issues that we have identified and look forward to working with you and your staff. If you have any questions, please contact me at (303) 312-6416, or have your staff contact Adam Clark, lead staff for SSM-related issues, at (303) 312-7104.

Sincerely,

Carl Daly,
Director, Air Program



VIA ELECTRONIC MAIL

David Fees
Delaware Department of Natural Resources and Environmental Control
Division of Air Quality
100 West Water Street, Suite 6A
Dover, DE 19904

October 25, 2016

RE:     **Sierra Club Comments on Delaware Department of Natural Resources and
        Environmental Control Proposed State Implementation Plan ("SIP")
        Revision to Satisfy EPA's SIP Call Related to Air Emissions During
        Equipment Startup and Shutdown, 80 Fed. Reg. 33840--Proposed Revisions
        to 7 DE Admin Code 1104, 1105, 1124, 1142 [20 DE Reg. 250, 251, 256, 258,
        317 (Oct. 1, 2016)]**

Dear Mr. Fees,

On behalf of its thousands of members and supporters who live, work, and recreate in
Delaware and adjacent states affected by Delaware emissions, Sierra Club appreciates the
opportunity to provide these comments concerning Delaware's proposal to amend its Clean Air
Act state implementation plan ("SIP") and associated Administrative Code provisions in
response to EPA's recently finalized rulemaking relating to startup, shutdown, and malfunction
events.[1]  Sierra Club is the nation's oldest and largest grassroots environmental organization and
is dedicated to the protection of the natural environment and public health.  While we commend
Delaware for proposing to repeal some of the unlawful SSM exemptions that EPA identified in
its SSM SIP Call, Delaware's proposed revisions to particulate matter and opacity emission
limits are flawed several respects.  In particular, we have serious concerns about Delaware's
creation of new emission limits and averaging times that are significantly less stringent than
currently required.  These provisions essentially circumvent EPA's SSM SIP Call and effectively
sanction significantly *more* pollution from affected sources throughout the year.  Delaware also
provides insufficient technical support for its proposal to eliminate sulfur dioxide and nitrogen
oxide compliance obligations.  As a result, Delaware's proposed changes do not meet the
requirements of the Clean Air Act or EPA's final SSM policy, and are not approvable by EPA.

---

[1] *State Implementation Plans: Response to Petition for Rulemaking; Restatement and Update of
EPA's SSM Policy Applicable to SIPs; Findings of Substantial Inadequacy; and SIP Calls To
Amend Provisions Applying to Excess Emissions During Periods of Startup, Shutdown and
Malfunction*, 80 Fed. Reg. 33840 (June 12, 2015) [hereinafter, "SSM SIP Call"].

Although Delaware's proposed revisions to 7 DE Admin. Code 1104, 1105, 1124, and 1142 purport to satisfy EPA's SIP Call relating to startup and shutdown emissions, they are flawed in the following respects:

- Delaware fails to demonstrate, as required by EPA's SIP Call and the Clean Air Act itself, that the state's revised emission limits for particulate matter and opacity were properly developed with an appropriate technical basis;
- The state fails to demonstrate that its proposal to replace its particulate matter and opacity emission limits complies with the Clean Air Act's requirements, 42 U.S.C. § 7410(l), including the 24-hour National Ambient Air Quality Standard ("NAAQS") for particulate matter and the Clean Air Act's anti-backsliding policy;
- Delaware fails to demonstrate that its revised SIP emission limits for particulate matter are legally and practically enforceable;
- The state fails to properly justify the elimination of opacity emission limits from the SIP;
- The state fails to support its assertion that current federal requirements will assure compliance with the NAAQS for sulfur dioxide; and
- The SIP fails to establish that "best engineering judgment" for nitrogen oxide emissions can assure compliance with Clean Air Act requirements during startup and shutdown.

## I.   LEGAL AND FACTUAL BACKGROUND

*A.   Pollution Exceedances During Startup, Shutdown, and Malfunction Events Cause Significant and Adverse Impacts to Vulnerable Communities*

As EPA recognized in its SSM SIP Call, power plants and other industrial facilities can emit massive amounts of particulate matter and other pollutants during periods of startup, shutdown, or malfunction. Indeed, as part of its SSM SIP Call rulemaking, EPA recognized the practical consequences of SSM exemptions, noting "one malfunction that was estimated to emit 11,000 pounds of [sulfur dioxide] SO2 over a 9-hour period when the applicable limit was 3,200 pounds per day."[2] EPA found that the "average" electric generating unit ("EGU") had between 9 and 10 startup events per year between 2011 and 2012, and that many EGUs had "over 100 startup events in 2011 and over 80 in 2012." Assessment of startup period at coal-fired electric generating units – Revised," at p. 4 (Nov. 2014).[3] These large SSM pollution exceedances can occur many times each year, and often have disproportionate impacts to air quality in the neighborhoods and communities immediately surrounding these large industrial facilities. While these SSM events have the most significant impact on nearby communities, exceedances may adversely affect broad geographic areas, impairing the ability of states to ensure compliance with the NAAQS.

---

[2] Memorandum dated Feb. 4, 2013, to EPA Docket No. EPA-HQ-OAR-2012-0322 at 23, *available at* https://www3.epa.gov/airquality/urbanair/sipstatus/docs/ssm_memo_021213.pdf.
[3] *Available at* https://www3.epa.gov/airtoxics/utility/matsssfinalruletsd 110414.pdf.

Given the huge amounts of pollution emitted during startup and shutdown events, and given that more than nearly three quarters of a million Delaware residents live and work in counties where the air quality has already been designated as unsafe to breathe, reducing startup and shutdown emissions from fuel-burning sources, including power plants, should be a priority for Delaware's Division of Air Quality.[4]  Indeed, these SSM events can severely impact the quality of life around power plants and industrial facilities, and can cause or exacerbate respiratory illnesses, heart disease, renal failure, rashes, and nose and throat irritation, nausea, and even impairing smell and taste.

B.      EPA's SSM SIP Call

To address the massive amounts of pollution from power pants and industrial sources during SSM events, EPA's 2015 SSM SIP Call requires 36 states, including Delaware, to remove from their SIPs exemptions and affirmative defenses that allow industrial facilities to pollute the air without consequences when those facilities start up or shut down. 80 Fed. Reg. at 33960 (identifying provisions of Delaware's SIP that impermissibly allow the state to exempt violations of SIP emission limits during startup and shutdown events).  EPA specifically found that SIPs with provisions that exempt emissions during start-up and shutdown—like Delaware's current SIP—are substantially inadequate to meet Clean Air Act requirements. 80 Fed. Reg. at 33840.  In addition to requiring the 36 states whose SIPs contain these exemptions or affirmative defense provisions to remove these provisions from their SIPs, the SIP Call also revises EPA's policy for SIP provisions addressing excess emissions during SSM events. *Id*. The SIP Call allows states 18 months to submit revised SIPs to EPA, which is the maximum time allowable under the statute. *Id*. at 33,848; 42 U.S.C. § 7410(k)(5).

The SIP Call increases protections for communities against harmful air pollution from industrial facilities. EPA expects that "revision of the existing deficient SIP provisions has the potential to decrease emissions significantly in comparison to existing provisions,… encourage sources to reduce emissions during startup and shutdown and to take steps to avoid malfunctions, should provide increased incentive for sources to be properly designed, operated and maintained in order to reduce emissions at all times, … [and] has the potential to result in significant emission control and air quality improvements." *Id*. at 33955-56. Importantly, beyond the legal deficiencies in the provisions, "the results of automatic and discretionary exemptions in SIP provisions, and of other provisions that interfere with effective enforcement of SIPs, are real-world consequences that adversely affect public health. *Id.* at 33850.

Because facilities subject to the Clean Air Act can emit massive amounts of particulate matter, sulfur dioxide, nitrogen oxide, and other harmful air pollution during periods of start-up and shutdown, it is imperative that Delaware include strong SIP provisions governing emissions

---

[4] In May 2015, EPA designated New Castle and Sussex County, Delaware as being in "marginal" nonattainment for the 2008 ozone NAAQS.  *See* 77 Fed. Reg. 30088 (May 21, 2012). Because the State of Delaware is part of the Ozone Transport Region, however, the entire State of Delaware is required to meet the plan submission requirements for a moderate nonattainment area classification as specified in CAA sections 182(b) and 184(b), regardless of the attainment classification for areas in the State.  *See* 81 Fed. Reg. 72529, 725531.

3

Exhibit 2
022

during these periods to protect fence-line and other communities.  Indeed, EPA expects that "revision of the existing deficient SIP provisions [including Delaware's] has the potential to decrease emissions significantly in comparison to existing provisions" because these required revisions will "encourage sources to reduce emissions during startup and shutdown and to take steps to avoid malfunctions, . . . should provide increased incentive for sources to be properly designed, operated and maintained in order to reduce emissions at *all* times."  80 Fed. Reg. at 33955-56 (emphasis added).  Removing those exemptions "has the potential to result in significant emission control and air quality improvement."  *Id*. at 33850.

With respect to Delaware, EPA identified seven source-specific and pollutant-specific provisions that provide impermissible exemptions during periods of startup and shutdown: 7 DE Admin Code §§ 1104 (Particulate Emissions from Fuel Burning Equipment); 1105 (Particulate Emissions from Industrial Process Operations); 1108 (Sulfur Dioxide Emissions from Fuel Burning Equipment); 1109 (Emissions of Sulfur Compounds From Industrial Operations); 1114 (Visible Emissions);  1124 (Control of Volatile Organic Compound Emissions); and 1142 (Specific Emission Control Requirements).  80 Fed Reg. 33960.

C.    *National Ambient Air Quality Standards*

The Clean Air Act's central purpose is to protect public health and welfare.[5]  Severe air pollution events in the 1940s to 60s sickened thousands, and even killed people, raising public awareness of the health hazards of air pollution.[6]  Congress adopted the Clean Air Act Amendments of 1970 in response to growing public concern over those hazards.[7]

A key component for achieving the Act's public health goal is compliance with the National Ambient Air Quality Standards ("NAAQS").[8]  NAAQS are the maximum permissible levels of common pollutants in the ambient air.  NAAQS are set at levels to protect public health with an "adequate margin of safety."  EPA has set NAAQS for six common air pollutants known as "criteria pollutants": particulate matter, ground-level ozone, carbon monoxide, sulfur oxides, nitrogen oxides, and lead.

In 2013, EPA updated its NAAQS for particulate matter to provide requisite protection of public health and welfare.  In particular, EPA lowered the standard for fine particles (generally referring to particles less than or equal to 2.5 micrometers (mm) in diameter, "PM2.5"), so as to provide increased protection against health effects associated with long- and short-term exposures.[9]  EPA also retained the 24-hour PM2.5 standard, as well as the 24-hour standard for

---

[5] 42 U.S.C. § 7401(b)(1).

[6] *See* Arnold W. Reitze Jr., The Legislative History of U.S. Air Pollution Control, 36 Hous. L. Rev. 679, 696, 698 (1999).

[7] *Id*. at 700-704; *see also* Lloyd A. Fry Roofing Co. v. EPA, 415 F. Supp. 799, 805 (W.D. Mo. 1976) ("[T]he Clean Air Act was enacted and amended for the purpose of protecting public health.").

[8] 42 U.S.C. §§ 7401, 7409.

[9] National Ambient Air Quality Standards for Particulate Matter, 78 Fed. Reg. 3,086 (Jan. 15, 2013); National Ambient Air Quality Standards for Particulate Matter, 71 Fed. Reg. 2,620, 2,626-7 (proposed Jan. 17, 2006) (EPA unable to find evidence supporting the selection of a

Exhibit 2
023

particles generally less than or equal to 10 mm in diameter ("PM10") to continue to provide public hearth protection against effects associated with short-term exposure to particulate matter. As EPA recognized in the NAAQS revision, exposure to particulate matter leads to a variety of adverse health effects including premature death, heart attacks, strokes, birth defects, and asthma attacks.  Fine particles are especially dangerous; they evade the body's filtering mechanisms, lodge deep inside our lungs and are able to cross over into our bloodstream. Indeed, Assistant EPA Administrator McCarthy recently reiterated in a letter to Congress that there is no threshold below which fine particulate pollution in the ambient air is considered safe to individuals.[10]

Sulfur dioxide ("$SO_2$") pollution causes similar harmful human health and environmental effects.  Indeed, EPA has determined that exposure to $SO_2$ on time scales as short as five minutes can cause decrements in lung function, asthma attacks, and respiratory and cardiovascular morbidity.[11]  Children and adults with asthma are particularly at risk for adverse health effects from short-term $SO_2$ exposure.[12]  Exposure to $SO_2$ can also aggravate existing heart disease, leading to increased hospitalizations and premature death.[13]  Accordingly, in 2010, EPA revised the NAAQS for $SO_2$ to protect the public against adverse respiratory effects associated with short term (5 minutes to 24 hours) $SO_2$ exposure.[14]  According to EPA, fossil fuel combustion at electric utilities contributes the majority of anthropogenic $SO_2$ emissions.[15]  The new 1-hour $SO_2$ standard would, if properly implemented, prevent 2,300-5,900 premature deaths and 54,000 asthma attacks a year.[16]  Nitrogen oxides ("NOx"), in combination with other pollutants like volatile organic compounds ("VOCs") and sunlight, create ground-level ozone—better known as smog, which also contribute to asthma, bronchitis, and other respiratory and cardiovascular illnesses.

       *D.*     *Requirements for Clean Air Act SIP Revisions*

The Clean Air Act employs a cooperative federalism regulatory scheme that establishes nationwide air quality goals and EPA's oversight of individual state plans to meet those goals. Subject to EPA approval, states are primarily responsible for developing state implementation plans and adopting the enforceable source-specific emission limitations and other air quality rules necessary for compliance with the national ambient air quality standards (NAAQS). 42 U.S.C. § 7410(a), (k).  In particular, SIPs must include enforceable "emissions limitations," that must apply on a "continuous" basis, and that ensure attainment and maintenance of the NAAQS

---

threshold level of PM2.5 under which the death and disease associated with PM2.5 would not occur at the population level).

[10] Letter from Gina McCarthy, EPA, to Hon. Fred Upton, U.S. House of Representatives (Feb. 3, 2012).

[11] *See* Primary National Ambient Air Quality Standard for Sulfur Dioxide Final Rule, 75 Fed. Reg. 35,520, 35,525 (June 22, 2010) (hereinafter "Final Rule").

[12] *See id.* at 35,525-26.

[13] Sulfur Dioxide, Envtl. Prot. Agency,  http://www.epa.gov/oaqps001/sulfurdioxide/health.html.

[14] 40 C.F.R. § 50.17(a).

[15] Envtl. Prot. Agency, Our Nation's Air: Status and Trends Through 2008, 6, Fig. 2 (2010).

[16] Envtl. Prot. Agency, Final Regulatory Impact Analysis (RIA) for the SO2 National Ambient Air Quality Standards (NAAQS), 5-35, tbl. 5.14 (2010).

throughout the state. *See* 42 U.S.C. §§ 7410(a)(2)(A), (a)(2)(C), 7407(a), 7602(k). States must also ensure that emissions from the state do not contribute significantly to nonattainment or interfere with attainment in any downwind area. *Id*. § 7410(a)(2)(D)(i)(I); *Sierra Club v. EPA*, 314 F.3d 735, 737 (5th Cir. 2002).

Additionally, under § 110(l) of the Clean Air Act, EPA cannot approve a SIP revision if the plan "would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or any other applicable requirement of this chapter." 42 U.S.C. § 7410(l). To address this requirement, EPA stated in the SSM SIP Call that, in revising its SIP to eliminate any unlawful SSM provisions, the state "should assure that the replacement provision meets the applicable overarching CAA requirements that the provision is designed and intended to meet, is legally and practically enforceable and is not less stringent than the prior SIP provision." 80 Fed. Reg. at 33976/2. To the extent that there is any concern that the revised SIP provision is less stringent than the provision it replaces, then "there will need to be a careful evaluation as to whether the revised provision would interfere with any applicable requirement concerning attainment and reasonable further progress and with any other applicable requirement of the CAA." *Id*. To comply with section 110(l), the state must demonstrate that it has properly developed the revised emission limitation to assure that it meets the overarching CAA requirements and to assure that it will not result in a less stringent emission limitations. *Id*. 80 Fed. Reg. at 33980.

## III.   DELAWARE'S PROPOSED SIP REVISIONS

### A.   *Delaware Must Remove the SSM Exemptions from Its SIP*

As the Division of Air Quality correctly recognizes, EPA's SSM SIP Call requires Delaware to remove the start-up and shutdown exemptions currently found at 7 DE Admin. Code §§ 1104, 1105, 1124, and 1142. Contrary to Delaware's proposal, however, the best approach to the SSM SIP Call is for the Division of Air Quality to simply remove the illegal SSM exemptions from the Delaware SIP, rather than attempting to create unsupported and unenforceable new emission limits that circumvent EPA's SIP Call.

Removing these exemptions would mean that the normal SIP limits that are designed to protect air quality and comply with the Act's requirements would apply during all "startup and shutdown" operations. As EPA has recognized, it is technically feasible for most sources to "meet the same emission limitation" during *both* "steady-state" and startup/shutdown periods. 80 Fed. Reg. at 33979. Indeed, in the SSM SIP Call EPA expressed its preference for numeric limitations during SSM operations, and many of the states and territories not included in EPA's SIP Call have regulations that require just that—*i.e.*, that sources meet SIP emission limits at *all* times. Moreover, as EPA noted in the Final SIP Call, simply *removing* these exemptions in their entirety should not entail a complicated analysis to demonstrate compliance with other provisions of the Act. Indeed, removal of these impermissible exemptions "would in fact strengthen the SIP and would be consistent with the overarching requirement that the SIP revision be consistent with the requirements of the CAA." *Id*. at 33975.

Because Delaware's primary consideration should be protection of public health in strict compliance with the federal Clean Air Act, the agency should simply remove those exemptions without attempting to create a "work around" that weakens public health safeguards and cannot be reconciled with the Clean Air Act or EPA's SIP Call.

> B.   Delaware's Revised Emission Limits for Particulate Matter are Inconsistent with the Clean Air Act and the SSM SIP Call.

In response to EPA's SSM SIP Call, Delaware proposes to repeal its current two-hour numeric limit for particulate matter emissions from fuel-burning and industrial processes, and replace those emission limits with the same numeric limit, but based on a thirty-day rolling average. *See* 7 DE Admin. Code §§ 1104 and 1105.  Delaware has failed, however, to demonstrate that this relaxed, thirty-day averaging period for particulate emissions will ensure compliance with 24-hour NAAQS for PM.  Moreover, Delaware has not provided any technical demonstration to support the revised averaging time, or to demonstrate that it meets the overarching CAA requirements. *Id*. 80 Fed. Reg. at 33975-76.  Consequently, the agency's proposal cannot be approved as drafted.

As EPA made clear in the SSM SIP Call, the agency cannot approve a SIP revision if the plan "would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or *any other applicable requirement*" of the Clean Air Act.  See 80 Fed. Reg. at 33975 (citing 42 U.S.C. § 7410(l)).  Consistent with this requirement, EPA stated in the SSM SIP Call that, in revising its SIP to eliminate any unlawful SSM provisions, the state "should assure that the replacement provision meets the applicable overarching CAA requirements that the provision is designed and intended to meet, is legally and practically enforceable and is not less stringent than the prior SIP provision."  80 Fed. Reg. at 33976/2. To the extent that there is a concern that the revised SIP provision is less stringent than the provision it replaces, then "there will need to be a careful evaluation as to whether the revised provision would interfere with any applicable requirement concerning attainment and reasonable further progress and with any other applicable requirement of the CAA." *Id*.  In other words, where a state proposes to replace a continuously applicable, numeric emission limit with a less stringent limit, the state must demonstrate that (1) it has "properly developed" the revised emission limitation, (2) that the emission limit will meet all applicable requirements of the Act, including attainment and maintenance of the NAAQS, and (3) that the limit is both legally and practically enforceable. *Id*. 80 Fed. Reg. at 33975-76.  Here, Delaware's proposed revision to its particulate matter emission limit satisfies none of those requirements.

First, Delaware failed to provide any technical support demonstrating that its revised, and considerably less stringent particulate matter limit was "properly developed."  80 Fed. Reg. at 33975.  Indeed, replacing a 0.3 lb/MMBtu allowable level, *on a 2-hour average*, with the *same* numerical value of 0.3 lb/MMBtu with a much longer *30-day rolling average* drastically *reduces* the stringency of the standard.[17]  The proposal could, for example, allow short-term bursts of pollution during start-up or shutdown that cause exceedances of the 24-hour NAAQS, even

---

[17]  Delaware's proposal also fails to make clear whether "particulate matter" include only filterable or both filterable and condensable particulate matter.  It should include both.

though the source complies with the thirty-day limit in the SIP.  This is precisely the problem that EPA sought to address by eliminating unlawful SSM exemptions—namely, the state practice of allowing sources to emit massive amounts of pollution in short periods of time, even though a particular area may be in attainment with the NAAQS.  Delaware's proposal effectively circumvents EPA's SSM SIP Call, and essentially continues the state's practice of exempting particulate matter exceedances during periods of startup and shutdown.

Even if it were the case that for some periods of time, and for some equipment, higher SSM emissions are unavoidable, there is no justification for Delaware's "one-size-fits-all" thirty-day averaging period.  As EPA made clear in the SSM SIP Call, the proper averaging period should be a case-by-case determination based on specific facts for a given source or source category.  To ensure a similar stringency, a longer averaging period should be accompanied by a *smaller* numerical value for the allowable emissions.  By allowing a longer than two-hour average simply in order to absorb or smooth-out high SSM emissions, Delaware's proposal undermines the core purpose of EPA's SSM SIP Call—namely, to require the use of emissions controls to the maximum degree possible, best work practices, and cleaner fuels to minimize the high emissions during SSM time periods.  To comply with EPA's SIP Call and the Clean Air Act itself, Delaware cannot simply average away unlawful emissions.  Even if this were an acceptable approach to SSM emissions (which it is not), the state has wholly failed to provide any technical support for its new averaging period.

Second, and importantly, Delaware has failed to demonstrate that the revised particulate matter emission limit will meet *all* applicable requirements of the Act, including attainment and maintenance of the NAAQS.  Indeed, Delaware does not even attempt to demonstrate that a thirty-day rolling average is sufficient to ensure compliance with the 24-hour PM NAAQS.  Because Delaware has not, and cannot, demonstrate that its relaxed thirty-day rolling average emission limit will *not* "interfere with any applicable requirement" of the Act, it cannot be approved under 42 U.S.C. § 7410(l).  Delaware's relaxed particulate matter limit also violates the Clean Air Act's anti-backsliding prohibition.  Although that provision, by its terms, applies only when EPA "relaxes" a primary NAAQS," EPA has interpreted it to apply to circumstances like this SSM SIP revision.  Indeed, "the Act reflects Congress's intent that air quality should be improved until safe and never allowed to retreat thereafter."  *S. Coast Air Quality Mgmt. Dist. v. E.P.A.*, 472 F.3d 882, 900 (D.C. Cir. 2006), *decision clarified on denial of reh'g,* 489 F.3d 1245 (D.C. Cir. 2007) (applying the Clean Air Act's anti-backsliding prohibition to circumstances where EPA tightens air quality standards).  Even where EPA or the state sets requirements that ultimately prove too stringent and unnecessary to protect public health, EPA and the states are forbidden from relaxing those standards.  *See id.*; 42 U.S.C. § 7502(e).  Additionally, EPA made clear in the final SIP Call that states should comply with the Act's anti-backsliding prohibition.  80 Fed. Reg. at 33975-76.  And where, as here, a state proposes to weaken a particular emission limit, the state must provide a more detailed evaluation and demonstration that the SIP revision is consistent with the overarching requirements of the Act.

As EPA makes clear in its SIP Call, *any* emission limit or narrative standard that newly authorizes emissions must be demonstrated not to cause a violation of other substantive CAA requirements, including the NAAQS and the Clean Air Act's Prevention of Significant Deterioration ("PSD") increments. *See, e.g.*, *id.* at 33916 (alternative limits "must comply with sections 110(k)(3), 110(l), and 193 and any other applicable substantive requirements of the

CAA"). To determine whether the NAAQS or PSD increments are affected by startup or shutdown operations or by new, less stringent emission limitations, states may need to model those emissions. In a proposed rule on a SIP revision by Alabama, for example, EPA has taken the position that — at least when a state attempts to weaken a SIP limit — the state bears the burden of showing that this weakening will not affect the NAAQS. *See* 79 Fed. Reg. 8645, 8650 (Feb. 13, 2014) ("EPA now concludes that it should assume that a SIP revisions that relaxes an existing SIP requirement 'would interfere' with NAAQS attainment and maintenance in the absence of record evidenced demonstrating that it would not"). Unless Delaware evaluates the impact of higher SSM emissions on the NAAQS, PSD increments and other Clean Air Act requirements, the state's relaxed particulate matter standard cannot be approved. Importantly, Delaware must also consider the collective impact of higher emissions from all sources that are to receive alternative requirements for startup and shutdown — and not measure the impact of higher limits for individual sources in a vacuum.

Delaware suggests that the particulate matter revision will not change the annual emissions—*i.e.*, tons per year. As an initial matter, the state fails to provide any technical support for this statement, and it is unclear how the state translated the two-hour limit into a thirty day limit. This statement is likely to be untrue since the stringency of the standard is being considerably weakened. The state should provide a technical justification for the proposition that that annual emissions will not increase as a result of the proposed revision. However, even if it were the case that the annual emissions might not change, this is irrelevant since the PM10 and PM2.5 NAAQS (as well as NAAQS for pollutants such as NOx and SO2, for which PM compounds are precursors) have averaging times that are much shorter than annual emissions (or even 30-days). That Delaware's proposal may not increase annual emissions does not demonstrate compliance with EPA's 24-hour PM NAAQS.

Finally, even if Delaware had provided adequate support for its less stringent averaging period, and even if the agency could demonstrate that the new limit will meet the requirements of the Clean Air Act, the state has failed to demonstrate that the new limit is both legally and practically enforceable. 80 Fed. Reg. at 33975-76. Indeed, the revisions do not specify how compliance with the thirty-day limit (or any replacement averaging time period) will be demonstrated. While compliance with the existing 2-hour allowable limit might be demonstrated using stack tests, it is not practical to use stack tests for PM compounds for 30-days (or even 24-hours). If Delaware's intent is that PM continuous emissions monitoring systems ("CEMS") will be used as the method of compliance, the state must include that enforceable requirement in the SIP revision.[18]

    C.    *Delaware's Revised SIP Revisions Relating to Sulfur Dioxide and Opacity Emissions are Similarly Inconsistent with the Clean Air Act and the SSM SIP Call.*

---

[18] Moreover, since only filterable PM can be measured using CEMS, if condensable PM is also included, as it should, the method of compliance has to be PM CEMS plus stack-testing supplemented by some form of process/parametric monitoring.

Exhibit 2
028

In response to EPA's SSM SIP Call, Delaware also proposes to repeal their entirety the state's current opacity and sulfur dioxide emission limits. *See* 20 DE Reg. 317 at 2.3-2.5 (Oct. 1, 2016) (proposing to remove in their entirety 7 DE Admin. Code §§ 1108 (sulfur dioxide emissions from fuel burning equipment); 1109 (sulfur dioxide from industrial operations); and 1114 (visible emissions)). These proposed SIP revisions are unlawful for all of the same reasons that the state's proposal to relax its particulate matter emissions violates the Clean Air Act and the SSM SIP Call. In particular, Delaware has failed to demonstrate that its revised SIP contains enforceable emission limits that ensure compliance with all applicable requirements of the Act, including the SO2 NAAQS and the Clean Air Act's visibility protection requirements. 42 U.S.C. §§ 7410(a)(2)(A), 7410(a)(1); *Conn. Fund for Env't, Inc. v. EPA*, 696 F.2d 169, 172 (2d Cir. 1982) (CAA requires that SIPs contain "measures necessary to ensure the attainment and maintenance of NAAQS"); *Mont. Sulphur & Chem. Co. v. EPA*, 666 F.3d 1174, 1180 (9th Cir. 2012) ("The Clean Air Act directs states to develop implementation plans—SIPs—that 'assure' attainment and maintenance of national ambient air quality standards ("NAAQS") through enforceable emission limitations.") (citing 42 U.S.C. §§ 7407(a), 7410(a)(2)(A)); *Hall v. EPA*, 273 F.3d 1146, 1153 (9th Cir. 2001) ("Each State must submit a [SIP] that specif[ies] the manner in which [NAAQS] will be achieved and maintained within each air quality control region in the State") (internal citations omitted). EPA may approve an Infrastructure SIP only if it meets the requirements of section 110(a)(2) of the Act, and the state bears the burden of demonstrating that its SIP submission satisfies the standards of section 110(a)(2). *Mich. Dept. of Envtl. Quality v. Browner*, 230 F.3d 181, 183, 185 (6th Cir. 2000) (affirming EPA's rejection of a SIP proposal where the state "failed to offer evidence that [the] proposed rules will not interfere with the attainment and maintenance of the NAAQS."). "Each plan must demonstrate that the measures, rules, and regulations contained in it are adequate to provide for the timely attainment and maintenance of the national standard that it implements." 40 C.F.R. § 51.112(a). Here, Delaware's proposal to eliminate the SIP provisions governing sulfur dioxide and opacity emissions fails to meet these standards, and thus cannot be approved.

Delaware justifies its revision to the opacity regulations on the grounds that "there is no quantifiable relationship between visibility emissions and fine particulate matter emissions." 20 DE Reg. 317 at 2.5. This is technically incorrect. Reduced visibility (*i.e.*, opacity) often results from fine particulate matter emissions. While it is correct that there is no universal relationship between opacity and particulate matter (*i.e.*, applicable to all sources at all times), it is incorrect that there is "*no quantifiable relationship*." The state should strike this sentence.

Similarly, with respect to the sulfur dioxide regulations, Delaware states that it "believes existing federal requirements like, for example, New Source Performance Standards are adequate to ensure attainment and maintenance of sulfur related NAAQS in Delaware." It is not clear what this belief is based on. The state must provide appropriate analysis to justify this statement.

> D.    *Delaware's Proposed Revisions to 7 DE Admin. Code § 1142, Concerning "Best Engineering Judgment" for NOx Emissions, are Insufficient to Comply with the Clean Air Act.*

Finally, we agree with Delaware's proposal to repeal the exemption for startup and shutdown nitrogen oxide ("NOx") emissions. 7 DE Admin. Code § 2.3.1.6. We have serious

concerns, however, with the remaining regulatory language, which states that "best engineering judgment" may be used to determine compliance with NOx emission limits during SSM events. The key language in the regulations provides:

> NOx emissions from each NOx emission source at the facility shall be determined for all periods of startup, shutdown or malfunction. To the extent that such emissions are not measured by CEMS during such periods of startup, shutdown or malfunction, and to the further extent that performance testing for such source did not establish emission factors for such equipment reflective of operations during periods of startup, shutdown or malfunction, then the owner or operator shall estimate such emission rates from such source during any periods of startup, shutdown or malfunction in accordance with *best engineering judgment*.

7 DE Admin. Code § 1142-2.4.2.2 (emphasis added).  Although Delaware's "best engineering judgment" standard for demonstrating compliance with NOx emission limits is not a new proposal, the state's revision essentially establishes an alternative SSM compliance method for certain NOx sources, even though Delaware has not adequately demonstrated that such an approach is appropriate under these circumstances.  The term "best engineering judgment" is not only too vague and ambiguous to be practically or legally enforceable, but it does not reflect consideration of the seven specific criteria by which alternative emission limitations for startup and shutdown should be developed.  *See* 80 Fed. Reg. at 33913-14.  In particular, Delaware must demonstrate that the "best engineering judgment" standard (1) is narrowly tailored to defined source categories using specific control strategies; (2) that the use of a specific compliance method and control strategy for the source category is "technically infeasible" during startup or shutdown; (3) that "all possible steps are taken to minimize the impact of emissions during startup and shutdown on ambient air quality"; and (4) that the actions during startup and shutdown are properly documented or that the work practice standards are both practically and legally enforceable.  *Id*. at 33914.  Delaware's "best engineering judgment" satisfies none of those requirements, and is therefore not an approvable SIP revision.  Delaware must reevaluate and revise the "best engineering judgment" standard to comply with EPA's SIP Call guidance.

As an initial matter, we recommend that the agency should explicitly define what that term means, and that the state provide support for using "best engineering judgment" as an alternative compliance method, as well as examples of "best engineering judgment" in particular contexts.  In our experience, this term and similarly broad and undefined terms allowing the use of "best judgment" have often resulted in emissions estimates based on nonexistent engineering or even bad engineering "judgment."

Moreover, it does not appear that Delaware has considered the potential effect of this "best engineering judgment" standard on its ability to satisfy the required ozone attainment demonstrations and planning under the Act.  Under § 110(l) of the Clean Air Act, EPA cannot approve SIP revisions that would interfere with attainment of the NAAQS or PSD increments: "The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or any other applicable requirement of this chapter."  42 U.S.C. § 7410(l).  In keeping with this requirement, EPA stated in the SSM SIP call that, "[a]s part of its justification of the SIP revision, the state [should] analyze[] the potential worst-case emissions

11

that could occur during startup and shutdown based on the applicable alternative emission limitation" 80 Fed. Reg. at 33980.

Here, Delaware's narrative SIP revision fails to address or evaluate the impact of uncontrolled nitrogen oxide emissions during startup and shutdown on the state's nonattainment areas, or how the "best engineering judgment" standard addresses assures compliance with ozone NAAQS. This is especially troubling given that Delaware's "best engineering judgment" standard apparently applies to areas of the state that have the worst air quality in the state—New Castle and Sussex Counties. Given the huge quantities of nitrogen oxide emissions that are possible during startup and shutdown, and given that NOx is a precursor pollutant that causes ground-level ozone, Delaware must evaluate the potential worst-case emissions that could occur during startup/shutdown under the "best engineering judgment" standard. It appears that the state's proposal will do little (if anything) to reduce NOx emissions below the status quo, and could exacerbate New Castle and Sussex County's nonattainment status.

Finally, Delaware must require sources to report how they intend to comply with the "best engineering judgment" standard and the substantive requirements of the NOx regulations. As written, there is no way for Delaware, EPA, or citizens to know—without requesting documentation from sources—whether sources are complying with state's NOx limits during startup and shutdown, and what "best engineering judgment" means for any particular source. Thus, the standard is not practically enforceable by Delaware, EPA, or citizens in federal court. If Delaware insists on keeping this vague and ambiguous "best engineering judgment" standard—which we maintain is not consistent with the requirements of the Clean Air Act or the SIP Call rule, and therefore not approvable by EPA—the agency should require any "best engineering judgment" determinations to be incorporated into individual Title V permits. SSM emissions and compliance methods must then be reported by sources through, at the least, their quarterly Title V compliance reports.

## IV.    CONCLUSION

Thank you for the opportunity to submit these comments. We respectfully request that Delaware revise its proposed rule as outlined above. Please do not hesitate to contact us with any questions or to discuss the matters raised in these comments.

Sincerely,

Joshua Smith
Staff Attorney
2101 Webster St.
Oakland, CA 94612
joshua.smith@sierraclub.org

*Via Electronic Mail*

March 24, 2017

To:     Stephen Ours
        Department of Energy and Environment
        Air Quality Division
        1200 First Street, N.E., 5th Floor
        Washington, D.C. 20002
        airqualityregulations@dc.gov
        stephen.ours@dc.gov

From:  Sierra Club

Re:     Public Comments:
        (1) Notice of Proposed Rulemaking, Air Quality Fees and Synthetic Minor
        Permitting Program
        (2) Notice of Proposed Rulemaking, Chapters 1 and 2 of the Air Quality Regulations

## SIERRA CLUB'S COMMENTS

Sierra Club hereby respectfully submits comments on the above-referenced proposed rules published on February 3, 2017 by the Department of Energy and Environment ("DOEE" or "the Department"). Both proposals, which affect the Department's regulation of air pollution sources across the District, include changes that fail to comport with the federal Clean Air Act, and could compromise the health of the City's residents. While we appreciate the Department's desire for regulatory changes that allow for enhanced and efficient enforcement and understand the nature of many of the District's major air pollution sources, there are significant aspects of these proposals that are inadequate and require revision. Below, we identify several deficiencies for the Department to address before taking final action.

## I.     The Proposals Undermine Public Participation in the Department's Decisionmaking Process.

Sierra Club appreciates the extended opportunity to comment on these proposed rulemakings. At the same, however, we note that given the dearth of explanation provided in the rule proposals, it has been unduly difficult to understand, much less meaningfully comment on, these actions and their implications, particularly regarding the new synthetic minor permitting program. For example, in issuing the proposed program, DOEE failed to offer any explanation as to: why the proposed synthetic minor option is needed; the potential air quality impacts of allowing the District's sources to utilize the program, in general and specifically for hazardous air pollution; the process by which a permittee would obtain, and the Department would approve, a synthetic minor source permit; and the types of monitoring, reporting, and recordkeeping requirements that will be required to ensure compliance with any synthetic minor sources emissions limits. By failing to provide a detailed written explanation of its rationale for these regulatory changes, the Department's proposed rulemakings fall far short of what is needed to assure adequate and meaningful public participation. Simply put, the agency's failure to provide

1

more detail in the proposals on what it is doing and why, impedes the public's ability to participate in a useful, informed manner, undermining the very purpose of public participation.

The Department's failure to explain and justify its actions also undermines judicial review. As the D.C. Court of Appeals has recognized, for an administrative action like the Department's "to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive." *D.C. Appleseed Center for Law and Justice, Inc. v. D.C. Dept. of Insurance, Securities and Banking*, 54 A.3d 1188, 1216 (D.C. 2012) (*quoting SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947)); *Id.* at 1216-17 ("By requiring the [agency] to explain its decisions fully and rationally, we can 'be confident that missing facts, gross flaws in agency reasoning, and statutorily irrelevant or prohibited policy judgments will come to a reviewing court's attention.") (*quoting Great Lakes Gas Transmission Ltd. P'ship v. F.E.R.C.*, 984 F.2d 426, 432 (D.C. Cir.1993).

At the very least, the Department's proposals should be accompanied by full explanations of its legal authority and reasoning, including discussions of why it is proposing the particular action, and a discussion of what effects these actions might have on air quality and health in the District. We also urge the Department to adopt the specific notice and comment requirement revisions suggested below to further enhance the ability of the public to engage in the Department's decisionmaking processes.

## II.     The Proposal Regarding Air Quality Fees and Synthetic Minor Permitting Program

### A.     The Proposed Synthetic Minor Program is Incomplete and Arbitrary.

In the proposed rule concerning "Air Quality Fees and Synthetic Minor Permitting Program," the Department formally establishes a new and significant permitting scheme that will excuse many, if not most, of the District's major air pollution sources from the otherwise applicable, more comprehensive permit requirements mandated by the federal Clean Air Act.

As presented, the "synthetic minor" program allows exemption of air pollution sources from the Department's Chapter 300 permitting requirements that apply to (a) any major source; (b) any source, including an area source, subject to a standard, limitation, or other requirement under § 111 of the Clean Air Act; (c) any source, including an area source, subject to a standard or other requirement under § 112 of the Clean Air Act; (d) any affected source; and (e) any source in a source category designated by the Administrator pursuant to 40 C.F.R. § 70.3. *See* Proposed Rule 1 at § 300.1. It also allows exemption of air pollution sources from other applicable District or federal air quality regulations. Specifically, the "synthetic minor" provisions state as follows:

> 200.6   The Department may establish a condition in a permit issued pursuant to this chapter that limits emissions from a source so as to avoid applicability of the permitting requirements of § 300.1.

Exhibit 2
033

200.7   The Department may establish a condition in a permit issued pursuant to this chapter that limits emissions from a source so as to avoid applicability of a District or federal air quality regulation, other than the requirements of § 300.1, except when prohibited by another District or federal regulation.

\*      \*      \*

300.3(c) All sources that obtain a permit with a condition pursuant to § 200.6 that allows the source to avoid the applicability of § 300.1, and pay the associated fees pursuant to § 305.5, commonly referred to as a "synthetic minor" permit, are exempted from the requirements to obtain a Part 70 permit…

In effect, this proposed program will allow major sources of air pollution—including any sources that are major for their hazardous air pollution emissions—to circumvent the legal requirements for major sources, including stricter pollution limits and requirements for inspections and recordkeeping.

First, as a general matter, EPA has, for its part, excused some major sources from compliance with otherwise applicable emission standards and permitting requirements based on synthetic minor source permits intended to limit the source's "potential" to emit. There is nothing in the Department's proposed regulations, however, that provides any reason to believe that permits granted under its synthetic minor program would actually limit a source's "potential" to emit. Likewise, there is nothing ensuring that any synthetic minor emissions limits issued under this program would be federally enforceable, as EPA requires. To be federally enforceable, limits must be practically enforceable.[1]

The Department's proposed regulations are instead impermissibly vague and incomplete. The proposal lacks regulatory provisions that clearly set forth monitoring, reporting, recordkeeping, and other requirements necessary to ensure that synthetic minor source emissions limits are never exceeded by the permitted source. In fact, as drafted, it is unclear whether synthetic minor sources would be subject to *any* such requirements if they are exempt from the Chapter 3 (Operating Permits and Acid Rain Programs) requirements.[2] For example, Chapter 3

---

[1] *See, e.g.*, *In re Shell Offshore, Inc., Kulluck Drilling Unit and Frontier Discoverer Drilling Unit*, 13 E.A.D. 357, 394 n.54 (EAB 2007) (explaining that in "addition to requiring conditions and limitations directly enforceable by regulators at both the federal and state level (see 40 C.F.R. 5§ 2.21(b)(17)), the term 'federal enforceability' has been interpreted as requiring practical enforceability as well. That is, the permit must include conditions allowing the applicable enforcement authority to show continual compliance (or non-compliance) such as adequate testing, monitoring, and record keeping requirements.").

[2] Chapter 5 provides the Mayor with authority to require monitoring and testing, but neither Chapter 5 nor these proposed rules require the Mayor to exercise that authority for synthetic minors. In fact, several of the Chapter 5 requirements apply only to sources that emit twenty-five tons or more per year of air pollution, thereby excluding those with synthetic minor limits. *See, e.g.*, D.C. Mun. Regs. tit. 20 §§ 500.2, .9. To the extent the Department intends for synthetic

Exhibit 2
034

requires permittees to identify and describe "air pollution control equipment and compliance monitoring devices or activities," describe or reference "any applicable test method for determining compliance with each applicable requirement," and set forth "methods used for determining compliance including a description of monitoring, recordkeeping, and reporting requirements and test methods." D.C. Mun. Regs. tit. 20 § 301.3(c)-(d), .5. The Department's proposed program does not even mention monitoring, recordkeeping, or reporting.

Similarly, the Department's proposed program does not set forth any specific requirements for the actual content of a synthetic minor permit. This is in stark contrast to the specific permit content requirements applicable to Chapter 3 sources. *See* D.C. Mun. Regs. tit. 20 § 302. The proposed notice requirement at section 210.5(d), requiring the Department to include a "description of the proposed limitation and the resulting potential to emit of the" synthetic minor source is not at all sufficient to correct these discrepancies. The permit, not just the Department's notice, must include the emissions limit, along with the other requirements to ensure that the limit is federally enforceable.

The Department's proposal does not even describe the particular process by which a source would apply for and obtain coverage under a synthetic minor program. It is not acceptable for the Department to fill these key program gaps later via policy statements, case-by-case determinations, or in a different rulemaking; it must do so now, before allowing the District's sources to circumvent the Clean Air Act's requirements.

## B. The Proposed Synthetic Minor Program Threatens the Health of District Residents With Unregulated Hazardous Air Pollutants.

It is important to understand that the Department's proposed synthetic minor program could present serious toxic risks to those who live, work, and recreate in the District. This is because it could excuse major sources of hazardous air pollutants from compliance with the strict national emissions standards for dangerous toxics, including mercury and lead, which can be very dangerous at very low levels.

Before finalizing this program, the Department should determine whether and which sources in the District could claim the synthetic minor exemption for their hazardous air pollution emissions. We understand that, comparatively speaking, there are not many large polluting sources in this City. However, it is unclear whether any of those sources, including the Capitol Power Plant, the U.S. Government Printing Office, the U.S. Treasury Bureau of Engraving & Printing, Blue Plains Wastewater Treatment Plant, and the District's operating asphalt plants, would be able to claim the synthetic minor source limits for their hazardous air pollutants. Indeed, although there was no synthetic minor program at the time, the Department previously applied synthetic minor limits on the Capitol Power Plant's hazardous air pollution.[3]

---

minor sources to be subject to particular requirements set forth in Chapter 5, it must say so clearly in the proposal.

[3] *See* DOEE, Permits to Construct Two Combustion Turbines and Associated Two Heat Recovery Steam Generating Units with Duct Burners at II.e-f  (June 5, 2013), https://doee.dc.gov/sites/default/files/dc/sites/ddoe/page_content/attachments/Capitol%20Power%20CTs%20Permits%206663-C%20and%206664-C%20Final.pdf.

Under a synthetic minor program, when such major hazardous air pollution sources are regulated instead as synthetic minors, they may only be required to limit emissions of any single hazardous air pollutant to less than 10 tons per year ("TPY") and emissions of all hazardous air pollutant emissions to less than 25 TPY. In practice, sources may be able to meet those thresholds by limiting only their hydrogen chloride (HCl) emissions, leaving them free to emit dangerous levels of other hazardous air pollutants, including lead and mercury—levels that would have been significantly reduced had the source been required to install the controls required for major sources of hazardous air pollutants.[4] Even if HCl limits could cause some emissions of other hazardous pollutants to proportionally decrease below 10TPY, releases of highly toxic chemicals in those amounts would still pose serious health threats. To guard against this, the Department should revise its proposed program to explicitly prohibit sources from becoming synthetic minors for their hazardous air pollutant emissions.

## C.  The Proposed Notice-and-Comment Opportunity Requirements for Draft Permits Are Inadequate.

As noted above, it is crucial for the Department to ensure meaningful opportunities for public participation in the agency's decisionmaking process. To that end, the Department must revise section 210.4, which sets forth the notice and comment procedures for draft permits.

As proposed, § 210.4 states as follows:

> The Department shall use <u>at least one</u> (1) of the following procedures to ensure appropriate means of notification:
>
> (a)    Mail or e-mail a copy of the notice to persons on a mailing list that the Department develops consisting of those persons who have requested to be placed on such a mailing list;
>
> (b)    Post the notice on the Department's website;
>
> (c)    Publish the notice in a newspaper of general circulation in the area affected by the source;
>
> (d)    Provide copies of the notice for posting at one (1) or more locations in the area affected by the source, such as post offices, libraries, community centers, or other gathering places in the community; <u>or</u>
>
> (e)    Employ other means of notification as appropriate.

Proposed Rule 1 at § 210.4 (emphases added). This provision arbitrarily assumes that providing notice by *just one* of these means will "ensure appropriate means of notification"; the Department has made no showing, however, nor can it, that simply "provid[ing] copies of the

---

[4] For example, a source that qualifies as a synthetic minor because it emits 24.999 tons of hazardous air pollutants per year could avoid installing controls for mercury and thereby emit far greater mercury levels than a major source that would be subject to controls.

notice for posting" at a post office, library, community center, or "other gathering place[] in the community" that is "affected by the source" is on its own actually an effective or appropriate way to notify the public of permitting decisions.[5]

At a minimum, the Department needs to establish interested-party lists comprised of persons who wish to receive notice of permitting actions, as well as community groups, news media, and ANC commissioners, and should *always* mail or e-mail notices to those interested parties and also post the notices on the Department's website for the duration of the comment period. This would require minimal, if any, agency resources, but would make it substantially easier for the public to learn about and participate in permitting decisions. Based on this suggestion, the revised language of 210.4 would state as follows (additions in **bold**):

> The Department shall use *at least one* (1) of the following procedures to ensure appropriate means of notification:
>
> (a)    Mail or e-mail a copy of the notice to persons on a mailing list that the Department develops consisting of those persons who have requested to be placed on such a mailing list, **community groups, news media, and Advisory Neighborhood Commissioners**; **and**
>
> (b)    Post the notice on the Department's website;.
>
> **In addition to (a) and (b), the Department shall use at least one (1) of the following procedures:**
>
> (c)    Publish the notice in a newspaper of general circulation in the area affected by the source;
>
> (d)    Provide copies of the notice for posting, **and ensure the notice is posted,** at one (1) **three (3)** or more locations the area affected by **reasonably calculated to provide actual notice to persons potentially affected by** the source, such as post offices, libraries, community centers, or other gathering places in the community; or
>
> (e)    Employ other means of notification as appropriate **reasonably calculated to give actual notice of the action in question to the persons potentially affected by it, including press releases or any other forum or medium to elicit public participation**.

These suggested changes are consistent with EPA's operating permit regulations, which require permitting agencies to use multiple methods for providing public notice. *See* 40 C.F.R. §

---

[5] It is unstated and unclear how the Department would define the area "affected by the source" for air pollution permitting purposes, but that area would surely include multiple post offices, libraries, and community centers/ gathering places, so providing the notice to just one location would be plainly inadequate.

71.11(3) (requiring notice to be mailed to specific persons, including those on an interested party list; posted on a public website; and other methods "reasonably calculated to give actual notice of the action in question to the persons potentially affected by it, including press releases or any other forum or medium to elicit public participation."); *id.* § 70.7(h)(1) (requiring "notice to persons on a mailing list developed by the permitting authority using generally accepted methods (*e.g.*, hyperlink sign-up function or radio button on an agency Web site, sign-up sheet at a public hearing, etc.) that enable interested parties to subscribe to the mailing list.").

### D.   The Source-Category Permit Provisions Improperly Exclude Public Participation.

Section 200.8 authorizes the Department to "establish a source category permit covering a group of similar sources or emission units in accordance with certain requirements listed in §§ 200.8(a)-(i). Subpart (e) states that the Department need not respond to each source category permit application; "rather the source category permit may specify a reasonable period of time after which an application is deemed approved and the applicant may construct and operate under the source category permit." Subpart (f) then notes that "[t]he applicant for a source category permit may be issued an individual permit, letter, or other document indicating that the application has been approved or denied." Finally, section 200.8(i) now provides that the "draft source category permit shall be subject to the public notice and comment requirements of § 210, however, individual applications for the permit are not subject to public notice and comment." These provisions improperly and unfairly deprive District residents of important information concerning the regulation of air pollution sources in their communities.

District residents have a right to know about air pollution from facilities, small or large, near their homes, schools, places of work and play, and how that pollution is controlled. Yet under this section of the Department's regulations, the public will not even be notified when a facility in their community has applied for or received a source-category permit, much less have a chance to provide input on or contest a facility's use of a source-category permit. The Department has not provided any explanation for its basis from excusing its process for issuing individual source-category permit process from the notice and comment procedures set forth in Chapter 2, *see* D.C. Mun. Regs. tit. § 210.1 ("Before issuing a permit under this chapter…"). At the very least, the Department should provide notice of individual applications to the public via interested party lists and the Department's website, as proposed above. Further, the Department cannot lawfully allow decisions concerning individual permits to skirt judicial review to the extent that participation in the public comment process is required for such review.

Before finalizing this proposal, we ask the Department to explain the following: (1) why the Department is not requiring any kind of public notice and comment on individual source-category permit applications; and (2) how, under § 200.8, the Department ensures that each individual permittee meets the requirements of the source-category permits and is properly claiming coverage under the source-category permit. We ask the Department to address the second question in light of the language in § 200.8(e), quoted above, which states that the Department need not even respond to a permit application and allows permits to be approved automatically if the Department does not act within a specified timeframe.

E.     **The Proposed Changes to Section 303's Judicial Review Provisions are Unclear.**

The Department proposes to change section 303.11 to state that "[a]ny final action granting or denying an application for a permit, permit amendment or modification, or permit renewal shall be subject to judicial review in the <u>Office of Administrative Hearings</u>" (emphasis added), instead of the Superior Court of the District of Columbia. But the provision and the ones surrounding it continue to refer to "judicial review," not *administrative* review. The Department has failed to explain how it has legal authority to make this change, and again, has failed to explain why it is doing so. DOEE must revise the rules to clarify how and where the public obtains review of, and appeals, the Department's permitting actions. We also ask the Department to clarify the judicial review process for synthetic minor permits issued pursuant to §§ 200.6 and 200.7, and individual source-category permits issued pursuant to § 200.8.

III.    <u>**The Proposal Regarding Chapters 1 and 2 of the Air Quality Regulations.**</u>

In the Department's second proposed rulemaking concerning "Chapters 1 and 2 of the Air Quality Regulations" DOEE seeks to "clarify its general authorities to protect air quality in the District." Among other things, the Department proposes amendments to Section 102 that purport to comply with EPA's recently finalized rulemaking, *State Implementation Plans: Response to Petition for Rulemaking; Restatement and Update of EPA's SSM Policy Applicable to SIPs; Findings of Substantial Inadequacy; and SIP Calls To Amend Provisions Applying to Excess Emissions During Periods of Startup, Shutdown and Malfunction*, 80 Fed. Reg. 33840 (June 12, 2015) (SSM SIP Call). The SSM SIP Call requires DOEE to repeal the portions of its SIP that provide exemptions and affirmative defenses to industrial polluters for excess emissions during periods of startup, shutdown and upsets. DOEE's proposal fails to comply with the rule and the Clean Air Act. The DOEE's proposed Subsection 102 contains unlawful exemptions and director discretion provisions that allows DOEE to permit excess emissions during planned shutdowns and allows DOEE to permit removal of control equipment mandated by federally enforceable permits. Additionally, DOEE's proposal is incomplete because it does address the unlawful affirmative defense provisions in Sections 606.1, 606.2, and 606.4 that EPA called in the SSM SIP Call Rule. 80 Fed. Reg. at 33,960/3-61/1.

EPA's SSM SIP Call requires 36 states and air districts, including DOEE, to remove from their SIPs exemptions and affirmative defenses that allow industrial facilities to pollute the air without consequences when those facilities start up, shut down, or experience malfunctions. Id. at 33,957-76.  EPA found that SIPs with provisions that exempt emissions during such events— like DOEE's current SIP— are substantially inadequate to meet Clean Air Act requirements. *Id*. In addition to requiring the 36 states whose SIPs contain these exemptions or affirmative defense provisions to remove these provisions from their SIPs, the SIP Call also revises EPA's policy for SIP provisions addressing excess emissions during SSM events. *Id*. The SIP Call allows states 18 months to submit revised SIPs to EPA, which is the maximum time allowable under the statute. *Id*. at 33,848; 42 U.S.C. § 7410(k)(5).

The SIP Call increases protections for communities against harmful air pollution from industrial facilities. EPA expects that "revision of the existing deficient SIP provisions has the potential to decrease emissions significantly in comparison to existing provisions,… encourage sources to reduce emissions during startup and shutdown and to take steps to avoid malfunctions,

8

should provide increased incentive for sources to be properly designed, operated and maintained in order to reduce emissions at all times, … [and] has the potential to result in significant emission control and air quality improvements." 80 Fed. Reg. at 33,955-56.  Importantly, beyond the legal deficiencies in the provisions, "the results of automatic and discretionary exemptions in SIP provisions, and of other provisions that interfere with effective enforcement of SIPs, are real-world consequences that adversely affect public health. *Id*. at 33,850.

Because, as EPA has recognized, facilities subject to the Clean Air Act can emit significant amounts of particulate matter, sulfur dioxide, nitrogen oxide, and other harmful air pollution during periods of start-up, shutdown, and maintenance, it is imperative that DOEE include strong SIP provisions governing emissions during these periods to protect communities across the District. Indeed, EPA expects that "revision of the existing deficient SIP provisions has the potential to decrease emissions significantly in comparison to existing provisions" because these required revisions will "encourage sources to reduce emissions during startup and shutdown and to take steps to avoid malfunctions, . . . [and] should provide increased incentive for sources to be properly designed, operated and maintained in order to reduce emissions at all times." *Id*. at 33,955-56 (emphasis added). SSM exemptions, like those in the current and proposed DOEE SIP, have "real-world consequences that adversely affect public health," and removing those exemptions "has the potential to result in significant emission control and air quality improvement." *Id*. at 33,850, 33,956.

The best approach to the SSM SIP Call is for affected states, such as DOEE, to remove the illegal exemptions from their respective SIPs. Removing the exemptions would restore the effectiveness of emission limits that are designed to protect air quality and satisfy the Clean Air Act's requirements would apply at all times. Removing the exemption would make the regulations of affected states comparable to regulations in those states that were not subject to the SSM SIP Call.

Alternatively, for those source categories that truly cannot meet SIP emission limits during startup and shutdown, states can establish alternative numerical limits that satisfy the other requirements of the Clean Air Act. In these instances, states must establish clear, narrow definitions of "startup" and "shutdown" to ensure these periods are as short as possible. Any alternative limits must be adopted through the SIP revision process, with the accompanying requirements for public notice and comment. Such limits must not interfere with maintenance of any National Ambient Air Quality Standards ("NAAQS") or Prevention of Significant Deterioration ("PSD") increments.

**A. The Department's Proposal Violates the Clean Air Act and EPA's SIP Call and Policy.**

**1.    DOEE's Called SIP Provisions.**

In the SSM SIP Call Rule, EPA found that "the provisions in D.C. Mun. Regs. tit. 20 § 107.3, D.C. Mun. Regs. tit. 20 §§ 606.1 and 606.2 and D.C. Mun. Regs. tit. 20 § 606.4 are substantially inadequate to meet CAA requirements and the EPA is thus issuing a SIP call to the District of Columbia to correct its SIP with respect to these provisions." 80 Fed. Reg. at 33961. EPA found that Section 107.3 is substantially inadequate because it contains an unlawful exemption.  The current SIP-approved section 107.3 provides:

Exhibit 2
040

> The Mayor shall by notice to the owner or operator permit the continued operation of the
> stationary source for the time period proposed, or for the lesser time as the Mayor finds
> reasonable, or the Mayor may order the owner or operator to discontinue operation of the
> stationary source until the maintenance is completed, or the malfunctioning equipment is
> repaired.

(emphasis added). In the SSM SIP Call Rule, EPA explained why such exemptions are unlawful
under the Clean Air Act:

> In accordance with the requirements of CAA section 110(a)(2)(A), SIPs must contain
> emission limitations and, in accordance with the definition of ''emission limitations'' in
> CAA section 302(k), such emission limitations must be continuous. Thus, any excess
> emissions above the level of the applicable emission limitation must be considered
> violations, whether or not the state elects to exercise its enforcement discretion. SIP
> provisions that create exemptions such that the excess emissions during startup,
> shutdown, load change, or emergencies are not violations of the applicable emission
> limitations are inconsistent with the fundamental requirements of the CAA with respect
> to emission limitations in SIPs.

78 Fed. Reg. 12460, 12496 (Feb 22, 2013) ("Proposed SSM Rule") (emphasis added). EPA also
found that the existing Section 107.3 is unlawful because it is an unbounded director's discretion
provision that allows the Mayor to excuse violations.

> In the case of D.C. Mun. Regs. tit. 20 § 107.3, the provision authorizes the Mayor to
> permit continued operation at stationary sources without functioning air pollution control
> equipment. The Mayor's grant of permission to continue to operate during the period of
> malfunction or maintenance could be interpreted to excuse excess emissions from that
> time period, and it could thus be read to preclude enforcement by the EPA or through a
> citizen suit in the event that the Mayor elects not to treat the event as a violation. In
> addition, the provision vests the Mayor with the unilateral power to grant an exemption
> from the otherwise applicable SIP emission limitation, without any additional public
> process at the D.C. or federal level, and without any bounds or parameters to the exercise
> of this discretion. Most importantly, however, the provision purports to authorize the
> Mayor to create an exemption from the emission limitation, and such an exemption is
> impermissible in the first instance. Such a director's discretion provision undermines the
> emission limitations and the emissions reductions they are intended to achieve and
> renders them less enforceable by the EPA or through a citizen suit. The EPA believes that
> the inclusion of an unbounded director's discretion provision in D.C. Mun. Regs. tit. 20 §
> 107.3 is thus a substantial inadequacy and renders this specific SIP provision
> impermissible for this reason, in addition to the creation of an impermissible exemption.

*Id*. at 12,496-7.

2.      **DOEE's Proposed Section 102 Contains Unlawful Exemptions and Unbounded Director Discretion Provisions.**

DOEE's proposed Section 102 provides an exemption and director discretion provisions substantially similar to the 107.3 provision that EPA has found to be unlawful in the SSM SIP Call. The problematic provisions are listed below, with emphasis on the unlawful language. The proposed Section 102.1 states:

> The devices or practices provided for the control of air pollutants discharged from stationary sources, or for otherwise complying with the air quality laws and regulations, shall remain operative or effective whenever the stationary source being controlled is operative or capable of producing emissions, <u>except as otherwise provided in this section, and shall not be removed prior to the owner or operator requesting, and receiving, either written approval from the Department</u> or an amendment to the source's operating permit issued pursuant to Chapter 2 of this title, as provided in §§ 102.4 and 102.6 of this title.

(emphasis added).  DOEE's proposed Section 102.4 provides:

> <u>The Department may</u>, by written notice to the owner or operator, <u>permit the continued operation of the source</u> for the time period proposed, or for the lesser time as the Department finds reasonable, provided that:
>
> (a)      The owner or operator of the equipment provides the notice required in §§ 102.2 and 102.3 of this title;
>
> (b)      The Department determines that measures have been taken to minimize the length of the shutdown period;
>
> (c)      The Department determines that it would be impossible or impractical to shut down the source operation during the maintenance or repair period; and
>
> (d)      The Department determines that operation of the source will not result in the violation of any federally enforceable emissions limitation or requirement.

(emphasis added). The Proposed Subsection 102.6 provides:

> <u>The Department may</u>, by written notice to the owner or operator, <u>allow the removal of a control device or practice</u> pursuant to § 102.1 provided that:
>
> (a)      The owner or operator submits a written request for removal of the control device or practice at least ninety (90) days prior to the proposed date of removal;
>
> (b)      The Department determines that it would be impossible or highly impractical to maintain the control device or practice;
>
> (c)      The Department determines that operation of the stationary source without the control device or practice will not result in the violation of any federally enforceable emissions limitation or regulatory requirement; and

(d)    <u>If the control device or practice is required by a permit issued pursuant to Chapters 2 or 3 of the air quality regulations, the owner or operator shall submit an application for an amendment to the permit at the same time or prior to the written request specified under paragraph (a)</u>.

(emphasis added).

The Department's proposal disregards the rule it purports to respond to, and is unlawful for the numerous reasons EPA explained in the SSM SIP Call Rule. First, as EPA has already made clear, DOEE cannot provide an exemption (like the one it has proposed) from otherwise applicable SIP emission limitations by permitting continued operation when air controls are shut down or removed. 78 Fed. Reg. at 12,496-7; 80 Fed. Reg. at 33,961. Exemptions are inconsistent with the Clean Air Act because SIPs must include enforceable "emission limitations," 42 U.S.C. §§ 7410(a)(2)(A), (a)(2)(C), 7602(k), which must apply on a "continuous basis." *Id*. § 7602(k). *Sierra Club v. EPA*, 551 F.3d 1019, 1027-28 (D.C. Cir. 2008). The requirement for "continuous" emission limitations means that "temporary, periodic, or limited systems of control" do not comply with the Act. *Id.* at 1027 (quoting H.R. Rep. No. 95-294, at 92 (1977), *as reprinted in* 1977 U.S.C.C.A.N. 1077, 1170). Yet that is precisely what an exemption from emission limitations allows—temporary, periodic, or limited controls on emissions of air pollution. This core requirement helps to ensure that the ambient air quality standards are achieved, and communities are protected from the harmful impacts of pollution. DOEE's proposal to allow exemptions from operating control equipment in 102.1, to permit operation during shutdown in 102.4, and to allow removal of control equipment under 102.6 would operate as unlawful exemptions from SIP emissions limitations in violation of the Act and the SSM SIP Call Rule.

Second, also explicitly made clear in the SSM SIP Call, DOEE cannot maintain unbounded director's discretion provisions like the proposed sections quoted above. The DOEE cannot be "the unilateral arbiter of whether the excess emissions in a given event constitute a violation…." 78 Fed. Reg. at 12,496. The proposed Section 102.4 would allow the Department to unilaterally decide to "permit the continued operation of the source" for some predetermined period during shut downs, and 102.6 would allow the Department to unilaterally allow "the removal of a control device or practice," before the owner/operator undergoes the mandatory permitting procedures with notice and opportunity for public comment. In fact the provision expressly allows the removal of equipment with submission of an application for a permit change. *See* Proposed Rule 2, Section 102.6(d). Section 102.1 is the catchall that would allow non-operation of control equipment as permitted by 102.4 or 102.6. All of these provisions give the director unbounded discretion to allow sources to violate their permits, and could be read to preclude enforcement by EPA or through a citizen suit.

The Act provides for citizens to have easy access to courts to improve the efficacy of the protections established under it. 42 U.S.C. § 7604(a), (f); *see also Train v. NRDC*, 510 F.2d 692, 700 (D.C. Cir. 1975) ("The legislative history of the Clean Air Act Amendments reveals that the citizen suits provision reflected a deliberate choice by Congress to widen citizen access to the courts, as a supplemental and effective assurance that the Act would be implemented and enforced."). The Clean Air Act expressly authorized citizen suits over violations of "an emission standard or limitation under this chapter." 42 U.S.C. § 7604(a)(1). It specifically defined

"emission standard or limitation" to mean "a schedule or timetable of compliance, emission limitation, standard of performance or emission standard" "which is in effect under…an applicable implementation plan." *Id*. § 7604(f). Congress further defined the "terms 'emission limitation' and 'emission standard'" to "mean a requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis." *Id*. § 7602(k). Congress also defined "the term 'applicable implementation plan'" to "mean[] the portion (or portions) of the implementation plan, or most recent revision thereof, which has been approved under section 7410… and which implements the relevant requirements of this chapter." *Id*. § 7602(q). Thus, read together, these provisions mean that citizens have the right to bring suits in federal court over violations of EPA-approved, state-established requirements for limiting emissions of air pollutants. *See Lopez v. Gonzalez*, 549 U.S. 47, 56 (2006) ("[O]ur interpretive regime reads whole sections of a statute together to fix on the meaning of any one of them…."); *Sierra Club*, 551 F.3d at 1027 (reading definitions section of Clean Air Act, § 7602, together with other section). Because exemptions remove citizens' ability to enforce emission limitations, they contravene the Act.

Additionally, director discretion provisions like DOEE's proposed Sections 102.1, 102.4, and 102.6 allow state personnel to revise SIP provisions without complying with the Act's mandated SIP revision process. 42 U.S.C. § 7410(a)(1) & (2), (i), (k), (l); § 7515; 80 Fed. Reg. at 33,928/1-2 & n.298. "Once approved by EPA, a SIP becomes federal law… and cannot be changed unless and until EPA approves any change." *Comm. for a Better Arvin v. EPA*, 786 F.3d 1169, 1174 (9th Cir. 2015). SIP emission limits can only be changed "through a SIP revision approved by EPA in another notice-and-comment rulemaking. *See* 42 U.S.C. 7410(l)." *Id*. Thus, in addition to the other reasons outlined above, proposed Sections 102.1, 102.4 and 102.6 contravene the Act because they allow the Department to unilaterally change the requirements of the SIP without complying with the statutory process for SIP revisions.

The Department admits in its public notice that its proposal is an exemption.  It states: "The Department is correcting the substantial inadequacy in its regulations by specifying the criteria under which the Department may grant this exemption." Public Notice at 1. The Department may not grant an exemption no matter what criteria it specifies because the Clean Air Act does not allow exemptions to emissions limitations.  EPA made clear in the SSM SIP Call that states can chose to add enforcement discretion provisions into their SIP (as long as they are not overly broad and would not interfere with enforcement by EPA or by other parties through a citizen suit), *see* 80 Fed. Reg. at 33980, but exemptions are not allowed under any circumstances.

Though not subject to the SIP Call, DOEE should also take this opportunity to clarify that the Department can only grant variances from "state law only" provisions, and Section 103.3 should be clarified to state that the Department cannot grant a variance to any federally enforceable emissions limitation or regulatory requirement. The proposed Section 103.3 reads that "No variance may be granted to excuse performance required by any federal mandate."  The term "mandate" is undefined and must be clarified.

**B.    DOEE Failed to Correct Provisions of the SIP in Section 606 Identified by EPA as Substantially Inadequate to Meet Clean Air Act Requirements.**

DOEE's proposal to respond to the SSM SIP Call Rule fails to include three of the four called SIP provisions. In the SSM SIP Call Rule, EPA found that "the provisions in D.C. Mun. Regs. tit. 20 § 107.3, D.C. Mun. Regs. tit. 20 §§ 606.1 and 606.2 and D.C. Mun. Regs. tit. 20 § 606.4 are substantially inadequate to meet CAA requirements and the EPA is thus issuing a SIP call to the District of Columbia to correct its SIP with respect to these provisions."  80 Fed. Reg. at 33,961.  DOEE's proposal only contains revisions to Section 107.3 and does not explain in the public notice why it has not proposed to fix the remaining sections, or when it will do so.

The SSM SIP Call gave the DOEE 18 months, the maximum amount of time allowed under the statute, to respond to the SIP Call. *Id.* at 33,848; 42 U.S.C. § 7410(k)(5). The deadline for DOEE to respond was November 22, 2016. Thus, DOEE's response is already four months overdue. DOEE must propose to fix the remaining sections in 606 as soon as possible, and should propose the revisions to 606 along with appropriate revisions to Section 102 and 103.  It would be inappropriate for DOEE to ask EPA to approve a partial response to the SIP Call, especially given DOEE has not even announced a timeline for proposing revisions to the remaining sections. Thus, we request that DOEE revise Section 102 and 103 as outlined above, and propose revisions to Section 606 as required by the SSM SIP Call Rule.

*             *             *

We thank you for the opportunity to submit these comments. Please do not hesitate to contact us with any questions or to discuss the matters raised in these comments.

Dated: March 24, 2017

Respectfully, on behalf of Sierra Club:

Khushi Desai            Andrea Issod              Jim Dougherty
Earthjustice             Sierra Club               DC Chapter, Sierra Club
kdesai@earthjustice.org   andrea.issod@sierraclub.org  jim.dougherty@sierraclub.org



Eric Cornwell
Manager, Stationary Source Permitting Program
Air Protection Brach, Georgia EPD
4244 International Parkway Suite 120, Atlanta 30354
Eric.Cornwell@dnr.ga.gov

*Via Electronic Mail*

May 4, 2016

Re:     **Sierra Club and GreenLaw Comments on Georgia EPD's SSM SIP Call
        Stakeholder Process and Updated Proposed SIP Revision**


Dear Mr. Cornwell,

        Sierra Club, GreenLaw, and Environmental Integrity Project (the "Commenters")
submit the following comments concerning Georgia EPD's SSM SIP Call stakeholder
process and the most recent draft of the proposed SIP revision ("Updated SIP Revision").
Sierra Club and GreenLaw previously filed comments on this matter on March 8, 2016.
Those comments are incorporated herein as Exhibit 1. As explained in more detail below,
the Updated SIP Revision overwhelmingly fails to address the concerns outlined therein
and now illegally proposes to apply these provisions to new source review ("NSR")
limits.

**Substantive Comments**

I.      **The Updated SIP Revision Fails to Address Serious Flaws Outlined in Sierra
        Club and GreenLaw's Previous Comments**

        As stated above, Sierra Club and GreenLaw submitted comments on the first
version of EPD's Proposed SIP Revision discussing many serious shortcomings within
the proposed regulations. EPD failed to correct virtually all of these problems. In
particular, among others, the following issues remain unaddressed in the Updated SIP
Revision. These and other issues are discussed more fully in the previous set of
comments. In addition, as discussed below, EPD's proposal is even worse than the
original in multiple key respects.

1

A. The Updated SIP Revision Maintains Inappropriate Work Practice Options for Compliance

Work practice compliance options such as those included in the Updated SIP Revision are only appropriate for certain source categories that cannot meet "normal" numerical limits, and even then, only for periods when they cannot accurately measure emissions of particular pollutants. As with EPD's initial Proposed SIP Revision, the Updated SIP Revision includes work practice compliance options that appear to apply to virtually all (if not all) sources covered by Georgia's SIP, despite the fact that many of those sources could in fact comply with normal SIP limits during startup and shutdown. Even assuming sources are unable to meet normal SIP limits during startup and shutdown, absent a showing that emissions are not measureable during that time, EPD should establish alternative numerical limits rather than relying on work practices.

B. The Updated SIP Revision Remains Unenforceable

Like the previous version of the proposal, the Updated SIP Revision contains a number of unaddressed enforceability issues. For instance, the proposal would not require sources to report any information to EPD to assure compliance with the proposed work practices. Furthermore, the Updated SIP Revision compounds the issue by only proposing to require sources to maintain records for five years rather than permanently, as was contemplated in the original proposal. As discussed more fully in the previous comments, the Updated SIP Revision is also impermissibly vague, lacking clear definitions or limitations for vital terms such as "startup," "shutdown," "operate," or "fire prevention or process safety protocols." The updated "clean fuels" requirement also remains vague and unenforceable as it allows sources to use the "cleanest fuel the unit is permitted to burn, as practicable" without any explanation of when fuel usage is considered "practicable." Thus, under the revised proposal, it is still up to sources to choose whether and to what extent to use clean fuels.

C. EPD Fails to Limit Emissions on a Continuous Basis

The Updated SIP Revision also fails to address Commenters' concerns that the proposed regulations fail to include continuous emissions limits. As mentioned above and discussed more fully in previous comments, the requirement to use clean fuels only to the "extent practicable" could effectively exempt emissions from regulation if a source deems burning of those clean fuels to be impracticable. Furthermore, EPD has not defined what it means to "operate" controls in its general work practice option. While the revised general work practice option now contains a requirement for the operation of scrubbers, it impermissibly allows sources to not use scrubbers during startup and shutdown if "specified by manufacturer." Such a requirement cannot assure continuous reduction of sulfur dioxide emissions during startup and shutdown if the manufacturer's specifications (which are not required to be reported to EPD or made available to the public) state that the scrubbers must be bypassed or otherwise cannot be used during startup and shutdown.

D.  EPD Failed to Address Other Problems Concerning Alternative Work Practice
Compliance Options

Even assuming work practice compliance options were appropriate under the
present circumstances, the Updated SIP Revision's compliance options contain issues
flagged in previous comments that were not corrected. First, the Updated SIP Revision
includes no requirement that work practice options in Paragraphs 7(ii)(IV) and 7(ii)(V)
comply with the SIP Revision Process. The Updated SIP Revision also retains language
that would require permit applications seeking the inclusion of source-specific work
practice requirements to merely *consider* certain conditions, rather than emphasizing this
option as a last resort upon sufficient showing of listed criteria. Furthermore, a number of
conditions required for consideration, such as "that the frequency and duration of
operation in startup or shutdown mode are minimized," have been cut from the Updated
SIP Revision. Finally the Updated SIP Revision fails to ensure that these compliance
options do not weaken the SIP. This has been exacerbated by EPD's deletion of the
requirement that applications for source-specific work practices consider worst-case
emissions during startup and shutdown.

E.  EPD's Voiding Language is Now Even More Problematic

As noted in our previous comments, EPD's proposed automatic rescission clause
in paragraph 9 is inconsistent with the Clean Air Act and cannot be approved by EPA
because the clause would allow EPD to avoid the required reasonable public notice of a
SIP revision and automatically modify the SIP without EPA's review. EPD has failed to
address this problem. In fact, EPD now has added language to the voiding clause stating
that the current SIP exemption for startup, shutdown and malfunction will apply to New
Source Review ("NSR") and Prevention of Significant Deterioration ("PSD") limits. This
appears to be an end run around the requirements for review and comment by the public
and EPA: it would apparently add startup and shutdown exemptions that do not currently
exist for NSR and PSD limits into the SIP without any opportunity for the public to
comment on—or EPA to object to—this change.

F.  EPD Fails to Demonstrate that Its Proposal Will Not Violate NAAQS or PSD
Increments

Finally, as discussed in previous comments, EPD has not made any showing that
the Updated SIP Revision would not interfere with attainment of National Ambient Air
Quality Standards ("NAAQS") or Prevention of Significant Deterioration ("PSD")
increments, as required by the Clean Air Act. This is particularly problematic given that
regions of Georgia comprising over half of the state's population are designated as
nonattainment for PM 2.5, which can be emitted in huge amounts during startup and
shutdown. Furthermore, as noted above, the Updated SIP Revision removes the single
consideration requirement of ambient air quality in its rules for source-specific alternative
work plans, meaning that applications to incorporate those plans need not even consider
their effect on the NAAQS or PSD increments.

3

## II.     EPD Inappropriately Applies the Updated SIP Revision to NSR Limits

In addition to those issues previously noted by Commenters, EPD has also impermissibly incorporated language that would apply the Updated SIP Revision Rules to NSR limits. This proposal is contrary to the Clean Air Act, as EPA has previously stated. In a letter to the Texas Commission on Environmental Quality ("TCEQ"), EPA stated that SIP provisions that revise NSR permits, "including adding or revising requirements for [malfunction, startup, shutdown] activities, should undergo the same process as the original Federal Permit." Letter from Jeff Robinson, EPA Air Permits Section Chief, to Richard Hyde, TCEQ Air Permits Division Director (May 21, 2008), *available at* https://www.epa.gov/sites/production/files/2015-07/documents/tceqssm.pdf. Thus, before these provisions can be included in NSR permits, EPD must follow all of the process requirements for each individual NSR permit, including notice and comment reopening of the permits and best available control technology ("BACT") and lowest achievable control technology ("LAER") review. *See id.* The blanket application of these startup and shutdown provisions to NSR limits as currently proposed in the Revision is therefore illegal.

## Conclusion

For the foregoing reasons, Georgia's proposed SIP revision must be further revised to ensure that it is consistent with the requirements of the SSM SIP Call and Clean Air Act, protects air quality and public health, and is approvable by EPA. Thank you, and please do not hesitate to contact us with any questions or to discuss the matters raised either here or in our previous comments.

Sincerely,

_____/s/_____
Lane A. Johnson
Environmental Law Program Fellow
The Sierra Club
50 F Street NW, 8th Floor
Washington, D.C. 20001
(202) 495-3051
lane.johnson@sierraclub.org

Zachary M. Fabish
Staff Attorney
The Sierra Club
50 F Street NW, 8th Floor
Washington, D.C. 20001
(202) 675-7917
zachary.fabish@sierraclub.org

Patton Dycus
Senior Attorney
Environmental Integrity Project
1000 Vermont Avenue, NW, Suite 1100
Washington, DC 20005
(202) 263-4455 (office)
(404) 446-6661 (cell)
pdycus@environmentalintegrity.org

Robert B. Jackson, IV, Esq.
GREENLAW
104 Marietta Street, NW - Suite 40
Atlanta, GA 30303
(404) 659-3122 (voice)
(404) 522-5290
rjackson@greenlaw.org

5

# Exhibit 1



# SIERRA CLUB

March 8, 2016

VIA ELECTRONIC MAIL

Eric Cornwell
Manager, Stationary Source Permitting Program
Air Protection Branch, Georgia EPD
4244 International Parkway Suite 120 Atlanta 30354
Eric.Cornwell@dnr.ga.gov

Re:   <u>Sierra Club and GreenLaw Comments on Georgia EPD's SSM SIP Call
      Stakeholder Process and Proposed SIP Revision</u>

Dear Mr. Cornwell,

Please find below comments by the Sierra Club and GreenLaw concerning Georgia EPD's SSM SIP Call stakeholder process and proposed SIP revision.

## I.   **INTRODUCTION**

Sierra Club and GreenLaw appreciate the opportunity to participate in EPD's stakeholder process concerning EPA's Startup, Shutdown and Malfunction state implementation plan call ("SSM SIP call") for Georgia and submit these comments on EPD's SSM proposal.

Because facilities subject to the Clean Air Act ("CAA") can emit massive amounts of particulate matter, sulfur dioxide and other harmful air pollution during periods of SSM, strong SIP provisions governing emissions during these periods are critical to protect fenceline and other communities. EPA expects that "revision of the existing deficient SIP provisions [including Georgia's] has the potential to decrease emissions significantly in comparison to existing provisions, . . . encourage sources to reduce emissions during startup and shutdown and to take steps to avoid malfunctions, . . . should provide increased incentive for sources to be properly designed, operated and maintained in order to reduce emissions at all times, . . . [and] has the potential to result in significant emission control and air quality improvements." 80 Fed. Reg. at 33,955-56. Importantly, beyond the legal deficiencies in the provisions, "the results of automatic and discretionary exemptions in SIP provisions, and of other provisions that interfere with effective enforcement of SIPs, are real-world consequences that adversely affect public health." *Id.* at 33,850.

1

Exhibit 2
052

EPD's proposal to rewrite Georgia's SSM SIP provisions suffers from a myriad of flaws and accordingly fails to meet either the requirements of the Clean Air Act or EPA's final SSM Policy from the SIP call, and is plainly not approvable by EPA. As described in more detail below, significant changes to EPD's proposal must be made in order to ensure that Georgia's SIP is revised in a manner that would comply with the Act and the SSM SIP call rule.

## II.     EPD MUST REMOVE THE SSM EXEMPTION FROM GEORGIA REGULATIONS

Because EPD's primary consideration should be protection of public health in strict compliance with the federal Clean Air Act and the Georgia Air Quality Control Act, the best approach to the SSM SIP Call is for EPD to simply remove the illegal SSM exemption from the Georgia SIP (as South Carolina is reportedly planning to do). Removing the exemption would mean that the normal SIP limits that are designed to protect air quality and health and comply with the Act's requirements would apply at all times—including during "startup and shutdown and malfunctions"—as required by the Clean Air Act. Removing the exemption would make Georgia's regulations comparable to regulations in those states that were not subject to the SSM SIP call. Further, removal of the exemption would avoid concerns about conformity with the Clean Air Act, as well as whether the EPA would approve the SIP.

## III.    FACILITIES CAN EMIT MASSIVE AMOUNTS OF POLLUTION DURING STARTUP AND SHUTDOWN

Alternatively, for those source categories that truly cannot meet emissions during startup and shutdown, EPD could establish alternative numerical limits that meet the other requirements of the Clean Air Act. In addition, EPD would need to establish clear, narrow definitions of "startup" and "shutdown" to ensure these periods are as short as possible. EPD must incorporate any alternative limits through the SIP revision process, with the accompanying requirements for public notice and comment. At the same time, EPD must ensure that any alternative limits do not interfere with maintenance of the NAAQS or PSD increments.

Power plants and other facilities can emit massive amounts of particulate matter and other pollutants during SSM periods. For example, permits issued in 2011 for ten power plants in Texas authorize PM emissions during maintenance, startup, or shutdown (which Texas terms as "MSS") up to 7616 pounds per hour, far higher than allowable emissions during "normal" operations. These permits do not restrict the number of MSS events or hours during which these higher limits apply. But if the allowable limits are reached for just 80 hours per year (about 1% of operating time), MSS emissions would account for between 15% and 66% of annual emissions the remainder of the year at these plants, based on our review of 2012 emission inventory data.

Similarly, EPA has also found that SSM events have historically caused disproportionate, and enormous, pollution. For example, as part of the SSM SIP-call

rulemaking, EPA stated: "[I]n connection with the EPA's issuance of a SIP call to address an exemption for excess emissions during malfunctions in Utah, the EPA illustrated the practical consequences of such exemptions by noting the large amount of additional emissions during malfunctions at individual sources, *e.g.*, one malfunction that was estimated to emit 11,000 pounds of SO2 over a 9-hour period when the applicable limit was 3,200 pounds per day." Memorandum dated February 4, 2013 to Docket EPA-HQ-OAR-2012-0322 at 23.[1]

Power plants can emit these large amounts of SSM pollution many times over in a year. After reviewing data from many power plants as part of the MATS rulemaking, EPA found that the "average EGU had between 9 and 10 startup events per year during 2011-2012, but data from a small number of EGUs indicated significantly more startup events (e.g., the EGUs with the most startup events had *over 100 startup events* in 2011 and *over 80* in 2012)." EPA Office of Air and Radiation, "Assessment of startup period at coal-fired electric generating units – Revised," at p. 4 (Nov. 2014) (emphasis added).[2]

Given the huge emissions possible during startup and shutdown, and given that parts of Georgia comprising **_over half_** of the state's total population are designated as nonattainment for PM 2.5,[3] reducing startup and shutdown emissions from fuel-burning sources, including power plants, should be a priority for EPD. Unfortunately, EPD's current SSM proposal does little (if anything) to reduce particulate and other emissions during SSM.

## IV.   SPECIFIC PROBLEMS WITH EPD'S CURRENT PROPOSAL

### a.   EPD Has Failed to Demonstrate that the Proposed Reliance on SSM Work Practices Is Appropriate Under These Circumstances

Work practices (in lieu of having to meet normal SIP limits during startup and shutdown) are only appropriate for those limited source categories that truly cannot meet "normal," numerical limits for particular pollutants during startup and shutdown. Work practices are also only appropriate for those limited periods of time when specific source categories cannot accurately measure emissions of particular pollutants.

In the final SSM SIP call rule, EPA confirmed that "[s]tartup and shutdown are part of the normal operation of a source and should be accounted for in the design and operation of the source. It should be possible to determine an appropriate form and degree of

---

[1] Available at: https://www3.epa.gov/airquality/urbanair/sipstatus/docs/ssm_memo_021213.pdf

[2] Available at: https://www3.epa.gov/airtoxics/utility/matsssfinalruletsd110414.pdf

[3] Over twenty different counties in Georgia are designated nonattainment for PM2.5: Barrow, Bartow, Carroll, Cherokee, Clayton, Cobb, Coweta, DeKalb, Douglas, Fayette, Forsyth, Fulton, Gwinnett, Hall, Heard, Henry, Newton, Paulding, Putnam, Rockdale, Spalding, and Walton. *See* U.S. EPA Greenbook, *available at* http://www3.epa.gov/airquality/greenbook/ancl.html. According to 2014 Census data, collectively 5.6 million people live in these counties, compared to Georgia's total population of 10.1 million people.

3

emission control during startup and shutdown and to achieve that control on a regular basis." 80 Fed. Reg. 33,840, 33,979 (June 12, 2015). Likewise, EPA also made clear that for most sources "it should be feasible to meet the same emission limitation" during both "steady-state" and startup/shutdown periods. *Id.* EPA's final SSM Policy from the SIP call provides that a "state can develop special, alternative emission limitations that apply during startup or shutdown *if the source cannot meet the otherwise applicable emission limitation in the SIP.*" *Id.* at 33,980 (emphasis added).

Here, EPD's proposed work practices appear to apply to virtually every (if not every) source covered by Georgia's SIP. Many if not most (if not all) of these sources can—and thus should be required to—meet the normal SIP limits during startup and shutdown.

Even for those sources that truly cannot meet normal limits during startup and shutdown, EPD should establish alternative numerical limits instead of work practices. Work practices should only be available for periods where emissions are not measurable. In the SIP call, EPA specifically stated that "*[i]n cases in which measurement of emissions during startup and/or shutdown is not reasonably feasible*, it may be appropriate for an emission limitation to include as a component a control for startup and/or shutdown periods other than a numerically expressed emission limitation." *Id.* (emphasis added). Where at all possible, establishing numerical limits in lieu of work practices is required by Clean Air Act § 110(a)(2), which provides that SIPs are to include "*enforceable* emission limitations . . . as may be necessary or appropriate to meet the applicable requirements" of the Act. 42 U.S.C. § 7410(a)(2) (emphasis added). In the SSM SIP call, EPA echoed that numerical limits are preferable to work practices in terms of enforceability. *See* 80 Fed. Reg. at 33,974-75 ("There are many sources for which a numerically expressed emission limitation will be the most appropriate and will result in the most legally and practically enforceable SIP requirements"); *id.* at 33,979 ("In practice, it may be that numerical emission limitations are the most appropriate from a regulatory perspective (*e.g.,* to be legally and practically enforceable) and thus the emission limitation would need to be established in this form to meet CAA requirements").

EPD has not shown that emissions are not measurable during periods of startup and shutdown for the various source types and multiple pollutants covered by EPD's proposed rule. At least for power plants, emissions are measurable during startup and shutdown, as shown by the fact that, as part of the Acid Rain program, EPA has required power plants to monitor sulfur dioxide and nitrogen oxide emissions continuously from the moment combustion begins and throughout generation, and has relied upon this data for decades to determine compliance with the requirements of the program.

b.  EPD's Proposal Is Not Enforceable for Multiple Other Reasons

Apart from the fact that work practices generally are not enforceable, EPD's proposal does not meet Clean Air Act § 110's enforceability requirement for other reasons:

First, the proposal does not require sources to report to EPD any information to assure that sources are complying with the requirements of the rule. Because there is no way for EPD to know—without requesting documentation from sources—whether sources are complying with the work practice requirements, there is no way for citizens or EPA to obtain information about whether or not sources are complying with the requirements. Thus, the requirements are not practically enforceable by EPD in enforcement suits. Nor are they enforceable by EPA or citizens in federal court. If EPD insists on including work practices instead of numerical limits (which we maintain is not consistent with the requirements of the Clean Air Act or the SIP Call rule, and therefore not approvable by EPA or the 11th Circuit), EPD should require the work-practice compliance information from the proposed rule to be reported by sources through, at the least, their quarterly Title V compliance reports.

Second, EPD's proposal does not include any definitions of "startup" or "shutdown" or any time limitations on these periods. This is extremely problematic. For example, coal-fired power plants could conceivably claim they are in startup or shutdown mode (and thus exempt from the SIP's numerical emissions limits applicable to "normal" operations) all the way up to full load—and for hours and hours. EPD should establish clear, limited definitions of startup and shutdown. If alternative limits or work practices are proper for power plants (and as explained above, they are not), startup under EPD's rule should end (and thus the normal numerical SIP limits should begin to apply) at the point these plants begin to generate electricity—either for sale over the grid or for any other purpose (including internal use). Similarly, shutdown should only begin when no electricity is generated for sale over the grid or for any other purpose—or when no fuel is being fired in the boiler.

Third, there is no indication in Proposal paragraph 7(ii)(IV)'s general alternative work practices option of what the dew point or maximum operating temperatures are for baghouses or what "fire prevention and process safety protocols" would prevent the operation of ESPs during startup and shutdown. Instead, EPD apparently proposes to leave it completely up to operators to decide when to engage these particulate controls. At the least, full-sized baghouses can and should be operated throughout all of startup. Similarly, properly maintained and properly sized ESPs can also be operated through all of startup.

The same problem exists for the other controls listed in the general work practices option, as nothing in the Proposal would prevent sources from simply claiming that the manufacturer of their SCR or other controls recommends that the controls be operated at temperatures higher than those listed by EPD.

If work practices are proper (again, they are not), EPD should require pollution controls to be operated at specific time points during startup and shutdown. As an example for at least power plants, EPD can look to the startup and shutdown work practices from the final Mercury and Air Toxics Standards ("MATS") rule (before these work practices were changed on reconsideration).[4]  There, for startup, EPA required all pollution controls

---

[4] In the D.C. Circuit Court of Appeals, Sierra Club and other organizations are currently challenging EPA's final action on reconsideration of the startup and shutdown provisions of the MATS rule. Sierra Club

(except for dry scrubber and SCR) to be operated once plants begin firing their primary fuel (e.g., coal for coal-fired power plants). 77 Fed. Reg. 9,304, 9,493 (Feb. 16, 2012.)[5] During shutdown, EPA required EGUs to operate all controls while filing coal, residual oil or solid oil-derived fuel. *Id.*

Fourth, the "clean fuels" requirement in the Proposal's paragraph 7(ii)(IV)(IV) of the general work practices option is also vague and unenforceable. Under this provision, EPD contemplates only requiring sources to burn the "cleanest fuel the unit is capable of accommodating, to the extent practicable"—such language is bereft of any real regulatory meaning at all. The proposed language that "fire protection and process safety protocols shall be followed" is equally problematic. Under EPD's Proposal, sources can choose what fuels they want to burn and can choose the point during startup that constitutes the use of clean fuels to the "extent practicable." In fact, under EPD's language, coal-fired power plants could choose not to burn natural gas or other clean fuels at all during startup; they could choose to only burn coal. If they did burn "clean" fuels at all, they could also decide that stopping the use of clean fuels at any point during startup constitutes the use of these fuels to the extent practicable.

At the least, EPD should define the clean fuels that sources are required to use during startup (which should include only true "clean fuels," including natural gas for power plants). For power plants, the MATS rule provides definitions of clean fuels that EPD could use. EPD's work practice should also require the use of clean fuels during startup, period—meaning that EPD remove the qualifying language regarding "fire protection and process safety protocols" and stating that sources only have to burn clean fuels that a "unit is capable of accommodating, to the extent practicable."

Fifth, under the "Similar Process Equipment Alternative Work Practice Standards Option" in paragraph 7(ii)(V) of EPD's Proposal, it is completely up to sources to pick and choose which federal MACT or NSPS work practices they want to comply with. If EPD insists on including work practices, EPD should instead match specific categories of sources (based on type, size and control equipment type) to the specific MACT and/or NSPS rules that cover those categories. EPA itself recognized in the SSM SIP call that it cannot automatically be assumed that the requirements from NSPS and NESHAP are appropriate for all sources regulated by SIPs because the universe of regulated sources is not identical, and the pollutants under the NESHAP are often different than those regulated for the NAAQS and PSD. 80 Fed. Reg. at 33,916. Also, as EPA recognized in the SIP call, many of EPA's older NSPS and MACT regulations do not meet the requirements of the Clean Air Act because, among other reasons, they have not been updated to assure continuous reductions in emissions.

---

maintains that EPA's final (reconsideration) definition of startup (which includes a four-hour exemption from numerical emission limits) and startup work practices do not meet the requirements of the Clean Air Act, including the requirement to achieve continuous reductions.

[5] We do not concede that dry scrubbers and SCR cannot be operated upon generation of electricity. However, under the Proposal EPD has put forward, these decisions would improperly be left to the regulated community.

Sixth, Proposal paragraph 7(ii)(IV)'s general alternative includes a work practice stating that SCR must be operated if the "catalyst bed temperature is greater than 400 [degrees]." We understand that most (if not all) facilities do not monitor catalyst bed temperatures. Thus, there is no way to enforce this work practice requirement for SCR. The work practice should be keyed off of a flue-gas inlet temperature, which is typically monitored at facilities.

c.   EPD's Proposal Impermissibly Fails to Limit Emissions on a Continuous Basis

As noted above, Clean Air Act § 110(a)(2) requires that SIPs are to include "enforceable emission limitations . . . as may be necessary or appropriate to meet the applicable requirements" of the Act. "Emission limitations" are defined under § 302(k) of the Act to include work practices, and these must be continuous.   More specifically, § 302(k) defines "emission limitation" as a "requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants *on a continuous basis, including* any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and *any design, equipment, work practice or operational standard promulgated under this chapter.*" 42 U.S.C. § 7602(k) (emphasis added). The D.C. Circuit Court of Appeals confirmed that exemptions for SSM events conflict with the Act's plain requirement that emission limitations and standards must be continuous. *Sierra Club v. EPA*, 551 F.3d 1019, 1027 (D.C. Cir. 2008).

EPA's Statement of SSM Policy in the final SSM SIP call reiterates this, making it clear that the only approvable SIP is one that consists of *continuous* emissions limitations:

> The EPA's longstanding interpretation of the CAA is that SIP provisions cannot include exemptions from emission limitations for emissions during SSM events. In order to be permissible in a SIP, an emission limitation must be applicable to the source continuously, *i.e.,* cannot include periods during which emissions from the source are legally or functionally exempt from regulation.

80 Fed. Reg. at 33,976.

Here, however, EPD's proposal does not ensure continuous reductions in emissions throughout startup and shutdown, and EPD's proposal includes periods during which emissions are functionally exempt from regulation. To begin with, the language in the general work practice option only requires clean fuel use to the "extent practicable" and if a unit is "capable of accommodating" such use. As discussed above, under this language, sources could choose to only burn their primary fuel (e.g., coal for coal-fired power plants) during startup and shutdown. For those sources, until the point during startup when their particular pollution controls engage and begin to reduce emissions (or after these controls disengage in shutdown), there is no requirement in Georgia's proposal to limit emissions during startup or shutdown. For example, coal-fired power plants could claim that they are not equipped to burn natural gas or other clean fuels during startup and could also claim that they cannot begin to operate their particulate matter controls until well into startup

7

(sometimes perhaps after 9 or 10 hours of startup, based on our experience with power plants in Texas). During these 9 or 10 hours, there would be no requirement in the Georgia rules for these plants to limit their emissions.

And for those power plants that do actually choose to burn cleaner fuels during startup, the requirement to burn clean fuels is meaningless past the point that plants start to burn their primary fuel (e.g., coal). This is because most coal-fired power units are not designed to co-fire other fuels after they begin to fire their primary fuel, which is usually when the generation of electricity begins. Ex. 1, Decl. of R. Sahu, at ¶¶ 10-19. . Thus, even for those plants that do burn clean fuels during startup, there is no requirement in EPD's proposal to reduce emissions from the point that they begin to burn their primary fuel to the point that their pollution controls begin to operate.

During shutdowns, we are not aware of coal-fired power plants that are able to burn cleaner fuels. Thus, for many sources, there is no requirement in EPD's proposal for sources to reduce emissions after the various controls turn off during shutdown.

Another reason that EPD's proposal does not achieve continuous reductions (and is not enforceable) is that EPD has not defined what it means to "operate" particulate and other controls in the general work practice option. Many electrostatic precipitators ("ESPs") have multiple fields that all need to be fully operative to achieve high control efficiencies. *See* Decl. of R. Sahu, at ¶ 11. EPD's work practice would allow ESPs to operate at widely varying performance levels, with some units choosing to "operate" at much lower efficiencies (e.g., by turning on one or two fields) than the equipment is capable of achieving. The requirement to simply turn on particulate control equipment— if that is what EPD means by "operate" —does nothing to ensure that this equipment is functioning at the levels needed to assure the maximum possible control of particulates. EPD should include clear definitions of what it means to operate the various controls listed in the general option. Those definitions should, at the least, require particulate controls to operate at near 100% efficiency at a clearly defined time early in startup.

Finally, EPD's proposal cannot assure continuous reductions because, as discussed above, the general work practice option essentially leaves it up to sources to choose when to begin to operate their various particulate and other pollution controls. Importantly, EPD's proposal contains no requirements for operation of sulfur dioxide controls, and thus the proposal cannot assure continuous reductions of $SO_2$. EPD should include a work practice requiring scrubbers to be operated from (at the least) the point that plants begin to fire their primary fuel. Such a work practice for $SO_2$ controls is especially important given that $SO_2$ exacerbates fine particles and given Georgia's nonattainment status for PM 2.5. Similarly, EPD should include a work practice for plants with SNCR to ensure continuous reductions of nitrogen oxide emissions.

    d.   Particular Sources' Choices to Use the Work Practices from Paragraphs 7(ii)(V) and 7(ii)(VI) Should Be Incorporated into Georgia's SIP

Any alternative limits or work practices must be incorporated through the SIP amendment process, allowing for public notice and comment and EPA approval.  For example, in the SSM SIP call, EPA specifically stated that a "SIP needs to reflect the control obligations of sources, and any revision or modification of those obligations should not be occurring through a separate process, such as a permit process, which would not ensure that 'alternative' compliance options do not weaken the SIP."  80 Fed. Reg. at 33,915.

EPD's Proposal on paragraphs 7(ii)(V) and (VI) does not comply with this requirement.  Sources that choose paragraph 7(ii)(V)'s "similar process equipment" work practice option could pick and choose the NSPS and MACT work practices they want to comply with.  If EPD maintains this option (as discussed above, this is not proper), any choice by a particular source to use the work practices from a particular NSPS or MACT rule should be incorporated into the Georgia SIP.

Likewise, if sources choose to pursue source-specific alternative work practices under paragraph 7(ii)(VI) (which option we do not believe is proper, for many of the reasons stated above and as discussed below), those source-specific practices must be incorporated into the SIP, with public notice and comment and EPA approval.

     e.   <u>There are Additional Problems with the Options for Source-Specific Work Practices and General Work Practices</u>

Proposed paragraph 7(ii)(VI) is problematic for additional reasons.  First, source-specific alternative limits or work practices are generally not proper at all.  In the SIP call, EPA specifically stated:

> [E]ven where a specific type of operation may not during startup and/or shutdown be able to meet an emission limitation that applies during full operation, the state should be able to develop appropriate limitations that would apply to those types of operations at all similar types of facilities. The EPA believes that there will be limited, if any, cases where it may be necessary to develop source-specific emission requirements for startup and/or                                      shutdown.

80 Fed. Reg. at 33,915.  Additionally, as language quoted above indicates, awarding sources alternative limits or work practices through permits would not ensure these compliance options do not weaken the SIP.  *See* 80 Fed. Reg. at 33,915.  When a state issues SSM limits through permits, it would make it very difficult to assess the collective impact on the NAAQS or PSD increments of multiple permitted alternative SSM limits.

Another problem with the option to pursue source-specific alternative work practices is that EPD's proposed paragraph 7(ii)(VI) only provides that an application has to incorporate certain considerations.  Instead, EPD should include specific language explaining that source-specific work practice standards could only be available as a very last resort upon a sufficient showing that the listed criteria are met, and as discussed above,

that such requirements are continuous and enforceable, and subject to the SIP revision process, with the accompanying requirements for public notice and comment.

In addition, we are concerned that the temperature designations include in paragraph 7(ii)(IV)'s option for general work practices are not low enough for all sources. Our understanding from the March 1 meeting is that the temperatures at which SCR, sorbent injection systems and regenerative thermal oxidizers must be operated were taken from EPA's brick and cement kiln NESHAP rule.  EPD should consider whether other sources (such as coal-fired power plants) are able to operate these controls at lower temperatures.

    f.   <u>EPD Must Demonstrate that Its Proposal Will Not Violate the NAAQS or PSD Increments</u>

Under § 110(l) of the Clean Air Act, EPA cannot approve SIP revisions that would interfere with attainment of the NAAQS or PSD increments: "The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or any other applicable requirement of this chapter." 42 U.S.C. § 7410(l).  In keeping with this requirement, EPA stated in the SSM SIP call that, "[a]s part of its justification of the SIP revision, the state [should] analyze the potential worst-case emissions that could occur during startup and shutdown based on the applicable alternative emission limitation" 80 Fed. Reg. at 33980.

Excess emissions from startup, shutdown and malfunction events has far-reaching impacts on other requirements of the Act. 78 Fed. Reg at 12,485.  States must rely on assumed continuous compliance with emissions limitations in their modeling exercises to demonstrate attainment and maintenance of ambient air quality standards.  See EPA Memorandum to Docket EPA-HQ-OAR-2012-0322, at 14, n. 41 (Feb. 4, 2013) (citing, inter alia, CAA sections 110(a)(2)(A)&(C)).  In areas that are meeting air quality standards, state plans must include emission limitations designed to ensure that air quality does not worsen. 42 U.S.C. § 7475(a)(3), 40 C.F.R. § 51.166(k)(1); see 78 Fed. Reg. at 12,485. Similarly, in nonattainment areas, nonattainment SIPs must include emission inventories which are comprehensive, accurate, and current of actual emissions and must also include emission statements from stationary sources. *See, e.g.*, 42 U.S.C. §§ 7511(a)(1), (3).  Also, in nonattainment areas, state plans must include a program that assures reasonable progress toward attainment of ambient air quality standards.  42 U.S.C. § 7501 *et seq.* Nonattainment NSR permitting requires offsetting of emissions based on permitted emission limits. *See, e.g.,* 42 U.S.C. § 7511(a)(4).  There is no way to adjust the required offsets should a source exceed its permitted emission limits during SSM because nonattainment NSR permitting occurs prior to construction and the permits do not ever expire.  Plans must also protect scenic views in many of America's most treasured public lands. 42 U.S.C. § 7491(a)(1).

Here, EPD appears not to have considered the potential effect of its proposed work practices on these required demonstrations and planning under the Act. This is especially

10

important give that parts of Georgia are nonattainment for PM 2.5 and given the huge particulate emissions possible during startup and shutdown. In fact, it appears that EPD's proposal will do little (if anything) to reduce particulate emissions below the status quo, and continue to contribute to Georgia's nonattainment status.

g.  EPD Must Remove the Voiding Language from Paragraph 7(iii)

EPD's proposed automatic rescission clause is inconsistent with the Clean Air Act and cannot be approved by EPA. Just a few days ago on March 4, EPA took final action disapproving a substantially similar rescission clause that EPD had proposed regarding permitting requirements for greenhouse gas (GHG) requirements. 81 Fed. Reg. 11,438 (March 4, 2016). As EPA stated in the final rule, EPD's proposed rescission clause would not provide reasonable public notice of a SIP revision as required by Section 110(l) of the Act. 81 Fed. Reg. at 11,439. Additionally, EPD's proposal to automatically modify its SIP without EPA's review conflicts with EPA regulations at 40 C.F.R. 51.105. For the same reasons, EPD's proposed rescission clause in the current proposal is inconsistent with the Act.
[AII]

h.  Work Practices Are Not Proper for Periods of Malfunction

At the March 1 stakeholder meeting, industry representatives requested that EPD add work practices for malfunctions. EPD should not do so, as these work practices would not be approvable by EPA or the 11th Circuit. As EPA stated in the SSM SIP call:

> In contrast to startup and shutdown, a malfunction is unpredictable as to the timing of the start of the malfunction event, its duration and its exact nature. The effect of a malfunction on emissions is therefore unpredictable and variable, making the development of an alternative emission limitation for malfunctions problematic. There may be rare instances in which certain types of malfunctions at certain types of sources are foreseeable and foreseen and thus are an expected mode of source operation. In such circumstances, the EPA believes that sources should be expected to meet the otherwise applicable emission limitation in order to encourage sources to be properly designed, maintained and operated in order to prevent or minimize any such malfunctions.

80 Fed. Reg. at 33,979. We agree with this reasoning and also believe that it will be extremely difficult (if not impossible) to develop work practices for any periods of malfunction that meet the Clean Air Act's mandates that SIP limits be enforceable and provide for continuous reductions in emissions. Regarding continuous reductions, we find it hard to believe that (as industry representatives seemed to assert in the March 1 meeting) sources will suddenly be able to switch to clean fuels during malfunctions.

11

## V.   **CONCLUSION**

Thank you.  Please do not hesitate to contact us with any questions or to discuss the matters raised in these comments.

Sincerely,

/s/ *Zachary Fabish*

Zachary M. Fabish, Esq.
SIERRA CLUB
50 F Street, NW - 8th Floor
Washington, DC 20001
(202) 675-7917 Voice
(202) 547-6009 Fax
zachary.fabish@sierraclub.org

Patton Dycus, Esq.
ENVIRONMENTAL INTEGRITY PROJECT
1000 Vermont Avenue NW, Suite 1100
Washington, DC 20005
(404) 446-6661 (cell)
(202) 296-8800 (office)
pdycus@environmentalintegrity.org

Robert B. Jackson, IV, Esq.
GREENLAW
104 Marietta Street, NW - Suite 430
Atlanta, GA  30303
(404) 659-3122  Voice
(404) 522-5290  Fax
rjackson@greenlaw.org

Comments on Georgia EPD's draft SIP revision to address the SSM SIP call.

**Minor comments**

1. The draft revision would move existing paragraph **391-3-1-.02(2)(a)7 "Excess Emissions"** to a new paragraph 9 and modify it to apply as a non-SIP approved rule.  EPA supports this proposal and believes that retention of the existing provisions as state-only would not inappropriately interfere with requirements for a sufficient state enforcement program.

2. Draft provision **391-3-1-.02(2)(a)7(ii)(I)** provides that "[c]ompliance with the emission limitations and standards identified in paragraph 391-3-1-.02(2)(a)7.(i) shall be achieved by either Option I or II below:"  Use of the term "option" is also used in the later provisions regarding alternative work practice standards.  To reduce possible confusion, EPA recommends striking the phrase "Option I or II below" from the text of provision 391-3-1-.02(2)(a)7(ii)(I).

3. Draft provision **391-3-1-.02(2)(a)7(ii)(II)** requires the owner or operator of a source that chooses to comply with alternative work practice standards for startup and shutdown to maintain documentation regarding the details of such events.  While these generic requirements are not emission limitations, EPA agrees they are important and necessary documentation requirements.

4. The first paragraph of draft provision **391-3-1-.02(2)(a)7(ii)(III) (General Alternative Work Practice Standards Option)** contains generic regulatory requirements to operate in a manner consistent with good air pollution control practice for minimizing emissions and to operate air pollution control devices to the maximum extent practicable, considering process and control device limitations and safety constraints.  While these "general duty" requirements cannot alone be alternative emission limitations for startup and shutdown, EPA agrees they are appropriate SIP requirements to impose upon sources.  EPA recommends making the requirements of this paragraph apply to all sources, not just those using option (ii)(III).

5. Draft provision **391-3-1-.02(2)(a)7(ii)II.B.** requires the owner or operator to document which option ((ii)(III), (ii)(IV), or (ii)(V)) is followed during each period of startup and shutdown.  Please note that the State should ensure that the requirements applicable to a source are established up front, before a startup or shutdown event occurs.

**Significant comments**

6. Draft provision **391-3-1-.02(2)(a)7(ii)(I)II** allows a source to comply with applicable emission limitations and standards "during normal operation" and to comply with alternative work practice standards "during periods of startup and shutdown."  As described in the SSM SIP call, EPA considers periods of startup and shutdown as part of the normal operation of a source.  (See Final SSM SIP Call notice (6/12/15), footnote 2 on p. 33843.)  In addition, this approach raises the question of what is expected of a source during periods of malfunction,

which are not "normal operation." EPA recommends revising draft provision 391-3-1-.02(2)(a)7(ii)(I)II to eliminate the reference to "normal operations" and instead state that compliance shall be achieved by complying with the applicable emission limitations and standards at all times other than startup and shutdown, during which the source will comply with the specified alternative work practice standards.

7. The second paragraph of draft provision **391-3-1-.02(2)(a)7(ii)(III)** provides that, during periods of startup and shutdown, sources subject to any of the SIP emission limitations identified in paragraph 391-3-1-.02(2)(a)7(i) may choose to comply with alternative work practice standards I through XI for fuel burning sources and pollution control devices installed to meet applicable emission limitations, as applicable. These standards do not appear to reflect consideration of the seven specific criteria EPA recommends for developing alternative emission limitations that apply during startup and shutdown. (See Final SSM SIP Call notice (6/12/15), p. 33980, col. 2.) Specific concerns EPA has with this provision include:

   a. These requirements seem to have been developed without consideration of whether sources are capable of complying with otherwise applicable numeric pollutant emission limits. EPA does not recommend establishing alternative emission limitations for sources that are capable of meeting their existing emission limitations at all times.

   b. These requirements have not been tailored for specific sources or source categories. Control requirements that apply during startup and shutdown must be clearly stated as components of the emission limitation and must meet the applicable level of control required for the type of SIP provision (*e.g.,* be RACT for sources located in nonattainment areas). A generically applicable requirement to operate control equipment to the maximum extent possible is not a component of an emission limitation for a specific source category. The EPA recommends that, in order to be approvable (*i.e.,* meet CAA requirements), alternative requirements applicable to a source during startup and shutdown should be narrowly tailored and take into account considerations such as the technological limitations of the specific source category and the control technology that is feasible during startup and shutdown.

8. Related to the comment above, EPA notes that all of the listed Alternative Work Practice Standards in **391-3-1-.02(2)(a)7(ii)(III)** except for II, III and VI appear to contain exempt periods, presumably due to technological limitations of the control equipment. Some of the standards also require operation "as specified by the manufacturer," which makes these standards difficult or impractical to enforce and may also result in exempt periods. For example, for units using baghouses, no emission limitation would apply whenever "the inlet gas temperature is below the dew point or the manufacturer's recommended minimum operating temperature." As discussed in the Final SIP Call notice, in accordance with the CAA, some emission limitation must apply at all times. Examples of potential alternative emission limitations that may be applied include use of additional emission controls, use of cleaner burning fuels, and establishment of higher numerical emission limits. (Note that establishment of higher numerical emission limits that are reasonable, appropriate and

practically enforceable likely would not be considered SIP backsliding under CAA sections 193 and 110(l) when they are replacing an exemption from existing SIP emission limitations.)

9.  Draft provision **391-3-1-.02(2)(a)7(ii)(IV) (Similar Process Equipment Alternative Work Practice Standards Option)** provides that in lieu of the General Alternative Work Practice Standards Option the owner or operator of a source may follow the startup and shutdown work practice standards in Federal rules included in 40 CFR Part 60 or 40 CFR Part 63, provided that the rule contains specific work practice standards for startup and shutdown periods.  The provision also notes that those federal rules are adopted by Georgia as 391-3-1- .02(8) and (9).

    While EPA has recommended that certain Federal rules may provide good examples of approaches for appropriate and feasible alternative emission limitations for states to apply during startup and shutdown in a SIP provision (in particular those federal rules that have been revised or newly promulgated since 2008), the SIP must be clear as to what the applicable limitations are for each source at all times.  Therefore, this provision should specify which sources or source categories will comply with the startup/shutdown procedures contained in Federal rules and which provisions from those federal rules are applicable.  The State should also not automatically assume that emission limitation requirements in recent NESHAP and NSPS are appropriate for all sources regulated by the SIP.  The universe of sources regulated under the federal NSPS and NESHAP programs is not identical to the universe of sources regulated by states for purposes of the NAAQS.  Moreover, the pollutants regulated under the NESHAP (*i.e.,* HAPs) are in many cases different than those that would be regulated for purposes of attaining and maintaining the NAAQS, protecting PSD increments, improving visibility and meeting other CAA requirements.  (See Final SSM SIP Call notice (6/12/15), p. 33916, cols. 2-3.)  EPA also recommends giving consideration to the seven specific criteria as appropriate considerations for developing emission limitations in SIP provisions that apply during startup and shutdown.  (See Final SSM SIP Call notice (6/12/15), p. 33980, col. 2.)

    To adopt federal rule SSM provisions into the SIP, EPA suggests that a state's rule include in the SIP provision the relevant language from the federal rule that serves as the applicable limitation during startup/shutdown.  Alternatively, the SIP could include reference to the specific applicable provisions.  For example, the rule might provide that steam generating units subject to GA Rule 391-3-1-.02(2)(b), (d) and (g) shall, during periods of startup and shutdown, comply with the applicable work practice standards specified in Table 3 to 40 CFR 63 Subpart UUUUU.  Such provision should also specify the version of the CFR (i.e., the "as of" date).

10. Draft provision **391-3-1-.02(2)(a)7(ii)(V)** provides that in lieu of options (ii)(III) and (ii)(IV), the owner or operator of a source may comply with a source-specific alternative work practice standard for startup and shutdown periods that has been incorporated into a federally enforceable permit.  EPA notes, however, that emission limits that are specified only in a permit are not in the SIP unless and until they are submitted for approval into the SIP.  For example, unless the permit (or its contents) is approved into the SIP, the emission reductions

attributable to those limits that are only in the permit cannot be counted towards attainment plan requirements (e.g., RFP). The fact that EPA approved the permitting program itself does not mean that EPA has approved the actual content of each permit or made it an approved part of the SIP. (See Final SSM SIP Call notice (6/12/15), p. 33915, col. 3 and p. 33922, col. 3).

In the context of emission limits contained in a state's SIP, EPA views the approach of establishing alternative emission limitations through a permit as a form of "director's discretion" problem addressed in the SIP call notice because it would allow the state to create alternatives to SIP emission limits without complying with the CAA's SIP revision requirements. Among other things, a permit-based approach to establishing an alternative emission limitation (that does not involve submitting the permit requirement to EPA for inclusion in the SIP) eliminates EPA's role in reviewing and approving emission limitations to ensure that they are "enforceable" as required by CAA section 110(a)(2)(A), i.e., that they are sufficiently specific regarding the source's obligations and they include adequate monitoring, recordkeeping, and reporting requirements.

Accordingly, a permitting process cannot be used to create alternatives to SIP emission limitations for sources during startup and shutdown in lieu of a SIP revision. However, a state may elect to use the permit development process as a means to evaluate and establish alternative emission limits for startup and shutdown for a specific source, but then submit that information to support a source-specific SIP revision. The State may be able to use the permit development process at the same time with the development of the SIP revision for efficiency. Alternative emission limitations established in this way would have to meet the necessary level of stringency for both purposes and be legally and practically enforceable.



VIA ELECTRONIC MAIL

Deidra Johnson
Attorney Supervisor
Louisiana Department of Environmental Quality
Office of the Secretary, Legal Division
P.O. Box 4302
Baton Rouge, LA 70821
Diedra.johnson@la.gov

Bryan D. Johnston
Louisiana Department of Environmental Quality
Air Permits Division
P.O. Box 4313
Baton Rouge, LA 70821
Bryan.johnston@la.gov

August 3, 2016

RE:   **Sierra Club, Louisiana Environmental Action Network, and Concerned Citizens of
Murphy Comments on Louisiana Department of Environmental Quality's Proposed
State Implementation Plan ("SIP") Amendments in Response to EPA's Startup,
Shutdown, and Malfunction SIP Call, 80 Fed. Reg. 33840 [LDEQ Doc. Nos. AQ 360;
363; 364; and 1607Pot1]**

Dear Ms. Johnson and Mr. Johnston:

Please accept these comments submitted on behalf of Sierra Club, Louisiana
Environmental Action Network ("LEAN"), and Concerned Citizens Around Murphy
(collectively, "Conservation Organizations") regarding the Louisiana Department of
Environmental Quality's ("LDEQ's") proposal to repeal LAC 33:III.1507.A and B (AQ 360);
LAC 33:III.2307.C (AQ 363); and LAC 33:III.2201.C.8 and its proposed amendment to LAC
33:III.2201.K (AQ 364). *See also* LDEQ 1607Pot1. The rule is intended to comply with EPA's
recently finalized rulemaking, State Implementation Plans: Response to Petition for Rulemaking;
Restatement and Update of EPA's SSM Policy Applicable to SIPs; Findings of Substantial
Inadequacy; and SIP Calls To Amend Provisions Applying to Excess Emissions During Periods
of Startup, Shutdown and Malfunction, 80 Fed. Reg. 33840 (June 12, 2015) [hereinafter, "SSM
SIP Call"]. Although we agree that, as required by EPA's SSM SIP Call, LDEQ must repeal the
subsections of its SIP that exempt excess emissions during periods of "start-up" and during "on-
line adjustments," we have serious concerns regarding LDEQ's proposed "Work Practice
Standards" in subsection 2201.k, and recommend revisions consistent with federal law.

1

## I.     INTRODCTION

On behalf of their thousands of members and supporters who live, work, and recreate in Louisiana, the undersigned Conservation Organizations appreciate the opportunity to provide these comments concerning Louisiana's proposal to amend its State Implementation Plan ("SIP") and associated Louisiana Administrative Code provisions in response to EPA's SSM SIP Call for Louisiana.  Sierra Club is the nation's oldest and largest grassroots environmental organization and is dedicated to the protection of the natural environment and public health.  LEAN is a Louisiana non-profit corporation, whose purpose is to preserve and protect the state's land, air, water, and other natural resources, and to protect its members and other residents of the state from threats of pollution.  Concerned Citizens of Murphy is an association of residents in St Bernard Parish, Louisiana, who live and work in neighborhoods that have been historically and disproportionately impacted by pollution from industrial pollution.  As described in the attached declarations and comments submitted in support of EPA's SSM SIP Call, members and supporters of the Conservation Organizations have been directly and adversely impacted by startup, shutdown, and malfunction events.[1]

This is because power plants and other industrial facilities can emit massive amounts of particulate matter and other pollutants during periods of startup, shutdown, or malfunction. Indeed, as part of its SSM SIP Call rulemaking, EPA recognized the practical consequences of SSM exemptions, noting "one malfunction that was estimated to emit 11,000 pounds of [sulfur dioxide] SO2 over a 9-hour period when the applicable limit was 3,200 pounds per day." Memorandum dated Feb. 4, 2013, to EPA Docket No. EPA-HQ-OAR-2012-0322 at 23, *available at* https://www.epa.gov/airquality/urbanair/sipstatus/docs/ssm_memo_021213.pdf. These large SSM pollution exceedances can occur many times each year.  After reviewing data from numerous power plants as part of the Mercury and Air Toxics rulemaking, EPA found that the "average" electric generating unit ("EGU") had between 9 and 10 startup events per year between 2011 and 2012, and that many EGUs had "over 100 startup events in 2011 and over 80 in 2012."  Assessment of startup period at coal-fired electric generating units – Revised," at p. 4 (Nov. 2014).[2]

Given the huge emissions possible during startup and shutdown, and given that more than nearly three quarters of a million Louisianans live and work in parishes that are designated as

---

[1] *See* Ex. 1 (Decl. of Velma White in support of EPA SSM SIP Call, EPA Docket No. EPA-HQ-OAR-2012-0322-0622), *available at* https://www.regulations.gov/contentStreamer?documentId=EPA-HQ-OAR-2012-0322-0622&attachmentNumber=10&disposition=attachment&contentType=pdf; Ex. 2 (Concerned Citizens of Murphy comments in support of EPA SSM SIP Call, EPA Docket No. EPA-HQ-OAR-2012-0322-0622), *available at* https://www.regulations.gov/contentStreamer?documentId=EPA-HQ-OAR-2012-0322-0088&attachmentNumber=3&disposition=attachment&contentType=pdf.

[2] *Available at* https://www3.epa.gov/airtoxics/utility/matsssfinalruletsd 110414.pdf.

nonattainment for 2008 ozone National Ambient Air Quality Standard, reducing startup and shutdown emissions from fuel-burning sources, including power plants, should be a priority for LDEQ.  Indeed, as described in the attached declaration of Velma White of Shreveport Louisiana, these SSM events can severely impact the quality of life around power plants and industrial facilities, and many members of the Conservation Organizations are concerned that SSM events can cause or exacerbate respiratory illnesses, heart disease, renal failure, rashes, and nose and throat irritation, nausea, and even impairing smell and taste.[3]  Moreover, these SSM events tend to disproportionately impact the minority and low income communities surrounding these facilities.

While we commend LDEQ for recognizing and proposing to repeal the unlawful SMM exemptions that EPA identified in its SSM SIP Call, the proposed SSM "work practices" proposal does little (if anything) to reduce particulate and nitrogen oxide ("NOx") emissions at affected facilities in the Baton Rouge area during SSM events.  As described in more detail below, Louisiana's proposed "work practice standards" under LAC 33:III.2201.K are flawed in several respects, do not meet the requirements of the Clean Air Act or EPA's final SSM policy, and are not approvable by EPA.  LDEQ must make several changes to ensure that those work practice standards conform with the Clean Air Act and EPA's SSM policy.

## II.     EPA's SSM SIP CALL

EPA's SSM SIP Call requires 36 states, including Louisiana, to remove from their SIPs exemptions and affirmative defenses that allow industrial facilities to pollute the air without consequences when those facilities start up, shut down, or experience self-diagnosed "malfunctions." 80 Fed. Reg. 33,840 (June 12, 2015).  In particular, EPA found that SIPs with provisions that exempt emissions during start-up, shutdown, and maintenance—like Louisiana's current SIP— are substantially inadequate to meet Clean Air Act requirements. 80 Fed. Reg. at 33,840.  In addition to requiring the 36 states whose SIPs contain these exemptions or affirmative defense provisions to remove these provisions from their SIPs, the SIP Call also revises EPA's policy for SIP provisions addressing excess emissions during SSM events. *Id*. The SIP Call allows states 18 months to submit revised SIPs to EPA, which is the maximum time allowable under the statute. *Id*. at 33,848; 42 U.S.C. § 7410(k)(5).

The SIP Call increases protections for communities against harmful air pollution from industrial facilities. EPA expects that "revision of the existing deficient SIP provisions has the potential to decrease emissions significantly in comparison to existing provisions,… encourage sources to reduce emissions during startup and shutdown and to take steps to avoid malfunctions, should provide increased incentive for sources to be properly designed, operated and maintained in order to reduce emissions at all times, … [and] has the potential to result in significant emission control and air quality improvements." *Id*. at 33,955-56. Importantly, beyond the legal deficiencies in the provisions, "the results of automatic and discretionary exemptions in SIP provisions, and of other provisions that interfere with effective enforcement of SIPs, are real-world consequences that adversely affect public health. *Id.* at 33,850.

---

[3] Ex. 1 at ¶¶7-10.

3

Because facilities subject to the Clean Air Act ("CAA") can emit massive amounts of particulate matter, sulfur dioxide, nitrogen oxide, and other harmful air pollution during periods of start-up, shutdown, and maintenance, it is imperative that Louisiana include strong SIP provisions governing emissions during these periods to protect fence-line and other communities. Indeed, EPA expects that "revision of the existing deficient SIP provisions [including Louisiana's] has the potential to decrease emissions significantly in comparison to existing provisions" because these required revisions will "encourage sources to reduce emissions during startup and shutdown and to take steps to avoid malfunctions, . . . should provide increased incentive for sources to be properly designed, operated and maintained in order to reduce emissions at *all* times." 80 Fed. Reg. at 33,955-56 (emphasis added). SSM exemptions, like those in the current Louisiana SIP, have "real-world consequences that adversely affect public health," and removing those exemptions "has the potential to result in significant emission control and air quality improvement." *Id*. at 33,850.

## III.   LDEQ MUST REMOVE THE SSM EXEMPTIONS FROM LOUISIANA REGULATIONS

As LDEQ correctly recognizes, EPA's SSM SIP Call requires the state to remove the start-up, shutdown, and malfunction exemptions currently found at LAC 33:III.1507.A and B; LAC 33:III.2307.C; and LAC 33.III.2201.C. As the agency recognized with its earlier proposals to repeal Louisiana's SSM exemptions for opacity and VOC emissions, however, the best approach to the SSM SIP Call is for LDEQ to simply remove the illegal SSM exemption from the Louisiana SIP.[4] Removing these exemptions would mean that the normal SIP limits that are designed to protect air quality and comply with the Act's requirements would apply during all "startup and shutdown and malfunctions." And EPA has made clear that it should be technically feasible for most sources to "meet the same emission limitation" during *both* "steady-state" and startup/shutdown periods. 80 Fed. Reg. 33,840, 33,979 (June 12, 2015). Indeed, in the SSM SIP Call EPA expressed its preference for numeric limitations during SSM operations, and many of the states and territories not included in EPA's SIP Call have regulations that require just that— *i.e.*, that sources meet SIP emission limits at *all* times. Moreover, removal of the exemption would avoid concerns about conformity with the Clean Air Act, as well as litigation and administrative risks associated with EPA review and approval. Because LDEQ's primary consideration should be protection of public health in strict compliance with the federal Clean Air Act, the agency should simply remove those exemptions without attempting to create impractical and unenforceable work practice standards.

## IV.   SPECIFIC PROBLEMS WITH LDEQ'S WORK PRACTICES PROPOSAL

### A.   EPA's SSM Work Practices Policy Under the Clean Air Act

In its SIP Call rule, EPA identifies the criteria by which alternative emissions limits for startup and shutdown should be developed, as follows:

---

[4] Sierra Club also supports Louisiana's previous proposals to repeal the SSM exemptions found at LAC 33:III1107, *see* AQ 361 (proposing to delete excess opacity exemption), and LAC 33:III.2153, *see* AQ362 (deleting VOC emission exemption for industrial waste water).

4

(1) the alternative emission limitation is "limited to specific, narrowly defined source categories using specific control strategies,"
(2) use of the control strategy for the source category is "technically infeasible" during startup/shutdown,
(3) the limit requires that the frequency and duration of operation in startup/shutdown mode are "minimized to the greatest extent practicable,"
(4) the state analyzes the potential worst-case emissions that could occur during startup/shutdown based on the proposed limit,
(5) the limit requires that "all possible steps are taken to minimize the impact of emissions during startup and shutdown on ambient air quality,"
(6) the limitation requires that "at all times, the facility is operating in a manner consistent with good practice for minimizing emissions and the source uses best efforts regarding planning, design, and operating procedures," and
(7) the actions during startup/shutdown are properly documented.

*Id.* at 33914.

Importantly, EPA further states that alternative requirements applicable to the source during startup and shutdown should be "narrowly tailored and take into account considerations such as the technological limitations of the specific source category and the control technology that is feasible during startup and shutdown."  *Id.* at 33913.

B.    *LDEQ Has Failed to Demonstrate that its Proposed Reliance on SSM Work Practices is Appropriate Under these Circumstances*

LDEQ's proposed work practice standards are not only too vague and ambiguous to be enforceable, but they do not appear to reflect consideration of the seven specific criteria by which alternative emission limitations for startup and shutdown should be developed.  In particular, LDEQ's has failed to demonstrate that its work practice standards (1) are narrowly tailored to defined source categories using specific control strategies; (2) the use of the control strategy for the source category is "technically infeasible" during startup or shutdown; (3) the state analyzed the potential worst-case emissions that could occur during startup/shutdown based on the proposed limit; or (4) that the actions during startup and shutdown are properly documented or that the work practice standards are enforceable.

1.    LDEQ's Work Practice Standards Are Not Narrowly Tailored

Louisiana's proposed work practices standards are not "limited to specific, narrowly defined source categories using specific control strategies." *Id.* at 33914.  Indeed, the work practice standards apply to virtually every major source of nitrogen oxides in and surrounding the Baton Rouge nonattainment area without consideration of whether sources are technically capable of complying with numeric SIP limits during periods of startup, shutdown, or malfunction.  *See* proposed LAC 33:III.2201.K.3.a (applying to all "affected point source[s]" Baton Rouge Nonattainment Area and Region of Influence).  In the final SSM SIP call rule, EPA confirmed that startup and shutdown are "part of the normal operation of a source and should be

5

accounted for in the design and operation of the source.  It should be possible to determine an appropriate form and degree of emission control during startup and shutdown and to achieve that control on a regular basis." 80 Fed. Reg. at 33979.  EPA's final SSM Policy from the SIP call provides that a "state can develop special, alternative emission limitations that apply during startup or shutdown *if the source cannot meet the otherwise applicable emission limitation in the SIP*." *Id.* at 33,980.  Thus, work practices or alternative compliance plans (in lieu of having to meet normal SIP limits during startup and shutdown) are *only* appropriate for those narrowly limited source categories that truly cannot meet numerical limits for particular pollutants during startup and shutdown.

Additionally, Louisiana's proposed work practice standards are not appropriately limited to specific, narrowly defined control strategies or operations.  Proposed section 2201.K.3.c indicates that sources must engage "control devices *such as* selective catalytic reduction (SCR) . . . *as expeditiously as possible*, considering safety and *manufacturer recommendations*."  LAC 33.III.2201.K.3.c (emphasis added).  As an initial matter, control requirements that apply during startup and shutdown must be clearly stated as components of the emission limitation and must meet the applicable level of control required for the type of SIP provision (*e.g.,* be RACT for sources located in nonattainment areas).  A generically applicable requirement to operate control equipment "such as" selective catalytic reduction "as expeditiously as possible" is not a narrowly tailored continuous and enforceable limitation.  The same ambiguity and enforceability problem applies to the provision requiring operation of controls only to the extent the "manufacturer recommendations," which makes these standards difficult or impractical to enforce and may also result in exempt startup and shutdown periods.  Indeed, manufacturers typically recommend that control equipment, such as SCR, be operated only at temperatures higher than those typical during startup and shutdown.  Exempting sources from operating pollution controls according to manufacturer recommendations conflicts with EPA's mandate that some emission limitation be applicable at all times.

If work practices are proper (again, they are not), LDEQ should require pollution controls to be operated at specific time points during startup and shutdown.  As an example for power plants, LDEQ can look to the startup and shutdown work practices from the final Mercury and Air Toxics Standards ("MATS") rule (*before* these work practices were changed on reconsideration).[5]  There, for startup, EPA required all pollution controls to be operated once plants begin firing their primary fuel (*e.g.*, coal for coal-fired power plants).  77 Fed. Reg. 9304, 9493 (Feb. 16, 2012).  Instead of allowing pollution controls to be engaged at some uncertain time that is purportedly "practicable," LDEQ must explicitly require that pollution controls be engaged no later than the end of startup, which is defined as the time when electricity is generated for any purpose.  *See* LAC 33:III.2201.K.3.b (as proposed).

---

[5] In the D.C. Circuit Court of Appeals, Sierra Club and other organizations are currently challenging EPA's final action on reconsideration of the startup and shutdown provisions of the MATS rule.  Sierra Club maintains that EPA's final (reconsideration) definition of startup (which includes a four-hour exemption from numerical emission limits) and startup work practices do not meet the requirements of the Clean Air Act, including the requirement to achieve continuous reductions.

2.    LDEQ Has Failed to Demonstrate that it is "Technically Infeasible" for
      Sources to Meet Numeric Limits During Startup and Shutdown

Consistent with the SIP Call, alternative emissions limits (including work practice standards) should only be available for sources showing that use of controls or meeting numeric limitations are *technically infeasible*" during that time.  80 Fed. Reg. at 33980 (emphasis added).  Such technical infeasibility cannot include sources with outdated or undersized pollution controls that, if properly designed, could operate during startup or shutdown.  Many (if not all) of the affected sources in the Baton Rouge nonattainment area can and should be required to meet normal SIP limits during startup and shutdown.  Because LDEQ has failed to provide a factual basis for demonstrating that affected sources are *not* capable of meeting their existing emission limitations at all times, the agency has failed to demonstrate that its proposed SSM work practice standards are appropriate under the circumstances.  Accordingly, LDEQ's proposed work practice standards must be removed from the proposed SIP.

Even for those sources (if any) that truly cannot meet normal limits during startup and shutdown, LDEQ should establish alternative numerical limits instead of work practices.  In its SIP Call, EPA also made clear that work practices are only appropriate for those limited periods of time when "*measurement of emissions during startup and/or shutdown is not reasonably feasible.*"  *See* 80 Fed. Reg. at 33980 (emphasis added).  Where possible, establishing numerical limits in lieu of work practices is required by Clean Air Act § 110(a)(2), which provides that SIPs are to include "*enforceable* emission limitations . . . as may be necessary or appropriate to meet the applicable requirements" of the Act."  42 U.S.C. 7410(a)(2) (emphasis added).  In the SSM SIP call, EPA echoed that numerical limits are preferable to work practices in terms of enforceability.  *See* 80 Fed. Reg. at 33974-75 ("There are many sources for which a numerically expressed emission limitation will be the most appropriate and will result in the most legally and practically enforceable SIP requirements"); *id.* at 33979 ("In practice, it may be that numerical emission limitations are the most appropriate from a regulatory perspective (*e.g.,* to be legally and practically enforceable) and thus the emission limitation would need to be established in this form to meet CAA requirements").  At least for power plants, like Big Cajun II near Baton Rouge, it is demonstrably reasonable to measure NOx emissions during startup and shutdown.  For decades, under the Clean Air Act Acid Rain Program, power plants like Big Cajun II have continuously monitored sulfur dioxide and nitrogen oxide emissions from the moment combustion begins throughout generation.

3.    LDEQ Must Demonstrate that Its Proposal Will Not Violate the NAAQS
      or PSD Increments.

Under § 110(l) of the Clean Air Act, EPA cannot approve SIP revisions that would interfere with attainment of the NAAQS or PSD increments:  "The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or any other applicable requirement of this chapter."  42 U.S.C. § 7410(l).  In keeping with this requirement, EPA stated in the SSM SIP call that, "[a]s part of its justification of the SIP revision, the state [should] analyze[] the potential worst-case emissions that could occur during

startup and shutdown based on the applicable alternative emission limitation" 80 Fed. Reg. at 33980.

Excess emissions from startup and shutdown events have far-reaching impacts on other requirements of the Act. 78 Fed. Reg at 12,485. States must rely on assumed continuous compliance with emissions limitations in their modeling exercises to demonstrate attainment and maintenance of ambient air quality standards. See EPA Memorandum to Docket EPA-HQ-OAR-2012-0322, at 14, n. 41 (Feb. 4, 2013) (citing, inter alia, CAA sections 110(a)(2)(A)&(C)). In areas that are meeting air quality standards, state plans must include emission limitations designed to ensure that air quality does not worsen. 42 U.S.C. § 7475(a)(3), 40 C.F.R. § 51.166(k)(1); see 78 Fed. Reg. at 12,485. Similarly, in nonattainment areas, nonattainment SIPs must include emission inventories which are comprehensive, accurate, and current of actual emissions and must also include emission statements from stationary sources. See, e.g., 42 U.S.C. §§ 7511(a)(1), (3). Also, in nonattainment areas, state plans must include a program that assures reasonable progress toward attainment of ambient air quality standards. 42 U.S.C. § 7501 et seq. Nonattainment NSR permitting requires offsetting of emissions based on permitted emission limits. See, e.g., 42 U.S.C. § 7511(a)(4). There is no way to adjust the required offsets should a source exceed its permitted emission limits during SSM because nonattainment NSR permitting occurs prior to construction and the permits do not ever expire. Plans must also protect scenic views in many of America's most treasured public lands. 42 U.S.C. § 7491(a)(1).

Here, it does not appear that LDEQ has considered the potential effect of its proposed work practices on these required attainment demonstrations and planning under the Act. Indeed, LDEQ's narrative SIP revision contains a cursory description of the revision with no analysis whatsoever of the impact of uncontrolled nitrogen oxide emissions during startup and shutdown on the Baton Rouge nonattainment area. This is especially troubling given that LDEQ's proposed work practice standards will specifically apply to areas of Louisiana that have the worst air quality in the state—the Baton Rouge nonattainment area for ozone. Given the huge quantities of nitrogen oxide emissions that are possible during startup and shutdown (while NOx controls will not be required to operate), and given that NOx is a precursor pollutant that causes ground-level ozone, LDEQ must evaluate the potential worst-case emissions that could occur during startup/shutdown under the proposed work practice standards. It appears that LDEQ's proposal will do little (if anything) to reduce NOx emissions below the status quo, and could exacerbate Baton Rouge's nonattainment status.

### 4.     LDEQ Must Include Reporting Requirements

LDEQ's work practices proposal does not require sources to report to LDEQ any information to assure that sources are complying with the requirements of the rule. Because there is no way for LDEQ to know—without requesting documentation from sources—whether sources are complying with the work practice requirements, there is also no way for citizens or EPA to obtain information about whether or not sources are complying with the requirements. Thus, the requirements are not practically enforceable by LDEQ in enforcement suits. Nor are they enforceable by EPA or citizens in federal court. If LDEQ insists on including work practices instead of numerical limits (which we maintain is not consistent with the requirements of the Clean Air Act or the SIP Call rule, and therefore not approvable by EPA or the 11th Circuit), the agency should require the work-practice compliance information from the proposed rule to be reported by sources through, at the least, their quarterly Title V compliance reports.

#### C.  LDEQ's Work Practices Standards are Inappropriate for Multiple Additional Reasons

Apart from the fact that LDEQ failed to demonstrate that its work practices standards are appropriate or enforceable under EPA's SSM SIP criteria, Louisiana's proposal does not meet Clean Air Act § 110's enforceability requirement for other reasons:

##### 1.    LDEQ's Proposal Does Not Limit Emissions on a Continuous Basis

As noted above, Clean Air Act § 110(a)(2) requires that SIPs are to include "enforceable emission limitations . . . as may be necessary or appropriate to meet the applicable requirements" of the Act.  "Emission limitations" are defined under § 302(k) of the Act to include work practices, and these must be continuous.   More specifically, § 302(k) defines "emission limitation" as a "requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants *on a continuous basis, including* any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and *any design, equipment, work practice or operational standard promulgated under this chapter.*" 42 U.S.C. § 7602(k) (emphasis added).  The D.C. Circuit Court of Appeals confirmed that exemptions for SSM events conflict with the Act's plain requirement that emission limitations and standards must be continuous.  *Sierra Club v. EPA,* 551 F.3d 1019, 1027 (D.C. Cir. 2008).

Accordingly, EPA's Statement of SSM Policy in the final SSM SIP call states:  "The EPA's longstanding interpretation of the CAA is that SIP provisions cannot include exemptions from emission limitations for emissions during SSM events. In order to be permissible in a SIP, an emission limitation must be applicable to the source continuously, *i.e.,* cannot include periods during which emissions from the source are legally or functionally exempt from regulation."  80 Fed. Reg. at  33976.

Here, LDEQ's proposal does not ensure continuous reductions in emissions throughout startup and shutdown, and LDEQ's proposal includes periods during which emissions are functionally exempt from regulation.  As an initial matter, the language in the general work practice option only requires the operation of nitrogen oxide control technology as soon as "practicable" and only if consistent with "manufacturer recommendations."  As discussed above, this language gives sources broad latitude to choose when to operate those controls, and many NOx control systems are only operated above operating temperatures.  For those sources, until the point during startup when their particular pollution controls engage and begin to reduce emissions (or after these controls disengage in shutdown), there is no requirement in Louisiana's proposal to limit emissions during startup or shutdown.  For example, coal-fired power plants could claim that manufacturers recommend that their equipment not be operated until close to full load, which could well into startup (sometimes perhaps after 9 or 10 hours of startup, based on our experience with power plants in Texas).  During these 9 or 10 hours, there would be no requirement in the Louisiana rules for these plants to limit their emissions.

However, as noted in the attached report, prepared for Sierra Club by Dr. Ranajit (Ron) Sahu, Ph.D, QEP, CEM (Nevada), sources can, in fact, temporarily operate SCR technology

below the manufacturer's recommended minimum operating temperature (for up to 12 hours) *without* causing any irreversible adverse impacts to the SCR.  *See* Attach. A to Ex. 3 at 10-13.  Indeed, many SCR systems are capable of operating at a "range below the temperature at which" the catalyst condenses "while maintaining the required NOx removal efficiency." *Id*. at 11.  "Benefits to the utility include higher overall NOx removal, improved flexibility for load cycling and maintenance, and the potential for eliminating the need for an economizer bypass or alternate methods of temperature control for the SCR system in new designs and retrofits." *Id*.

Separately, there are several industry-recognized methods that can be used to maintain boiler/SCR exit gas temperature above the minimum operating temperature for SCR even during low load operations at a unit, including during startup and shutdown. *Id*. § 5.0.  In fact, vendors are currently able to optimize SCR systems "to allow for operation of the boiler *down to 25% load* with the SCR in service while maintaining unit efficiency at full load." Id. at 15 (emphasis added).  Thus, there are in fact technically feasible methods for operating SCR technology, even during periods of low load operation such as start up.  Accordingly, LDEQ must revise its work practice standards to make clear that control devices, such as SCR or SNCR must be engaged *during* startup.

Another reason that LDEQ's proposal does not achieve continuous reductions (and is not enforceable) is that LDEQ has not defined what it means to "engage" selective catalytic reduction systems and other NOx "control devices" in the general work practice option.  *See* LAC 33:III.2201.K.3.c.  Control devices, like selective catalytic reduction, have multiple levels of removal efficiency.  LDEQ's work practice would allow such control devices to operate at widely varying performance levels, with some units choosing to "engage" the unit but operate at much lower efficiencies than the equipment is capable of achieving.  The requirement to simply turn on NOx control equipment—if that is what LDEQ means by "engage"—does nothing to ensure that this equipment is functioning at the levels needed to assure the maximum possible control of NOx emissions.  LDEQ must include clear definitions of what it means to engage the various controls listed in the general option.  Those definitions should, at the least, require NOx controls to operate at near 100% efficiency at a clearly defined time early in startup.

Finally, LDEQ's proposal cannot assure continuous reductions because, as discussed above, the general work practice option essentially leaves it up to sources to choose when to begin to operate their various NOx pollution controls—*i.e.*, as expeditiously as practicable taking into consideration manufacturer recommendations.  LDEQ should include a work practice requiring SCR and similar controls to be operated from (at the least) the point that plants begin to fire their primary fuel.  Such a work practice for NOx controls is especially important given that NOx is an ozone precursor and Baton Rouge's nonattainment status for ozone.

      2.    <u>Particular Sources' Choices to Use the Alternative Work Practices Must Be Incorporated into Louisiana's SIP</u>

Any alternative limits or work practices must be incorporated through the SIP amendment process, allowing for public notice and comment and EPA approval.  For example, in the SSM SIP call, EPA specifically stated that a "SIP needs to reflect the control obligations of sources, and any revision or modification of those obligations should not be occurring through a

10

Exhibit 2
077

separate process, such as a permit process, which would not ensure that 'alternative' compliance options do not weaken the SIP."  80 Fed. Reg. at 33915.

LDEQ's proposal for Section 2201.K does not comply with this requirement.  Sources can choose between Section D's NOx emission factors, paragraph K.1's alternative plan approved in accordance with Paragraph E.1 or 2,  or paragraph K.3's work practices standards.  If LDEQ maintains this option (as discussed above, this is not proper), any choice by a particular source to use an alternative plan or the work practices rule should be incorporated into the Louisiana SIP.

Additionally, LDEQ proposes to include the following language in the revised section 2201.K: For affected point sources that are shut down intentionally more than once per month, the owner or operator shall include NOx emitted during periods of start-up and shutdown for purposes of determining compliance with the emission factors set forth in Subsection D of this Section, *or with an alternative plan approved* in accordance with Paragraph E.1 or 2 of this Section." (emphasis added). This language is impermissibly vague and appears to inappropriately allow for the development of alternative emission limits outside of the SIP approval process.  The SIP Call Rule makes it clear that alternative emissions limits must be included in an approved SIP, not merely in permits. 80 Fed. Reg. at 33915. As EPA explains, the "SIP needs to reflect the control obligations of sources, and any revision or modification of those obligations *should not be occurring through a separate process, such as a permit process*, which would not ensure that "alternative" compliance options do not weaken the SIP." 80 Fed. Reg. 33915 (emphasis added). As a result, "any revisions to obligations in the SIP *need to occur through the SIP revision process….*" 80 Fed. Reg. 33916 (emphasis added). Any alternative emissions limits must therefore comply with the SIP process, including providing the requisite notice and comment period, and all other SIP limit change public participation and other process requirements.  LDEQ must clarify in its proposed rule that any alternative emission limits will be incorporated into its SIP via normal SIP rule change procedures and provide for public participation.

3.    There are Additional Problems with the Options for Source-Specific Alternative Plans Under Section 2201.K.1.

Proposed paragraph K.1 is problematic for additional reasons.  First, source-specific alternative limits or work practices are generally not proper at all.  In the SIP call, EPA specifically stated, "even where a specific type of operation may not during startup and/or shutdown be able to meet an emission limitation that applies during full operation, the state should be able to develop appropriate limitations that would apply to those types of operations at all similar types of facilities.  The EPA believes that there will be limited, if any, cases where it may be necessary to develop source-specific emission requirements for startup and/or shutdown."  80 Fed. Reg. at 33915.  Additionally, as quoted language above indicates, awarding sources alternative limits or work practices through permits would not ensure these compliance options do not weaken the SIP.  *See* 80 Fed. Reg. at 33915.  When a state issues SSM limits through alternative plans that are incorporated into permits, it would make it very difficult to assess the collective impact on the NAAQS or PSD increments of multiple permitted alternative SSM limits.

11

Another problem with the option to pursue source-specific alternative plans under Sections E.1 and 2 is that those provisions do not reflect any consideration of the factors EPA has identified as appropriate considerations for developing alternate SSM requirements.  These alternative plans, implemented through a permit, also raise the prospect of "director's discretion" problems addressed in EPA's SIP Call notice because it would allow the state to create alternatives to SIP emission limits without complying with the CAA's SIP revision requirements.  Among other things, a permit-based approach to establishing an alternative emission limitation (that does not involve submitting the permit requirement to EPA for inclusion in the SIP) eliminates EPA's role in reviewing and approving emission limitations to ensure that they are "enforceable" as required by CAA section 110(a)(2)(A)—*i.e.*, that they are sufficiently specific regarding the source's obligations and they include adequate monitoring, recordkeeping, and reporting requirements.  To avoid these problems, LDEQ should include specific language explaining that source-specific alternative plans are only available as a very last resort upon a sufficient showing that the listed criteria are met, and as discussed above, that such requirements are continuous and enforceable, and subject to the SIP revision process, with the accompanying requirements for public notice and comment.

## V.    CONCLUSION

Thank you for the opportunity to submit these comments.  We respectfully request that LDEQ revise its proposed rule as outlined above.  Please do not hesitate to contact us with any questions or to discuss the matters raised in these comments.

Sincerely,

Joshua Smith
Staff Attorney
2101 Webster St.
Oakland, CA 94612
joshua.smith@sierraclub.org



VIA ELECTRONIC MAIL

Melissa Kuskie
Minnesota Pollution Control Agency
Environmental Analysis and Outcomes Division
520 Lafayette Road North
St. Paul, Minnesota 55155-4194
melissa.kuskie@state.mn.us

November 9, 2016

RE:   **Sierra Club Comments on Minnesota Pollution Control Agency's Proposed State Implementation Plan ("SIP") Amendments in Response to EPA's Startup, Shutdown, and Malfunction SIP Call, 80 Fed. Reg. 33840**

Dear Ms. Kuskie:

Please accept these comments submitted on behalf of Sierra Club regarding the Minnesota Pollution Control Agency's ("MPCA's") proposal to repeal Minnesota Rule 7011.1415, and its proposed amendment to Minnesota Rule 7007.0100, subp. 6a.[1]  The rule is intended to comply with EPA's recently finalized rulemaking, State Implementation Plans: Response to Petition for Rulemaking; Restatement and Update of EPA's SSM Policy Applicable to SIPs; Findings of Substantial Inadequacy; and SIP Calls To Amend Provisions Applying to Excess Emissions During Periods of Startup, Shutdown and Malfunction, 80 Fed. Reg. 33840 (June 12, 2015) [hereinafter, "SSM SIP Call"].  Although we agree that, as required by EPA's SSM SIP Call, MPCA must repeal the subsections of its SIP that exempt excess "process gas" emissions—Minnesota Rule 7011.1415—we have serious concerns regarding MPCA's proposed "alternative operating scenarios" in Minnesota Rule 7007.0100, subp. 6a.

## I.   INTRODCTION

On behalf of their thousands of members and supporters who live, work, and recreate in Minnesota, Sierra Club appreciate the opportunity to provide these comments concerning MPCA's proposal to amend its State Implementation Plan ("SIP") and associated Minnesota Rule provisions in response to EPA's SSM SIP Call for Minnesota.  Sierra Club is the nation's oldest and largest grassroots environmental organization and is dedicated to the protection of the natural environment and public health.

Sierra Club's members and supporters have been directly and adversely impacted by startup, shutdown, and malfunction events.  This is because power plants and other industrial facilities can emit massive amounts of particulate matter and other pollutants during periods of

---

[1] *See also* https://www.pca.state.mn.us/sites/default/files/SSM%20SIP.pdf

startup, shutdown, or malfunction. Indeed, as part of its SSM SIP Call rulemaking, EPA recognized the practical consequences of SSM exemptions, noting "one malfunction that was estimated to emit 11,000 pounds of [sulfur dioxide] SO2 over a 9-hour period when the applicable limit was 3,200 pounds per day." Memorandum dated Feb. 4, 2013, to EPA Docket No. EPA-HQ-OAR-2012-0322 at 23, *available at* https://www3.epa.gov/airquality/urbanair/sipstatus/docs/ssm_memo_021213.pdf. These large SSM pollution exceedances can occur many times each year. After reviewing data from numerous power plants as part of the Mercury and Air Toxics rulemaking, EPA found that the "average" electric generating unit ("EGU") had between 9 and 10 startup events per year between 2011 and 2012, and that many EGUs had "over 100 startup events in 2011 and over 80 in 2012." Assessment of startup period at coal-fired electric generating units – Revised," at p. 4 (Nov. 2014).[2]

Given the huge emissions possible during startup and shutdown, reducing startup and shutdown emissions from fuel-burning sources should be a priority for MPCA. Indeed, these SSM events can severely impact the quality of life around power plants and industrial facilities, and many Sierra Club members are concerned that SSM events can cause or exacerbate respiratory illnesses, heart disease, renal failure, rashes, and nose and throat irritation, nausea, and even impairing smell and taste.[3] Moreover, these SSM events tend to disproportionately impact the minority and low income communities surrounding these facilities.

While we commend MPCA for recognizing and proposing to repeal the unlawful SMM exemptions that EPA identified in its SSM SIP Call, Minnesota's proposed "alternative operating scenario" proposal does little (if anything) to reduce harmful emissions at affected facilities in Minnesota during SSM events. As described in more detail below, Minnesota's proposed "alternative operating scenario" are flawed in several respects, do not meet the requirements of the Clean Air Act or EPA's final SSM policy, and are not approvable by EPA. Minnesota must make several changes to ensure that the "alternative operating scenario" provision conforms with the Clean Air Act and EPA's SSM policy.

## II.    EPA's SSM SIP CALL

EPA's SSM SIP Call requires 36 states, including Minnesota, to remove from their SIPs exemptions and affirmative defenses that allow industrial facilities to pollute the air without consequences when those facilities start up, shut down, or experience self-diagnosed "malfunctions." 80 Fed. Reg. 33,840 (June 12, 2015). In particular, EPA found that SIPs with provisions that exempt emissions during start-up, shutdown, and maintenance—like Minnesota's current SIP— are substantially inadequate to meet Clean Air Act requirements. In addition to requiring the 36 states whose SIPs contain these exemptions or affirmative defense provisions to remove these provisions from their SIPs, the SIP Call also revises EPA's policy for SIP provisions addressing excess emissions during SSM events. *Id.* The SIP Call allows states 18 months to submit revised SIPs to EPA, which is the maximum time allowable under the statute. *Id.* at 33,848; 42 U.S.C. § 7410(k)(5).

---

[2] *Available at* https://www3.epa.gov/airtoxics/utility/matsssfinalruletsd 110414.pdf.
[3] Ex. 1 at ¶¶7-10.

2

The SIP Call increases protections for communities against harmful air pollution from industrial facilities. EPA expects that "revision of the existing deficient SIP provisions has the potential to decrease emissions significantly in comparison to existing provisions,… encourage sources to reduce emissions during startup and shutdown and to take steps to avoid malfunctions, should provide increased incentive for sources to be properly designed, operated and maintained in order to reduce emissions at all times, … [and] has the potential to result in significant emission control and air quality improvements." *Id*. at 33,955-56. Importantly, beyond the legal deficiencies in the provisions, "the results of automatic and discretionary exemptions in SIP provisions, and of other provisions that interfere with effective enforcement of SIPs, are real-world consequences that adversely affect public health. *Id.* at 33,850.

Because facilities subject to the Clean Air Act ("CAA") can emit massive amounts of particulate matter, sulfur dioxide, nitrogen oxide, and other harmful air pollution during periods of start-up, shutdown, and maintenance, it is imperative that Minnesota include strong SIP provisions governing emissions during these periods to protect fence-line and other communities. Indeed, EPA expects that "revision of the existing deficient SIP provisions [including Minnesota's] has the potential to decrease emissions significantly in comparison to existing provisions" because these required revisions will "encourage sources to reduce emissions during startup and shutdown and to take steps to avoid malfunctions, . . . should provide increased incentive for sources to be properly designed, operated and maintained in order to reduce emissions at *all* times."  80 Fed. Reg. at 33,955-56 (emphasis added).  SSM exemptions, like those in the current Minnesota SIP, have "real-world consequences that adversely affect public health," and removing those exemptions "has the potential to result in significant emission control and air quality improvement."  *Id*. at 33,850.

## III.  MPCA MUST REMOVE THE SSM EXEMPTION FROM MINNESOTA REGULATIONS

As MPCA correctly recognizes, EPA's SSM SIP Call requires the state to remove the start-up, shutdown, and malfunction exemptions currently found at Minnesota Rule 7011.1415. Indeed, the best approach to the SSM SIP Call is for MPCA to simply remove the illegal SSM exemption from the Minnesota SIP.  Removing these exemptions would mean that the normal SIP emission limits that are designed to protect air quality and comply with the Act's requirements would apply continuously, as required by the Clean Air Act.  And EPA has made clear that it should be technically feasible for most sources to "meet the same emission limitation" during *both* "steady-state" and startup/shutdown periods. 80 Fed. Reg. 33,840, 33,979 (June 12, 2015).  In fact, in the SSM SIP Call EPA expressed its strong preference for *numeric* limitations during all operations, and many of the states and territories not included in EPA's SIP Call have regulations that require just that—*i.e.*, that sources meet SIP emission limits at *all* times.  Moreover, removal of the exemption would avoid concerns about conformity with the Clean Air Act, as well as litigation and administrative risks associated with EPA review and approval.  Because MPCA's primary consideration should be protection of public health in strict compliance with the federal Clean Air Act, the agency should simply remove those exemptions without attempting to create impractical and unenforceable work practice standards.

3

## IV.    SPECIFIC PROBLEMS WITH MPCA'S WORK PRACTICES PROPOSAL

Sierra Club has several serious concerns with the proposed inclusion of Minnesota Rule 7007.0100, subp. 6a in its SIP.  The key language in the proposed revision provides:

> Alternative operating scenario. "Alternative operating scenario" means a scenario authorized in a part 70 permit that involves a change at the part 70 source for a particular emissions unit and that either results in the unit being subject to one or more applicable requirements that differ from those applicable to the emissions unit prior to implementation of the change or renders inapplicable one or more requirements previously applicable to the emissions unit prior to implementation of the change.

40 SR 1090.  MPCA proposes to incorporate this definition by reference into multiple provisions of the SIP. As specified below, we have this proposed language does not comply with EPA's SSM SIP Call policy or the Clean Air Act.

### A    Alternative Emissions Limits Must Be Included in an Approved SIP, Not Merely in Permits

To address SSM operations MPCA proposes authorize "alternative operating scenarios" into individual Title V or Part 70 operating permits.  This language is impermissibly vague and appears to inappropriately allow for the development of alternative emission limits outside of the SIP approval process.  EPA's SIP Call Rule makes it clear that alternative emissions limits must be included in *an approved SIP, not merely in permits*. 80 Fed. Reg. at 33,915.  As EPA explains, the "SIP needs to reflect the control obligations of sources, and any revision or modification of those obligations *should not be occurring through a separate process, such as a permit process*, which would not ensure that "alternative" compliance options do not weaken the SIP." 80 Fed. Reg. 33,915 (emphasis added). As a result, "any revisions to obligations in the SIP *need to occur through the SIP revision process*…." 80 Fed. Reg. 33,916 (emphasis added). Any alternative emissions limits must therefore comply with the SIP process, including providing the requisite notice and comment period, and all other SIP limit change public participation and other process requirements.

### B.    MPCA Has Failed to Demonstrate that its Proposed Reliance on Alternative Emission Standards is Appropriate Under these Circumstances

In its SIP Call rule, EPA identifies the following criteria by which alternative emissions limits for startup and shutdown should be developed:

> (1) the alternative emission limitation is "limited to specific, narrowly defined source categories using specific control strategies,"
> (2) use of the control strategy for the source category is "technically infeasible" during startup/shutdown,
> (3) the limit requires that the frequency and duration of operation in startup/shutdown mode are "minimized to the greatest extent practicable,"

4

Exhibit 2
083

(4) the state analyzes the potential worst-case emissions that could occur during startup/shutdown based on the proposed limit,

(5) the limit requires that "all possible steps are taken to minimize the impact of emissions during startup and shutdown on ambient air quality,"

(6) the limitation requires that "at all times, the facility is operating in a manner consistent with good practice for minimizing emissions and the source uses best efforts regarding planning, design, and operating procedures," and

(7) the actions during startup/shutdown are properly documented.

*Id.* at 33914.

Importantly, EPA further states that alternative requirements applicable to the source during startup and shutdown should be "narrowly tailored and take into account considerations such as the technological limitations of the specific source category and the control technology that is feasible during startup and shutdown." *Id.* at 33913.

MPCA's proposed alternative operating scenarios are not only too vague and ambiguous to be enforceable, but they do not appear to reflect consideration of the seven specific criteria by which alternative emission limitations for startup and shutdown should be developed. In particular, MPCA's has failed to demonstrate that its alternative operating scenario would be (1) narrowly tailored to defined source categories using specific control strategies; (2) that the use of the control strategy for the source category is "technically infeasible" during startup or shutdown; (3) the state analyzed the potential worst-case emissions that could occur during startup/shutdown based on the proposed limit; and (4) the agency has failed to include specific reporting requirements for sources that opt for alternative operating scenarios.

## 1.    MPCA's Work Practice Standards Are Not Narrowly Tailored

Minnesota's proposed alternative operating scenarios do not appear to be "limited to specific, narrowly defined source categories using specific control strategies." *Id.* at 33914. Indeed, the standards could apply to virtually every major source without consideration of whether sources are technically capable of complying with numeric SIP limits during periods of startup, shutdown, or malfunction. In the final SSM SIP call rule, EPA confirmed that startup and shutdown are "part of the normal operation of a source and should be accounted for in the design and operation of the source. It should be possible to determine an appropriate form and degree of emission control during startup and shutdown and to achieve that control on a regular basis." 80 Fed. Reg. at 33979. EPA's final SSM Policy from the SIP call provides that a "state can develop special, alternative emission limitations that apply during startup or shutdown *if the source cannot meet the otherwise applicable emission limitation in the SIP.*" *Id.* at 33,980 (emphasis added). Thus, alternative compliance plans (in lieu of having to meet normal SIP limits during startup and shutdown) are *only* appropriate for those narrowly limited source categories that truly cannot meet numerical limits for particular pollutants during startup and shutdown.

5

Additionally, Minnesota's proposed work practice standards are not appropriately limited to specific, narrowly defined control strategies or operations. Proposed Rule 7007.0100, subp. 6a indicates that it applies to a "particular emissions unit and that either results in the unit being subject to one or more applicable requirements that differ from those applicable to the emissions unit prior to implementation of the change or renders inapplicable one or more requirements previously applicable to the emissions unit prior to implementation of the change. As an initial matter, control requirements that apply during startup and shutdown must be clearly stated as components of the emission limitation and must meet the applicable level of control required for the type of SIP provision (*e.g.,* be RACT for sources located in nonattainment areas). A generically applicable requirement to operate control equipment is not a narrowly tailored continuous and enforceable limitation.

If alternative operating standards are proper (again, we believe they are not), MPCA should require pollution controls to be operated at specific time points during startup and shutdown. As an example for power plants, MPCA can look to the startup and shutdown work practices from the final Mercury and Air Toxics Standards ("MATS") rule (***before*** these work practices were changed on reconsideration).[4] There, for startup, EPA required all pollution controls to be operated once plants begin firing their primary fuel (*e.g.*, coal for coal-fired power plants). 77 Fed. Reg. 9304, 9493 (Feb. 16, 2012).

> 2.     MPCA Has Failed to Demonstrate that it is "Technically Infeasible" for Sources to Meet Numeric Limits During Startup and Shutdown

Consistent with the SIP Call, alternative emissions limits (including work practice standards) should only be available for sources showing that use of controls or meeting numeric limitations are "*technically infeasible*" during that time. 80 Fed. Reg. at 33980 (emphasis added). Such technical infeasibility cannot include sources with outdated or undersized pollution controls that, if properly designed, could operate during startup or shutdown. As EPA made clear in the SSM SIP Call, many (if not all) of the affected sources in Minnesota can and should be required to meet normal SIP limits during startup and shutdown. Because MPCA has failed to provide a factual basis for demonstrating that affected sources are *not* capable of meeting their existing emission limitations at all times, the agency has failed to demonstrate that its proposed alternative operating scenario provision is appropriate under any circumstances. Accordingly, MPCA's proposed work practice standards must be removed from the proposed SIP.

Even for those sources (if any) that truly cannot meet normal limits during startup and shutdown, MPCA should establish alternative numerical limits instead of individualized alternative compliance scenarios. In its SIP Call, EPA also made clear that alternative emission

---

[4] In the D.C. Circuit Court of Appeals, Sierra Club and other organizations are currently challenging EPA's final action on reconsideration of the startup and shutdown provisions of the MATS rule. Sierra Club maintains that EPA's final (reconsideration) definition of startup (which includes a four-hour exemption from numerical emission limits) and startup work practices do not meet the requirements of the Clean Air Act, including the requirement to achieve continuous reductions.

scenarios are only appropriate for those limited periods of time when "*measurement of emissions during startup and/or shutdown is not reasonably feasible*."  *See* 80 Fed. Reg. at 33,980 (emphasis added).  Where possible, establishing numerical limits in lieu of work practices is required by Clean Air Act § 110(a)(2), which provides that SIPs are to include "*enforceable* emission limitations . . . as may be necessary or appropriate to meet the applicable requirements" of the Act."  42 U.S.C. 7410(a)(2) (emphasis added).  In the SSM SIP call, EPA echoed that numerical limits are preferable to work practices in terms of enforceability.  *See* 80 Fed. Reg. at 33974-75 ("There are many sources for which a numerically expressed emission limitation will be the most appropriate and will result in the most legally and practically enforceable SIP requirements"); *id.* at 33979 ("In practice, it may be that numerical emission limitations are the most appropriate from a regulatory perspective (*e.g.,* to be legally and practically enforceable) and thus the emission limitation would need to be established in this form to meet CAA requirements").  At least for power plants, it is demonstrably reasonable to measure NOx, SO$_2$, and PM emissions during startup and shutdown.  For decades, under the Clean Air Act Acid Rain Program, power plants have continuously monitored sulfur dioxide and nitrogen oxide emissions from the moment combustion begins throughout generation.

3.      MPCA Must Demonstrate that Its Proposal Will Not Violate the NAAQS
        or PSD Increments.

Under § 110(l) of the Clean Air Act, EPA cannot approve SIP revisions that would interfere with attainment of the NAAQS or PSD increments:  "The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or any other applicable requirement of this chapter."  42 U.S.C. § 7410(l).  In keeping with this requirement, EPA stated in the SSM SIP call that, "[a]s part of its justification of the SIP revision, the state [should] analyze[] the potential worst-case emissions that could occur during startup and shutdown based on the applicable alternative emission limitation"  80 Fed. Reg. at 33980.

Excess emissions from startup and shutdown events have far-reaching impacts on other requirements of the Act. 78 Fed. Reg at 12,485.  States must rely on assumed continuous compliance with emissions limitations in their modeling exercises to demonstrate attainment and maintenance of ambient air quality standards.  *See* EPA Memorandum to Docket EPA-HQ-OAR-2012-0322, at 14, n. 41 (Feb. 4, 2013) (citing, inter alia, CAA sections 110(a)(2)(A)&(C)).  In areas that are meeting air quality standards, state plans must include emission limitations designed to ensure that air quality does not worsen. 42 U.S.C. § 7475(a)(3), 40 C.F.R. § 51.166(k)(1); *see* 78 Fed. Reg. at 12,485.  Similarly, in nonattainment areas, nonattainment SIPs must include emission inventories which are comprehensive, accurate, and current of actual emissions and must also include emission statements from stationary sources.  *See, e.g.*, 42 U.S.C. §§ 7511(a)(1), (3).  Also, in nonattainment areas, state plans must include a program that assures reasonable progress toward attainment of ambient air quality standards.  42 U.S.C. § 7501 et seq.  Nonattainment NSR permitting requires offsetting of emissions based on permitted emission limits. *See, e.g.*, 42 U.S.C. § 7511(a)(4).  There is no way to adjust the required offsets should a source exceed its permitted emission limits during SSM because nonattainment NSR permitting occurs prior to construction and the permits do not ever expire.  Plans must also protect scenic views in many of America's most treasured public lands. 42 U.S.C. § 7491(a)(1).

Here, it does not appear that MPCA has considered the potential effect of its proposed alternative operating scenarios on these required attainment demonstrations and planning under the Act.  Indeed, MPCA's narrative SIP revision contains a cursory description of the revision with no analysis whatsoever of the impact of uncontrolled or alternative emissions scenarios during startup and shutdown on any attainment area.  Given the huge quantities of emissions that are possible during startup and shutdown (while controls might not be required to operate), MPCA must evaluate the potential worst-case emissions that could occur during startup/shutdown under the proposed alternative compliance standards.

4.    MPCA Must Include Reporting Requirements in the SIP

MPCA's proposal does not require sources to report to MPCA any information to assure that sources are complying with the requirements of the rule.  Because there is no way for MPCA to know—without requesting documentation from sources—whether sources are complying with the work practice requirements, there is also no way for citizens or EPA to obtain information about whether or not sources are complying with the requirements.  Thus, the requirements are *not* practically enforceable by MPCA in enforcement suits.  Nor are they enforceable by EPA or citizens in federal court.  If MPCA insists on including work practices instead of numerical limits (which we maintain is not consistent with the requirements of the Clean Air Act or the SIP Call rule, and therefore not approvable by EPA or the Eighth Circuit), the agency should require in the SIP itself that the any compliance information for alternative operating scenarios be reported by sources through, at the least, their quarterly Title V compliance reports.

*C.  MPCA's Alternative Operations Standards are Inappropriate for Additional Reasons*

Apart from the fact that MPCA failed to demonstrate that its alternative operating scenarios are appropriate or enforceable under EPA's SSM SIP criteria, Minnesota's proposal does not meet Clean Air Act § 110's enforceability requirement for other reasons.  First, source-specific alternative limits or work practices are generally not proper at all.  In the SIP call, EPA specifically stated, "even where a specific type of operation may not during startup and/or shutdown be able to meet an emission limitation that applies during full operation, the state should be able to develop appropriate limitations that would apply to those types of operations at all similar types of facilities.  The EPA believes that there will be limited, if any, cases where it may be necessary to develop source-specific emission requirements for startup and/or shutdown."  80 Fed. Reg. at 33915.  Additionally, as quoted language above indicates, awarding sources alternative limits or work practices through permits would not ensure these compliance options do not weaken the SIP.  *See* 80 Fed. Reg. at 33915.  When a state issues SSM limits through alternative plans that are incorporated into permits, it would make it very difficult to assess the collective impact on the NAAQS or PSD increments of multiple permitted alternative SSM limits.

Another problem with the option to pursue source-specific alternative plans is that those provisions do not reflect any consideration of the factors EPA has identified as appropriate considerations for developing alternate SSM requirements.  These alternative plans, implemented through a permit, also raise the prospect of "director's discretion" problems addressed in EPA's SIP Call notice because it would allow the state to create alternatives to SIP emission limits without complying with the CAA's SIP revision requirements.  Among other things, a permit-

8

Exhibit 2
087

based approach to establishing an alternative emission limitation (that does not involve submitting the permit requirement to EPA for inclusion in the SIP) eliminates EPA's role in reviewing and approving emission limitations to ensure that they are "enforceable" as required by CAA section 110(a)(2)(A)—*i.e.*, that they are sufficiently specific regarding the source's obligations and they include adequate monitoring, recordkeeping, and reporting requirements. To avoid these problems, MPCA should include specific language explaining that source-specific alternative plans are only available as a very last resort upon a sufficient showing that the listed criteria are met, and as discussed above, that such requirements are continuous and enforceable, and subject to the SIP revision process, with the accompanying requirements for public notice and comment.

## V.    CONCLUSION

Thank you for the opportunity to submit these comments.  We respectfully request that MPCA revise its proposed rule as outlined above.  Please do not hesitate to contact us with any questions or to discuss the matters raised in these comments.

Sincerely,

Joshua Smith
Staff Attorney
2101 Webster St.
Oakland, CA 94612
joshua.smith@sierraclub.org

9



Mississippi Department of Environmental Quality (MDEQ)
515 E. Amite St.
Jackson, Mississippi 39201

September 15, 2016

**RE:** **Sierra Club Comments on Mississippi Department of Environmental Quality's Proposed State Implementation Plan Amendments in Response to EPA's Startup, Shutdown, and Malfunction SIP Call, 80 Fed. Reg. 33,840**

Please accept these comments submitted on behalf of Sierra Club regarding the Mississippi Department of Environmental Quality's (MDEQ) proposal to amend 11 Miss. Admin. Code, Pt. 2, Ch. 1, Rule 1.10, "Provisions for Upsets, Startups, and Shutdowns." The rule is intended to comply with EPA's recently finalized rulemaking, State Implementation Plans: Response to Petition for Rulemaking; Restatement and Update of EPA's SSM Policy Applicable to SIPs; Findings of Substantial Inadequacy; and SIP Calls To Amend Provisions Applying to Excess Emissions During Periods of Startup, Shutdown and Malfunction, 80 Fed. Reg. 33840 (June 12, 2015) (SSM SIP Call).  We agree that, as required by EPA's SSM SIP Call, MDEQ must repeal the portions of its SIP that provide exemptions and affirmative defenses for excess emissions during periods of startup, shutdown and upsets.  We have a significant concern that the upset and maintenance portion of the proposal could interfere with EPA or citizen enforcement, and several other portions of the proposal also should be revised to comply with the Clean Air Act.

## I.     INTRODUCTION

Sierra Club appreciates the opportunity to provide these comments concerning Mississippi's proposal to amend its State Implementation Plan (SIP) in response to EPA's SSM SIP Call for Mississippi.

Power plants and other facilities can emit massive amounts of particulate matter and other pollutants during periods of startup, shutdown, or malfunction.  Indeed, as part of its SSM SIP Call rulemaking, EPA recognized the practical consequences of SSM exemptions, noting "one malfunction that was estimated to emit 11,000 pounds of [sulfur dioxide] SO2 over a 9-hour period when the applicable limit was 3,200 pounds per day."  Memorandum dated Feb. 4, 2013, to EPA Docket No. EPA-HQ-OAR-2012-0322 at 23, *available at* https://www3.epa.gov/airquality/urbanair/sipstatus/docs/ssm_memo_021213.pdf.  These large SSM pollution exceedances can occur many times each year.  After reviewing data from numerous power plants as part of the Mercury and Air Toxics rulemaking, EPA found that the "average" electric generating unit (EGU) had between 9 and 10 startup events per year between 2011 and 2012, and that many EGUs had "over 100 startup events in 2011 and over 80 in 2012."

1

Assessment of startup period at coal-fired electric generating units – Revised, at p. 4 (Nov. 2014).  Given the huge emissions possible during startup and shutdown, reducing startup and shutdown emissions from fuel-burning sources, including power plants, should be a priority for MDEQ.

We commend Mississippi for recognizing the unlawful SSM exemptions and affirmative defenses in its SIP, and promptly proposing to remove those provisions.  However, MDEQ should make several changes to ensure its revised proposal conforms with the Clean Air Act and EPA's SSM policy.  Most significantly, the enforcement discretions provisions for upsets and maintenance are ambiguous and not consistent with the Act or EPA guidance because they could potentially be construed to interfere with EPA and citizen suit enforcement.  Additionally, Mississippi did not include all the criteria recommended by EPA in Section 1.10(A) (Upsets) or 1.10(C)(Unplanned Maintenance), and should consider adding EPA's criteria to ensure a thorough and robust decision-making process in enforcement actions.

## II.     EPA's SSM SIP CALL

EPA's SSM SIP Call requires 36 states, including Mississippi, to remove from their SIPs exemptions and affirmative defenses that allow industrial facilities to pollute the air without consequences when those facilities start up, shut down, or experience malfunctions. 80 Fed. Reg. 33,840 (June 12, 2015).  EPA found that SIPs with provisions that exempt emissions during such events—like Mississippi's current SIP— are substantially inadequate to meet Clean Air Act requirements. *Id*.  In addition to requiring the 36 states whose SIPs contain these exemptions or affirmative defense provisions to remove these provisions from their SIPs, the SIP Call also revises EPA's policy for SIP provisions addressing excess emissions during SSM events. *Id*. The SIP Call allows states 18 months to submit revised SIPs to EPA, which is the maximum time allowable under the statute. *Id*. at 33,848; 42 U.S.C. § 7410(k)(5).

The SIP Call increases protections for communities against harmful air pollution from industrial facilities. EPA expects that "revision of the existing deficient SIP provisions has the potential to decrease emissions significantly in comparison to existing provisions,… encourage sources to reduce emissions during startup and shutdown and to take steps to avoid malfunctions, should provide increased incentive for sources to be properly designed, operated and maintained in order to reduce emissions at all times, … [and] has the potential to result in significant emission control and air quality improvements." *Id*. at 33,955-56.  Importantly, beyond the legal deficiencies in the provisions, "the results of automatic and discretionary exemptions in SIP provisions, and of other provisions that interfere with effective enforcement of SIPs, are real-world consequences that adversely affect public health. *Id.* at 33,850.

Because facilities subject to the Clean Air Act can emit massive amounts of particulate matter, sulfur dioxide, nitrogen oxide, and other harmful air pollution during periods of start-up, shutdown, and maintenance, it is imperative that Mississippi include strong SIP provisions governing emissions during these periods to protect fence-line and other communities.  Indeed, EPA expects that "revision of the existing deficient SIP provisions has the potential to decrease emissions significantly in comparison to existing provisions" because these required revisions will "encourage sources to reduce emissions during startup and shutdown and to take steps to avoid malfunctions, . . . [and] should provide increased incentive for sources to be properly

Exhibit 2
090

designed, operated and maintained in order to reduce emissions at *all* times." 80 Fed. Reg. at 33,955-56 (emphasis added).  SSM exemptions, like those in the current Mississippi SIP, have "real-world consequences that adversely affect public health," and removing those exemptions "has the potential to result in significant emission control and air quality improvement." *Id*. at 33,850, 33,956.

Excessive pollution during SSM events from large facilities has devastating impacts on surrounding communities, which are often low-income communities and/or communities of color. Indeed, SSM loopholes—whether incorporated in SIP provisions or in operating permits—undermine the emission limits found SIPs and operating permits, threaten states' abilities to achieve and maintain compliance with NAAQS, and endanger public health and public welfare. These provisions also undermine other requirements of the Act, including Prevention of Significant Deterioration increments, nonattainment plans, and visibility requirements. In addition, SSM loopholes create a disparity among states, where some states provide facilities with an unfair economic advantage through SSM loopholes as compared to facilities located in states that do not have SSM loopholes. This creates precisely a "race to the bottom" incentive structure that the Clean Air Act is designed to prevent.

To illustrate this point, attached to our comments are signed written statements (originally geared for related rulemakings and litigation) from a community member whose health and livelihood are at stake in this rulemaking.  Surely there are many other similar stories.

Barbara Weckesser lives in Pascagoula, Mississippi with her husband. Their residence is located close to a number of large industrial sources of pollution: the VT Halter Marine industrial ship building facility (approximately 675 yards away), the Signal International giant oil rig facility (less than one-half mile away), Mississippi Phosphate (less than one-half mile away), the Chevron refinery (approximately one mile away), and the Enterprise natural gas processing facility (approximately two miles away).[1] For years, the Pascagoula community has suffered from air pollution from the nearby industrial facilities. Barbara currently serves as President of Cherokee Concerned Citizens, a group formed to address the local community's concerns about pollution from the local facilities and to advocate to the Mississippi Department of Environmental Quality for strengthened permit limits for the nearby facilities and increased enforcement of Clean Air Act violations.[2]

SSM events at the nearby facilities cause Barbara and her neighbors alarm, emotional distress, and fear for the safety of their community.[3] For instance, in November 2013, there was an explosion and fire at the Chevron refinery, killing one employee and injuring another.[4] Almost two years later, a floating roof on one of the storage tanks at the Chevron refinery partially collapsed, exposing the community to noxious smells and chemicals for days.[5] The Enterprise facility remains shuttered after a recent explosion and fire there.[6] Barbara and the rest of the community are routinely plagued by pollution events from the nearby facilities, such as

---

[1] Declaration of Barbara Weckesser, ¶¶2-3.

[2] *Id.* at ¶4.

[3] *Id.* at ¶5.

[4] *Id.*

[5] *Id.*

[6] *Id.*

Exhibit 2
091

flaring, plumes of dark smoke, and alarming and sudden loud noises.[7] In addition, extremely pervasive and sometimes nauseating smells permeate throughout Barbara's house, and deposits from the nearby facilities, including calcium phosphorus, and black specks of oil and paint, land on her home and vehicle.[8]

Barbara has concerns about the impacts of dangerous air pollution from these facilities on her health and her husband's health.  Barbara suffers from chronic kidney disease and, in 2014, was diagnosed with asthma, and chemical pneumonia twice.[9] She has experienced blisters on her face as the result of spending time documenting or investigating events at these facilities.[10] Numerous neighbors suffer from health problems such as cancer, asthma, respiratory issues and ammonia exposure.[11]  By removing the exemption and affirmative defense provisions for SSM events, Mississippi will increase the incentives for polluters to avoid these harmful emissions, thus leading to reduced emissions and improved lives.

## III.    MDEQ MUST REMOVE THE SSM EXEMPTIONS AND AFFIRMATIVE DEFENSES FROM MISSSISSIPPI REGULATIONS

As MDEQ correctly recognizes, EPA's SSM SIP Call requires the state to remove the exemptions for excess emissions during start-up and shutdown, and affirmative defense provisions for upsets and maintenance currently found at 11 Miss. Admin. Code, Pt. 2, Ch. 1, Rule 1.10 and in the Mississippi SIP.  80 Fed. Reg. at 33964.  The easiest and cleanest way for Mississippi to comply with the SIP Call and the Act would be to remove the exemptions and affirmative defenses. Removing the unlawful exemption and affirmative defense provisions will ensure that the normal SIP limits that are designed to protect air quality and comply with the Act's requirements would apply during all times. As EPA has made clear, it should be technically feasible for most sources to "meet the same emission limitation" during *both* "steady-state" and startup/shutdown periods. 80 Fed. Reg. at 33,915.  Indeed, in the SSM SIP Call EPA expressed its preference for numeric limitations during SSM operations, and many of the states and territories not included in EPA's SIP Call have regulations that require just that—*i.e.*, that sources meet SIP emission limits at *all* times.

## IV. COMMENTS ON MDEQ'S PROPOSED DISCRETIONARY ENFORCEMENT PROVISIONS

MDEQ's proposal includes provisions outlining discretionary enforcement provisions for MDEQ enforcement action. Such provisions are consistent with the Act and EPA guidance as long as they are not overly broad and would not interfere with enforcement by the EPA or by other parties through a citizen suit. 80 Fed. Reg. at 33980. The Act grants EPA explicit enforcement authority under section 113, and to citizens under section 304.  Thus, whether or not the state decides to bring an enforcement action, the EPA and citizens have independent statutory authority to enforce violations of the Act. *Id*. at 33,981. Additionally, "[p]otential for enforcement by the EPA or through a citizen suit provides an important safeguard in the event

---

[7] *Id.* at ¶¶6-7.
[8] *Id.* at ¶¶8-9.
[9] *Id.* at ¶11.
[10] *Id.*
[11] *Id.* at ¶12.

that the state lacks resources or ability to enforce violations and provides additional deterrence." *Id*. Thus, the state can cabin its own discretion to bring enforcement action for excess emission events, but it cannot limit EPA or citizen suit enforcement in any manner. *Id*. Additionally, states cannot adopt "overly broad" enforcement discretion provisions because such provisions conflict with section 110(a)(2) of the Act, which requires states to have adequate enforcement authority. *Id*.

Mississippi's proposed enforcement discretion provisions for upset and maintenance state that the Commission "may" consider the listed criteria in determining whether or not to pursue enforcement action. Though the provisions give MDEQ complete discretion to consider and weigh the criteria, and thus appear not to overly constrict state enforcement authority, the provision could potentially be read to imply that EPA and citizens cannot bring such action. To ensure such confusion does not occur, consistency with the law, and EPA approval, Mississippi should clarify that these provisions do not affect or apply to enforcement by EPA or citizens.

Importantly, section 1.10(A)(2) of the rule, is ambiguous and should be removed or clarified. It states: "[i]n any enforcement proceeding, the source seeking to establish the occurrence of an upset has the burden of proof." In absence of the unlawful affirmative defense provision that Mississippi has proposed to remove, under which establishing an upset occurred would relieve a source from liability for violations, it is not clear what meeting the burden means. If the Commission, or EPA or a citizen, choses to bring an enforcement action for excess emissions, establishing that an upset occurred is meaningless under the rules. Of course, a source can provide whatever information it wants to the court for purposes of assessing damages for violations.

Because sections 1.10(A)&(C) are ambiguous, and could potentially be construed to interfere with EPA and citizen suit enforcement, they are not consistent with the Act or EPA guidance and must be removed or clarified in order for it to be approvable by EPA.

Additionally, Mississippi did not include all the criteria recommended by EPA in Section 1.10(A) (Upsets) or 1.10(C) (Unplanned Maintenance). EPA recommended the following criteria be included in enforcement discretion provisions:

(1) To the maximum extent practicable the air pollution control equipment, process equipment or processes were maintained and operated in a manner consistent with good practice for minimizing emissions;

(2) Repairs were made in an expeditious fashion when the operator knew or should have known that applicable emission limitations were being exceeded. Off-shift labor and overtime were utilized, to the extent practicable, to ensure that such repairs were made as expeditiously as practicable;

(3) The amount and duration of the excess emissions (including any bypass) were minimized to the maximum extent practicable during periods of such emissions;

(4) All possible steps were taken to minimize the impact of the excess emissions on ambient air quality; and

5

Exhibit 2
093

(5) The excess emissions are not part of a recurring pattern indicative of inadequate design, operation or maintenance.

Id. at 33981.  Mississippi should consider adding these additional criteria to ensure a thorough and robust decision-making process in enforcement actions. One additional suggestion is to clarify the provisions' titles to "State Enforcement Discretion for Upsets," and "State Enforcement Discretion for Unplanned Maintenance."

## V. COMMENTS ON MDEQ'S STARTUP AND SHUTDOWN PROPOSAL

### A.      EPA's SSM Policy for Startups and Shutdowns Under the Clean Air Act

In the final SSM SIP call rule, EPA confirmed that startup and shutdown are "part of the normal operation of a source and should be accounted for in the design and operation of the source.  It should be possible to determine an appropriate form and degree of emission control during startup and shutdown and to achieve that control on a regular basis."  80 Fed. Reg. at 33979.

EPA's SSM Policy provides that a "state can develop special, alternative emission limitations that apply during startup or shutdown if the source cannot meet the otherwise applicable emission limitation in the SIP." Id. at 33,980.  Thus, work practices or alternative compliance plans (in lieu of having to meet normal SIP limits during startup and shutdown) are only appropriate for those narrowly limited source categories that truly cannot meet numerical limits for particular pollutants during startup and shutdown.  In its SIP Call rule, EPA identifies the criteria by which alternative emissions limits for startup and shutdown should be developed, as follows:

(1) the alternative emission limitation is "limited to specific, narrowly defined source categories using specific control strategies,"
(2) use of the control strategy for the source category is "technically infeasible" during startup/shutdown,
(3) the limit requires that the frequency and duration of operation in startup/shutdown mode are "minimized to the greatest extent practicable,"
(4) the state analyzes the potential worst-case emissions that could occur during startup/shutdown based on the proposed limit,
(5) the limit requires that "all possible steps are taken to minimize the impact of emissions during startup and shutdown on ambient air quality,"
(6) the limitation requires that "at all times, the facility is operated in a manner consistent with good practice for minimizing emissions and the source uses best efforts regarding planning, design, and operating procedures," and
(7) the actions during startup/shutdown are properly documented.

Id. at 33914.

Importantly, EPA further states that "alternative requirements applicable to the source during startup and shutdown should be narrowly tailored and take into account considerations such as the technological limitations of the specific source category and the control technology that is feasible during startup and shutdown."  Id. at 33913.

6

B.     *Evaluation of MDEQ Startup and Shutdown Provision*

Mississippi's proposed startup and shutdown revisions properly require normal emission limitations to apply because "[s]tartups and shutdowns are part of normal source operation." Section 1.10(B)(1).

Where a source is unable to comply with existing emission limitations, the proposal gives MDEQ discretion to consider establishing alternative emission limitations or work practice standards for startup and shutdowns. Section 1.10(B)(2).  MDEQ's proposed work practice standards appear to reflect consideration of the seven specific criteria EPA recommends to develop alternative emission limitations for startup and shutdown.

Consistent with the SIP Call, the proposal requires that alternative emissions limits (including work practice standards) should only be available for sources showing that use of controls or meeting numeric limitations are "technically infeasible" during that time.  80 Fed. Reg. at 33,980.  Mississippi should make clear that such technical infeasibility does not include sources with outdated or undersized pollution controls that, if properly designed and/or maintained, could operate during startup or shutdown.

Even for those sources (if any) that truly cannot meet normal limits during startup and shutdown, MDEQ should establish alternative numerical limits instead of work practices.  In its SIP Call, EPA made clear that work practices are only appropriate for those limited periods of time when "measurement of emissions during startup and/or shutdown is not reasonably feasible."  *See* 80 Fed. Reg. at 33,980.  Where possible, establishing numerical limits in lieu of work practices is required by Clean Air Act § 110(a)(2), which provides that SIPs are to include "enforceable emission limitations . . . as may be necessary or appropriate to meet the applicable requirements" of the Act." 42 U.S.C. 7410(a)(2).  In the SSM SIP call, EPA echoed that numerical limits are preferable to work practices in terms of enforceability.  *See* 80 Fed. Reg. at 33974-75 ("There are many sources for which a numerically expressed emission limitation will be the most appropriate and will result in the most legally and practically enforceable SIP requirements"); *id*. at 33,979 ("In practice, it may be that numerical emission limitations are the most appropriate from a regulatory perspective (*e.g*., to be legally and practically enforceable) and thus the emission limitation would need to be established in this form to meet CAA requirements").

If work practices are actually proper for a particular source or category, MDEQ should require pollution controls to be operated at least while fuel-burning equipment are burning their primary fuels or when power plants are generating electricity.  In addition, up until the point that pollution controls are engaged, MDEQ should require clean fuels to be burned.

1.     MDEQ Must Include Reporting Requirements

MDEQ's work practices proposal does not require sources to report to MDEQ any information to assure that sources are complying with the requirements of the rule; it requires sources only to document startup and shutdown events in contemporaneous logs.  Because there is no way for MDEQ to know—without requesting documentation from sources—whether sources are complying with the work practice requirements, there is also no way for citizens or

EPA to obtain information about whether or not sources are complying with the requirements. Thus, the requirements are not practically enforceable by MDEQ in enforcement suits, in violation of Clean Air Act § 110(a)(2)(A).  Nor are they enforceable by EPA or citizens in federal court.  If MDEQ allows work practices instead of numerical limits (which we maintain is not consistent with the requirements of the Clean Air Act or the SIP Call rule, and therefore not approvable by EPA), the agency should require the work-practice compliance information from the proposed rule to be reported by sources through, at the least, their quarterly Title V compliance reports.

2.      The Proposal Properly Requires Alternative Limits to Be Incorporated into Mississippi's SIP

Section 1.10(B)(2)(d) of MDEQ's proposal should make clearer that any alternative limits or work practices must be incorporated through the SIP amendment process, allowing for public notice and comment and EPA approval.  In the SSM SIP call, EPA specifically stated that a "SIP needs to reflect the control obligations of sources, and any revision or modification of those obligations should not be occurring through a separate process, such as a permit process, which would not ensure that 'alternative' compliance options do not weaken the SIP." 80 Fed. Reg. at 33,915.

The SIP Call Rule makes it clear that alternative emissions limits must be included in an approved SIP, not merely in permits. *Id.* As EPA explains, the "SIP needs to reflect the control obligations of sources, and any revision or modification of those obligations *should not be occurring through a separate process, such as a permit process*, which would not ensure that 'alternative' compliance options do not weaken the SIP." *Id.* (emphasis added). As a result, "any revisions to obligations in the SIP *need to occur through the SIP revision process*…." 80 Fed. Reg. 33,916 (emphasis added).

## VI.    MDEQ Should Provide Specific, Narrowly-Tailored Definitions of Startup and Shutdown

The definition of startup and shutdown in Mississippi's rules are vague and provide for seemingly unlimited periods of such events. Rule 1.2 (CC) ("'Shutdown.' The termination of operation of equipment. Relative to fuel-burning equipment, a shutdown shall be construed to occur only when a unit is taken from a fired to a non-fired state.") & (HH) ("'Startup.' The bringing into operation from a non-operative condition. Relative to fuel-burning equipment, a startup shall be construed to occur only when a unit is taken from a non-fired to a fired state.") For example, it is ambiguous what the term "operation" means in these definitions. The rules should be clear as to when startup ends (preferably when fuel-burning sources start burning their primary fuel) and shutdown begins (preferably when fuel-burning sources stop burning their primary fuel).

8

## VII. CONCLUSION

Thank you for the opportunity to submit these comments.  We respectfully request that MDEQ revise its proposed rule as outlined above.  Please do not hesitate to contact us with any questions or to discuss the matters raised in these comments.

Sincerely,
/s/Andrea Issod
Andrea Issod
Sierra Club Environmental Law Program
2101 Webster St.
Oakland, CA 94612
andrea.issod@sierraclub.org
415-977-5544

Louie Miller
State Director
Sierra Club Mississippi
601-624-3503 (mobile)
louie.miller@sierraclub.org



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 4**
**ATLANTA FEDERAL CENTER**
**61 FORSYTH STREET**
**ATLANTA, GEORGIA 30303-8960**

September 16, 2016

Mr. Dallas Baker, Air Director
Air Division
Office of Pollution Control
Mississippi Department of
 Environmental Quality
P.O. Box 2261
Jackson, Mississippi  39225-2261

Dear Mr. Baker:

On August 16, 2016, the Region 4 Office of the U.S. Environmental Protection Agency received the
Mississippi Department of Environmental Quality's prehearing proposal responding to the EPA's
June 12, 2015, final State Implementation Plan (SIP) call and finding of substantial inadequacy with
respect to the treatment of excess emissions during periods of startup, shutdown and malfunction (SSM).
The proposal also includes the deletion of Mississippi's Clean Air Interstate Rule provisions and an
update to the incorporation by reference of EPA's New Source Performance Standards and National
Emission Standards for Hazardous Air Pollutants. We have completed our preliminary review and have
enclosed our comments for your consideration.

We look forward to continuing to work with you and your staff. If you have any questions, please
contact Ms. Lynorae Benjamin, Chief, Air Regulatory Management Section at (404) 562-9040, or have
your staff contact Ms. Tiereny Bell at (404) 562-9088.

Sincerely,

for  R. Scott Davis
Chief
Air Planning and Implementation Branch

Enclosure

Exhibit 2
098

**The U.S. Environmental Protection Agency Comments on**
**Mississippi's Prehearing Submittal Addressing the SSM SIP Call**

*Rule 1.10 Provisions for Upsets, Startups and Shutdowns, and Unplanned Maintenance*

I.   **Key Comments**

1.   Please include a redline strikeout that addresses the amended provisions of 11 Miss. Administrative Code, Part. 2, Chapter 1, Rule 1.10 (hereafter 11-2-1 Miss. Code), which was formerly known as APC-S-1, Section 10.

2.   11-2-1 Miss. Code R. 1.10.B describes a procedure whereby the Department may establish alternative emission limits in a permit that, upon SIP approval, apply to a source during startups and shutdowns. Provision R. 1.10.B(1) states, as preface:

> Startups and shutdowns are part of normal source operation. Emission limitations apply during startups and shutdowns unless specific emission limitations or work practice standards for startups and shutdowns are defined by an applicable rule, regulation, or permit.

In provision R. 1.10.B(1), as currently drafted, the term "[e]mission limitations" appears to include all applicable requirements (whether from the SIP, federal rules, or permits issued) that limit the emission of air pollutants. The provision provides that, during startups and shutdowns, "specific emission limitations or work practice standards for startups and shutdowns" apply when such are defined by an "applicable rule, regulation, or permit." The EPA is concerned that this provision appears to provide that an "applicable rule, regulation, or permit" that is not approved into the SIP might contain limitations that apply during startups and shutdowns *in lieu of an applicable SIP limit*. The EPA would like to clarify that applicable SIP limits may not be altered or applied in any way that is not specifically provided for by the SIP itself. Any alternative to a SIP emission limitation during startups and shutdowns must be approved into the SIP on either a source-specific or source category-specific basis. Therefore, provision R. 1.10 must be clear that any emission limitations that exist in an "applicable rule, regulation, or permit" do not apply as SIP emission limitations unless and until they are specifically approved as such into the SIP.

3.   11-2-1 Miss. Code R. 1.10.B(2) describes the conditions under which the Department "will consider establishing" alternative emission limitations for startups and shutdowns. Provision R.1.10.B(2)(d) provides that source-specific emission limitations or work practice standards for startups and shutdowns must be established in a federally enforceable permit, but it notes that those limitations will be considered "state-only" requirements until they have been adopted into MDEQ's regulations. The EPA believes it would be confusing and contradictory to establish "state-only" requirements in a "federally enforceable" permit. If Mississippi intends to include alternative emission limitations for startups and shutdowns in a permit before submitting them for SIP approval, the EPA suggests establishing them in a state-only permit. A more straightforward approach, we believe, would entail getting the alternative emission limitations approved into the SIP *prior to* including them in a federally enforceable permit

In addition, as a small point of clarification, we recommend that references to "this regulation"

appearing under paragraphs (d) and (e) be replaced with more specific reference, such as to 11 Miss. Admin. Code Pt. 2, Ch. 1.

**II.      General Comments**

1.      11-2-1 Miss. Code R. 1.10.A and C describe the inherent enforcement discretion of the Commission to determine enforcement action against a source for "noncompliance with an emission standard or other requirement of an applicable rule, regulation, or permit" resulting from an upset or unplanned maintenance. As part of the Final SSM SIP Call, the EPA addressed state-only enforcement discretion provisions and restated (see page 33981) five criteria recommended for consideration by air agency personnel in determining whether enforcement action is appropriate in the case of excess emissions during a malfunction (applicable as well to excess emissions during an "upset" as defined under 11-2-1 Miss. Code R. 1.2). The EPA notes that state-only enforcement discretion-related rules are not required to be submitted to the EPA for review and inclusion into the SIP. Moreover, to minimize any potential for confusion about the applicability of such provisions, we believe that it is preferable for state-only enforcement discretion provisions to be omitted from SIPs. However, if Mississippi would like to request the EPA's approval of provisions R. 1.10.A and C into the State's federally-approved SIP, we recommend adding language to make clear that the provision applies to the state's exercise of its own enforcement discretion and does not in any way bar enforcement by the EPA or by other parties in federal court through a citizen suit.

        In addition, we note that the word "that" appears unnecessary in paragraphs (a) and (d) of R. 1.10.A and paragraph (d) of R. 1.10.C.

2.      According to R. 1.10.B(2)(e), the actual alternative emission limitations would be stated under (e)(i), yet the impression of the "reserved for permit reference" placeholder language is that the SIP-approved rule would merely reference individual permits without also stating the actual limits. Please describe what sort of information Mississippi intends to include as the "permit reference" in 11-2-1 Miss. Code R. 1.10, B.(2)(e)(i).

3.      The EPA suggests that, throughout Mississippi's draft rule, the phrase "emission limitations or work practice standards" be replaced with "alternative emission limitations."

*Rule 1.14 Provisions for the Clean Air Interstate Rule, and Incorporation by Reference Changes*

4.      As it pertains to the deletion of Mississippi's Clean Air Interstate Rule provisions and update to the incorporation by reference of the EPA's New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants, the EPA offers no comments at this time.

**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE**
**MISSISSIPPI STATE CONFERENCE**



September 26, 2016

**Derrick Johnson**
President

**Charles Hampton**
1st Vice President

**Curley Clark**
2ND Vice President

**Clarence Magee**
3rd Vice President

**Renee Hampton**
4th Vice President

**Wayne McDaniels**
5th Vice President

**Willie Earl Thomas**
6th Vice President
**Monica McInnis**
Secretary

**Vacant**
Assistant Secretary

**James Crowell**
Treasurer

**Chris Taylor**
Assistant Treasurer

**Natalie Nicholson**
President Youth &
College Division

**Jocylynn Coleman**
Youth & College
Advisor

Gary C. Rikard, Executive Director
Mississippi Department of Environmental Quality
GRikard@mdeq.ms.gov
515 E. Amite St.
Jackson, Mississippi 39201

Dear Mr. Rikard:

The Mississippi State Conference of the National Associations for the Advancement of Colored People respectfully submits these comments regarding Mississippi Department of Environmental Quality's proposed adoption of amendments to state air pollution control regulations and a Revision to the State Implementation Plan("SIP") for the Control of Air Pollution (SIP Revision). The state regulations affected by the proposed amendments are Mississippi Administrative Code, Title 11, Part 2, Chapter 1, and "Air Emission Regulations for the Prevention, Abatement, and Control of Air Contaminants"; which are applicable statewide.

The proposed SIP Call is a Response to Petition for Rulemaking; Restatement and Update of EPA's SSM Policy Applicable to SIPs; Findings of Substantial Inadequacy; and SIP Calls To Amend Provisions Applying to Excess Emissions During Periods of Startup, Shutdown and Malfunction, 40 CFR Part, 52, EPA 80 Federal Regulation 33840 ("SSM        SIP        Call",        relative        to        Mississippi        Section        33963-33964).
https://www.gpo.gov/fdsys/pkg/FR-2015-06-12/pdf/2015-12905.pdf

In its comment letter to the U.S. Environmental Protection Agency, dated April 23, 2013, MDEQ presented a litany of objections to the SSM SIP Call and inferred that EPA had overreached its authority.
http://www.balch.com/files/Uploads/Documents/Mississippi%20Department%20of%20Environmental%20Quality.pdf

We are concerned that Mississippi Department of Environmental Quality's proposed amendments to the SSM SIP Call are inadequate, inconsistent, and lacking in much needed oversight, monitoring, enforcement and stringency. Portions of the amendment do not arise to conformity of the intent, purpose or spirit of EPA's SSM Policy Applicable to SIP.

We are especially mindful that these deficiencies could pose tremendous, adverse, and disproportionate impacts on the overall health and general welfare of our state's low income communities and communities of color, which are typically within close proximity of industrial operational establishments. This vulnerable population has been

systemically subjected to disparities in air and water quality and exposure to toxins and pollutants due to emissions generated by industrial operations.

**The comments of the Mississippi State Conference NAACP are as follows:**

1. **CONCERN THAT AMBIGUOUS TERMINOLGY COULD UNDERMINE, CIRCUMVENT OR POSSIBLY VIOLATE THE TERMS OF SECTIONS 110(k)(5) AND 112 OF THE CLEAN AIR ACT: Federal Register /Vol. 80, No. 113 / Friday, June 12, 2015 /Rules and Regulations 33926-33927**

Rule 1.2 Definitions, of the amendment, clearly defines an array of terms from A-Z and AA-KK. However, there is no attempt to offer any explanation or definition for "unplanned maintenance", even though it is a prominently titled and referenced term of the rule. **The term, "unplanned maintenance", appears to be a substitute term advanced by MDEQ in its proposed SIP amendment, for the term "malfunction".** The term is ambiguous and not reflective or consistent with the true definition of malfunction. Generally unplanned maintenance is the result of an upset or malfunction, not an arbitrary determination to avoid malfunctions, upsets and related penalties. Under EPA's 40 CFR § 63.2, Definitions: *Malfunctions means any sudden, infrequent, and not reasonably preventable failure of air pollution control and monitoring equipment, process equipment, or a process to operate in a normal or usual manner which causes, or has the potential to cause, the emission limitations in an applicable standard to be exceeded. Failures that are caused in part by poor maintenance or careless operation are not malfunctions.* https://www.gpo.gov/fdsys/pkg/CFR-2010-title40-vol9/pdf/CFR-2010-title40-vol9-sec63-2.pdf

A malfunction is what happens when equipment stops working properly because of unforeseeable equipment or other process-related failure. It does not include what happens to equipment if there is failure to maintain the equipment properly or are careless during operation so that the equipment breaks down or stops working properly.

How is a malfunction synonymous with "unplanned maintenance? How is it different from EPA's definition of malfunction? Why has MDEQ chosen to use this term?

MDEQ's amended definition of Malfunction in Rule 1.12, Section B (24) does not comport with EPA's definition of malfunction in that it omits monitoring equipment and makes provisional allowances to operate within established parameters "*as much as possible*". What are the determining factors and who makes the determination?

Rule 1.12 Section B: Provisions for Existing Hospital/Medical/ Infectious Waste Incinerators, Section (B) For the purpose of the requirements in Rule 1.12 of these regulations, the following definitions apply:

(24) "Malfunction" *means any sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner. Failures that are caused, in part, by poor maintenance or careless operation are not malfunctions. During periods of malfunction the operator shall operate within established parameters as much as possible, and monitoring of all applicable operating parameters shall continue until all waste has been combusted or until the malfunction ceases, whichever comes first.*

**Federal Register** /Vol. 80, No. 113 / Friday, June 12, 2015 /Rules and Regulations **33927**

https://www.gpo.gov/fdsys/pkg/FR-2015-06-12/pdf/2015-12905.pdf

*The EPA notes that CAA section 110(k)(5) can also be an appropriate tool to address ambiguous SIP provisions that could be read by a court in a way that would violate the requirements of the CAA. For example, if an existing SIP provision concerning the state's exercise of enforcement discretion is sufficiently ambiguous that it could be construed to preclude enforcement by the EPA or through a citizen suit if the state elects to deem a given SSM event not a violation, then that could render the provision substantially inadequate by interfering with the enforcement structure of the CAA.295 If a court could construe the ambiguous SIP provision to bar enforcement, then the EPA believes that it may be appropriate to take action to eliminate that uncertainty by requiring the state to revise the ambiguous SIP provision. Under such circumstances, it may be appropriate for the EPA to issue a SIP call to assure that the SIP provisions are sufficiently clear and consistent with CAA requirements on their face.*

### 2. LACK OF CLARITY OF "UNPLANNED MAINTENANCE" IN RELATION TO UPSETS, STARTUPS AND SHUTDOWNS, NO REFERENCE TO LENGTHS OF TIME OF UPSETS AND INCONSISTENCY WITH EPA GUIDELINES

Rule 1.10 Provisions for Upsets, Startups, Shutdowns, and **Unplanned Maintenance, A –Upsets: What is the relativeness between upsets and unplanned maintenance, if any? This is extremely misleading and conflicting. This rule appears to be discretionary, lacks clarity and omits and/or is inconsistent with pertinent EPA enforcement guidelines.**

In Rule 1.2 Definitions - KK. MDEQ defines "Upset." An unexpected and unplanned condition of operation of the facility in which equipment operates outside of the normal and planned parameters. An upset shall not include a condition of operation caused by improperly designed equipment, lack of preventive maintenance, careless or improper operation, operator error, or an intentional startup or shutdown of equipment.

Source: Miss. Code Ann. *§§ 49-2-9 (1)(b), 49-2-1, et seq., 49-17-17 and 49-17-1, et seq.*

Rule 1.10 Provisions for Upsets, Startups, ~~and~~ Shutdowns, and Unplanned Maintenance.

A.      Upsets (1) the Commission may pursue an enforcement action for noncompliance with an emission standard or other requirement of an applicable rule, regulation, or permit. In determining whether to pursue enforcement action, and/or the appropriate enforcement action to take, the Commission may consider whether the source has demonstrated through properly signed contemporaneous operating logs or other relevant evidence the following:

**Sections 1-3 of Rule 1.10 make no reference to the lengths of time of upsets, startups and shutdowns. Clearly delineated provisions which address the lengths of time of upsets startups and shutdowns, reporting and notification guidelines and responsibility of air quality monitoring should have been included in this section. The length of time of upsets, startups and shutdowns is germane to impacts of air quality and protection of human health and welfare.**

### 3. LACK OF TIMELY REPORTING AND PUBLIC NOTICE REQUIREMENTS AND LACK OF ENFORCEMENT UNIFORMITY OF UPSETS

Section 1(d) under Upsets allows 5 days for reporting requirements, which is too long. **What is the rationale for such a lengthy reporting timeframe?** Upsets lasting beyond an established time should be

**Mississippi NAACP • Making Democracy Work in Mississippi**

reported immediately (within 5 minutes rather than 5 days), regardless of time of occurrence. **Communities have a fundamental right to be informed of potential risks posed by compromised air**

**quality.** Any and all reportable quantities of releases can easily and immediately be communicated to The National Response Center (NRC), which maintains a 24-hours-per-day, 7-days-a-week, 365-days-a-year Operations Center.

The infrastructure in place at NRC will require uniformity in reporting by responsible parties to include: *Cause of the release or spill, Types of material(s) released or spilled; Quantity of materials released or spilled; Medium (e.g. land, water) affected by release or spill; Danger or threat posed by the release or spill; Number and types of injuries or fatalities (if any); Weather conditions at the incident location; Whether an evacuation has occurred; Other agencies notified or about to be notified; Any other information that may help emergency personnel respond to the incident.*

***Rule 1.10 Provisions for Upsets, Startups, and Shutdowns, and Unplanned Maintenance-Section* A. Upsets** allows *MDEQ Commission* discretionary latitude in making enforcement pursuit determinations and/or possible enforcement actions in the event of an Upset. This latitude lacks enforcement uniformity as it allows the Commission to decide on an individual occurrence/situational basis, without requiring any burden of proof as it relates to impacts. The MDEQ proposed amendment of 'relevant evidence' gives considerable autonomy to the industrial source by allowing self-monitoring and judgement without substantiation. **How will a determination be made as to whether the source was operating properly prior to the upset or if reasonable measures were taken to minimize emissions?**

**MDEQ should establish uniform reportable quantities/ time length requirements and enforcements for upsets. The lengths of time of occurrences should require different levels of enforcement.**

### 4. FAILURE TO INCLUDE EMISSION **LIMITATIONS FOR STARTUPS AND SHUTDOWNS IN THE PERMITTING ISSUANCE PROCESS**

Rule 1.10, Section B (1)- Provisions for Upsets, Startups, and Shutdowns, state that startups and shutdowns are part of normal industrial source operation. If so, why aren't they addressed at the permitting level rather than as an addendum? How frequent are these events? Why are there no permitting guidelines or stringent, established procedures for reducing startups and shutdown emissions from industrial sources such as fossil-fuel burning energy plants, given that these can sources generate considerable emissions during these periods?

Emissions during periods of startups, shutdowns, and maintenance can be substantial. The basis of the EPA's mandated SIP provisions was to offer protection during SSM periods for populaces, especially those who reside in close proximity of industrial operations; while holding the operators to higher standards of accountability in emissions reduction throughout all periods of operational procedures. Many of MDEQ's SIP amendments are vague, discretionary and failed to offer meaningful fortification to safeguard human health and welfare.

### 5. ALLOWANCE OF UNSPECIFIED EXCEPTIONS AND AUTONOMY OF THE INDUSTRIAL SOURCE TO SELF-DETERMINE WHETHER THEY ARE UNABLE TO COMPLY WITH EXISTING EMISSION LIMITATIONS DURING STARTUPS AND SHUTDOWNS

**Mississippi NAACP ● Making Democracy Work in Mississippi**

Rule 1.10, Section B (1) allows for unspecified exceptions of emissions limitations, giving industrial source flexibility in circumventing established EPA guidelines. What is the reporting process? What are the determinants? Who makes the determination?

Rule 1.10, Section B (2) gives tremendous sovereignty to industrial sources to decide their ability to comply with existing emission limitations during startups and shutdowns. Startups and shutdowns usually operate at less than 100% capacity, but can exceed emissions limitations. MDEQ must set limits and establish strict enforcement criteria in protection of its residents, rather than allowing industry freewill. MDEQ should establish reporting requirements.

## 6. LACK OF CLARITY IN MONITORING, ENFORCEMENT, REPORTING AND PUBLIC NOTIFICATION

MDEQ lists H. Monitoring and I. Reporting and Recordkeeping Requirements under Rule 1.12, which refers only to Provisions for Existing Hospital/Medical/Infectious Waste Incinerators. If the intent of monitoring, reporting and recordkeeping was to include all industrial sources, the rule should be amended for clarity. The rule allows for extensive self-monitoring and should instead comprise more monitoring and oversight authority of MDEQ.

While the recordkeeping requirements are meticulous, they amount to nothing more than files without equally comprehensive reporting, public notification, recommendations and follow-up requirements. This would allow for transparency, deference and adherence to the public's right to know of exposures and associated risks, if any.

I.   Reporting and Recordkeeping Requirements.

      (1)    The owner or operator of an affected facility shall submit semiannual reports containing any information recorded under subparagraphs (1)(c) through (1)(e) of this paragraph no later than 60 days following the reporting period. The first semiannual reporting period ends 6 months following the submission of information in subparagraph (2) of this paragraph. Subsequent reports shall be submitted no later than 6 calendar months following the previous report. All reports shall be signed by the facilities manager.

      (2)    All records specified under subparagraph (1) of this paragraph shall be maintained onsite in either paper copy or computer-readable format, unless an alternative format is approved by the Department.

**Why are the records not required to be reported and transmitted to a searchable online site for public viewing?** This transparency, in the interest of public safety, health and welfare, can be attained with minimal cost and would result in more public confidence and trust.
**As a result of these concerns, the Mississippi State Conference NAACP presents the following summary recommendations:**

    **1.**  MDEQ should delete the undefined, ambiguous and misleading terminology, such as "unplanned maintenance" and instead apply the term "malfunction" and its definition in its entirety, without exception, as outlined in **sections 110(k)(5) AND 112 of the Clean Air Act and 40 CFR Part, 52, EPA 80 Federal Regulation 33926-33927. MDEQ should revise all evasive, abstruse and industrial permissive, discretionary and guarded language, which is dismissive of the overall goal of EPA, to provide public protection, health and welfare.**

**Mississippi NAACP ● Making Democracy Work in Mississippi**

2. MDEQ must provide stringent, specific and enforceable penalties, which fully encompass the spirit and intent of the SIP Call and are consistent with EPA guidelines. Sections 1-3 of Rule 1.10 should be revised to include clearly delineated provisions which address and establish the lengths of time of upsets, startups and shutdowns, reporting and notification guidelines and responsibility of air quality monitoring.

3. MDEQ must review its reporting and public notification requirements and implement a swifter, more transparent process by which reportable quantities during upset occurrences are recorded, monitored, compiled, tracked and made available for public review. The public has a fundamental right to know, sooner, rather than later, about occurrences which could possible impact and compromise their air and water quality and their health and well-being.

3a. MDEQ should also establish consistent, uniform guidelines which categorize industrial sources, using varying degrees of enforcement penalties commensurate with violations. A clearly established, equitable process would ensure fairness and eliminate the appearance of subjectivity and bias, which can occur when ruling on individual, case-by-case basis.

3b. MDEQ must eliminate the extraordinary latitude proposed under Rule 1.10: Provisions for Upsets, Startups, and Shutdowns, and Unplanned Maintenance. MDEQ should incorporate uniform enforcement pursuit determinations and/or possible enforcement actions in its rule in the event of an upset and should require substantiation and uniformity in burdens of proof as it relates to impacts.

3c. MDEQ would better serve public interest, safety and trust by reconsideration of its reliance on industrial self-assessments, judgments and leniency which allows the source to make determinations as to whether it was operating properly prior to the upset or if reasonable measures were taken to minimize emissions.

4. MDEQ should strengthen its rules on startups, shutdowns and malfunctions and incorporate emission limitations in the permitting issuance process. The permitting issuance process s should be included in the rule as this would offer an opportunity for establish guidelines, accountability and offer insight into the estimated frequency and emissions amounts. Permitting guidelines, along with firm regulations would offer consistency, enforcement incentives, more accountability and better protection. When these events occur, established procedures could play a vital role in enforcement analyses and determinations.

4. There should be no allowances of arbitrary and/or unspecified exceptions in the amendment which could circumvent or violate EPA guidelines. MDEQ must remove the broad scope which allows industrial sources the autonomy to self-determine their compliance capabilities. MDEQ should establish emissions limitations during startups and shutdowns in an effort to fully comply with EPA SSM principles.

5a. MDEQ is charged with the protection of the general populace and regulation of industrial source emissions. As such, MDEQ rules should exclude language or rules which undermine established EPA guidelines by allowing unspecified exceptions to emissions limitations or lack specificity in the reporting or determination process.

5. MDEQ is obliged to present an explicitly accountable, monitoring, enforcement, reporting and public notification protocol for any and all industrial sources. In addition to recordkeeping requirements, it is imperative that MDEQ incorporate distinct reporting

**mandates which include public notification and access to reports. MDEQ must digress from its usual "filing" away of information and require electronic reporting which can be accessed by the public. Self-monitoring does not serve the interest of the general public, especially when the public is denied an opportunity to be made aware of events which effect their health and well-being.**

The Mississippi State Conference NAACP understands that MDEQ has an unenviable challenge of balancing much needed industrial economic contributions to our state with public health, safety and welfare. However, MDEQ should never compromise public and safety welfare in favor of a thriving economy. Our economy and environment can both prosper with responsible, industrial operating procedures and a state governing oversight agency which values protection of public health, safety and welfare.

We further recognize budgetary restrictions sometimes prevent the optimum level of monitoring and enforcement. However, public health, safety and welfare must always be an undisputable priority.

Respectfully,

Derrick Johnson, President
Mississippi State Conference NAACP

**Mississippi NAACP ● Making Democracy Work in Mississippi**



Submitted via email to:

DBaker@mdeq.ms.gov
Clafontaine@mdeq.ms.gov
GRikard@mdeq.ms.gov

Mississippi Department of Environmental Quality (MDEQ)
515 E. Amite St.
Jackson, Mississippi 39201

October 6, 2016

RE:    **Sierra Club Comments on Mississippi Department of Environmental Quality's
       Proposed State Implementation Plan Amendments in Response to EPA's Startup,
       Shutdown, and Malfunction SIP Call, 80 Fed. Reg. 33,840**

        Please accept the following additional comments to supplement the comments Sierra
Club submitted at the MDEQ hearing held on September 16, 2016, which we attach here again
for your convenience.  We appreciate MDEQ's extension of the public comment period until
October 6, 2016 to allow for further analysis of the proposal.

        1.   We agree with EPA's September 16, 2016 comments that Mississippi should not
propose the state-only enforcement discretion-related rules (Sections 1.10 A and C) for
inclusion into the SIP.  Since the provisions apply only to the state's enforcement
discretion, omitting the provisions from the SIP will minimize the potential for confusion
and impact on citizen or EPA enforcement.  We also agree with EPA that the state should
include additional language in the state regulations that explicitly provides that sections A
and C apply only to the state and do not in any way apply or affect EPA or citizen suit
enforcement.

        2.   As described in our previously-submitted comments, section 1.10(A)(2) of the
rule is ambiguous and needs clarification. It states: "[i]n any enforcement proceeding, the
source seeking to establish the occurrence of an upset has the burden of proof." It is not
clear from the text what meeting the burden means because the source can provide whatever
information it wants to MDEQ or a court to show it took precautions to prevent
excess emissions during startup and shutdown events.  Because the provision is
ambiguous it could potentially be construed to interfere with EPA and citizen
enforcement under the Act.

Sierra Club has learned from conversations with MDEQ that the intent of this provision is
to provide notice to the regulated community that they are responsible for providing

1

information to MDEQ to consider under this regulation. Sierra Club believes this is self-evident from section 1.10(A)(1) and unnecessary to state explicitly, especially since a source has ample incentive to act in its own self-interest to submit mitigating evidence to MDEQ to avoid enforcement action and penalties. Section 1.10(A)(1) states the Commission may consider "whether the source has demonstrated through properly signed contemporaneous operating logs or other relevant evidence…," which makes clear that the source is responsible for submitting evidence to MDEQ to consider.  To the extent MDEQ believes additional language is necessary, we recommend the following changes to MDEQ's proposal (shown in track changes):

"Where a source has met the burden of proof to demonstrate an ~~For an Uu~~pset occurred as defined in Rule 1.2, the Commission may pursue an enforcement action for noncompliance with an emission standard or other requirement of an applicable rule, regulation, or permit. In determining whether to pursue enforcement action, and/or the appropriate enforcement action to take, the Commission may consider whether the source has demonstrated through properly signed contemporaneous operating logs or other relevant evidence the following:

3.   We understand that MDEQ is considering removing the proposed unplanned maintenance provision in section 1.10(C).  Sierra Club urges MDEQ to do so.  The provision is vague as to what events would qualify.  The definition of "unplanned maintenance" is very broad and ambiguous: where "necessary to prevent or minimize emergency conditions or equipment malfunctions."  If MDEQ keeps this provision, Sierra Club urges MDEQ to require advance notification and approval for such events, and to impose a limit on the total number of hours of such events in advance.

4.   The provisions in sections 1.10(A)(1)(d) & (C)(1)(d) that give sources five days to report upset or maintenance events to MDEQ is a significant concern to community members. MDEQ should require that sources report excess emissions immediately and give sources no longer than 24 hours to report an event.

Additionally, MDEQ should make information about excess emission events easily and quickly accessible to the public so that communities can be better informed about the quality of their air and pollution from neighboring facilities.  Secret exposure to harmful pollution is unacceptable. Mississippi should create a publicly-available electronic database of this information similar to databases in Texas and Louisiana,[1] and maintain email lists to notify impacted communities of harmful air conditions.  Open records request laws are insufficient because the public is not made aware of these events when they occur in the first place.

Reporting provisions help enhance compliance and enforcement efforts. Making pollution data public is a low-cost, efficient manner to drive pollution reduction. It is

---

[1] *See* Louisiana Department of Environmental Quality's Electronic Document Management System, *available at* http://edms.deq.louisiana.gov/app/doc/querydef.aspx; Texas Commission Environmental Quality, Air Emission Event Report Database,  *available at* http://www2.tceq.texas.gov/oce/eer/.

2

widely recognized that this is a key benefit of the Toxic Release Inventory program.[2] Moreover, contemporaneous reporting of the conditions surrounding the violation, including the type and the quantity of the pollution released, the legal limit, the cause of the violation, and any measures taken to limit or prevent the emissions, is necessary to ensure that all stakeholders can respond to problems in real time and that enforcement resources are promptly targeted towards violations where further actions are warranted. Following issuance of EPA's Proposed SSM SIP Call, Jefferson County, Kentucky took initiative to revise its problematic regulations immediately, and included much-needed notification and reporting requirements.  The state explained that notification requirements ease the administrative burden in determining whether and how much excess emissions occur at facilities.[3]  Additionally, the information enables state agencies to better respond to citizen inquiries about excess emission events.[4]

5.   MDEQ should limit the total time for each event and per year a source may claim to be in startup, shutdown, upset, and unplanned maintenance mode if MDEQ retains that provision.[5] Community members are concerned that the regulations allow for unlimited emissions during these times.  With total limits, the regulated community will be on notice that MDEQ will use its discretion to enforce repeated violations of permitted limits.  Sources will also have greater incentive to take preventive measures to limit the number of these events.

---

[2] Archon Fung, *Reinventing Environmental Regulation From the Grassroots Up: Explaining and Expanding the Success of the Toxics Release Inventory*, 25 Env. Mgmt. 2, 115-127 (Feb. 2000), *available at* http://www.ncbi.nlm.nih.gov/pubmed/10594186.

[3] *See, e.g*, Jefferson County, KY Nov. 9 2010 SIP Revision, RTC 1.07-15, *available at* http://www.regulations.gov/#!documentDetail;D=EPA-R04-OAR-2013-0272-0002 ("Much of the current burden on the District is in determining whether excess emissions occurred, and, if so, the amount of excess emissions.  A proposed new provision specifically requires a company that filed an initial excess emission report to file a negative report if excess emissions did not occur.  Further, the revised language highlights that the company is required to identify and calculate the amount of excess emissions that occurred.  By not using its resources to determine whether excess emission occurred and the amount, the District will reduce its workload.")

[4] *Id*., RTC 1.07-13.

[5] We located two examples of such provisions in coal plant permits in New Jersey, and attach pertinent pages as an attachment to these comments. One permit limits startup to less than 6 hours and shutdown to less than 1 hour. *See, e.g*, Logan Generating Plant, Air Pollution Control Operating Permit, Significant Modification and Preconstruction Approval (Apr. 26, 2016), NJ DEP PI Number: 55834, Permit Activity Number: BOP150001, *available at* http://datamine2.state.nj.us/DEP_OPRA/OpraMain/pdflist_handler?COUNT=1&PI_NUMBER=43849&ACTIVITY_CLASS_CODE=BOP&ACTIVITY_NUMBER=150001, at pp. 73. 76; PSEG Fossil LLC Hudson Generating Station, Air Pollution Control Operating Permit, Operating Permit Renewal (Dec. 22, 2015), NJ DEP PI Number: 12202, Permit Activity Number: BOP140001, *available at* http://datamine2.state.nj.us/DEP_OPRA/OpraMain/pdflist_handler?COUNT=1&PI_NUMBER=43857&ACTIVITY_CLASS_CODE=BOP&ACTIVITY_NUMBER=140001, at pp. 65-66. Many Clean Air Act construction permits limit the annual number of startup and shutdown events. *E.g.*, Utah Department of Environmental Quality Approval June 24, 2016 Order for Revolution Fuels at II.B.1.g ("The owner/operator shall not exceed 4 start ups and 4 shutdowns on a rolling 12 month period.", *available at* http://168.178.3.241:8080/DAQ_NOI/DocViewer?IntDocID=94543&contentType=application/pdf.

Thank you for the opportunity to submit these additional comments on MDEQ's proposal.  We respectfully request that MDEQ revise its proposed rule as outlined above.  Please do not hesitate to contact us with any questions or to discuss the matters raised in these comments.

Sincerely,

/s/Andrea Issod
Andrea Issod
Sierra Club Environmental Law Program
2101 Webster St.
Oakland, CA 94612
andrea.issod@sierraclub.org
415-977-5544

Louie Miller
State Director
Sierra Club Mississippi
601-624-3503 (mobile)
louie.miller@sierraclub.org

4



August 1, 2016

*Via E-mail to daq.publiccomments@ncdenr.gov*

Joelle Burleson
North Carolina Department of Environmental Quality
Division of Air Quality
1641 Mail Service Center
Raleigh, NC 27699-1641

**Re:**  **Comments on North Carolina's Proposed Adoption of and Amendments to Rules Governing Startup and Shutdown Operations and Malfunction Events**

Dear Ms. Burleson:

On behalf of our North Carolina members and supporters, the Sierra Club respectfully submits these comments regarding the proposed adoption of and amendment to air quality rules ("Proposed Rule"), developed by the North Carolina Division of Air Quality ("DAQ") in response to a request by the U.S. Environmental Protection Agency ("EPA") that North Carolina amend those provisions of its Clean Air Act state implementation plan ("SIP") applying to excess emissions during startup, shutdown and malfunction ("SSM"). (EPA's request is hereinafter referred to as the "SSM SIP Call".)

As discussed below, the Proposed Rule suffers from a number of flaws and, accordingly, fails to satisfy the requirements of the Clean Air Act or EPA's final policy from the SSM SIP Call. Significant changes to the Proposed Rule must be made in order for EPA approval to be appropriate.

## I.  BACKGROUND

Power plants and other facilities can emit massive amounts of particulate matter and other pollutants during SSM periods. For example, ten permits issued by the Texas Commission on Environmental Quality in 2011 authorize particulate matter emissions from power plants during SSM periods up to 7,616 pounds per hour—far higher than allowable emission rates during "normal" operations. These permits do not restrict the number of SSM events or hours during which the higher limits apply. But if the allowable limits are reached for just 80 hours per year (about 1% of operating time), emissions of particulates during SSM periods would account for between 15% and 66% of total annual emissions, based on our review of 2012 emission inventory data.

EPA has found that SSM events historically have caused disproportionate, and enormous, pollution. As part of the SSM SIP Call rulemaking, EPA stated: "[I]n connection with the EPA's issuance of a SIP call to address an exemption for excess emissions during malfunctions in Utah, the EPA illustrated the practical consequences of such exemptions by noting the large amount of additional emissions during malfunctions at individual sources, *e.g.*, one malfunction that was estimated to emit 11,000 pounds of $SO_2$ over a 9-hour period when the applicable limit was 3,200 pounds per day."[1] Furthermore, EPA has found that power plants are likely to emit these large amounts of SSM pollution on multiple occasions during a year: the "average EGU [electric generating unit] had between 9 and 10 startup events per year during 2011-2012, but data from a small number of EGUs indicated significantly more startup events (e.g., the EGUs with the most startup events had o*ver 100 startup events* in 2011 and *over 80* in 2012)."[2]

Because facilities subject to the Clean Air Act can emit massive amounts of particulate matter, sulfur dioxide and other harmful air pollution during SSM periods, strong SIP provisions governing emissions during these periods are needed to protect downwind communities. Accordingly, EPA has directed thirty-six states to correct specific provisions in their SIPs that are inconsistent with governing law. EPA expects that revisions made in response to its SSM SIP Call could "decrease emissions significantly in comparison to existing provisions, . . . encourage sources to reduce emissions during startup and shutdown and to take steps to avoid malfunctions, . . . provide increased incentive for sources to be properly designed, operated and maintained in order to reduce emissions at all times, . . . [and] result in significant emission control and air quality improvements."[3] Importantly, beyond the legal deficiencies in the existing provisions, "the results of automatic and discretionary exemptions in SIP provisions, and of other provisions that interfere with effective enforcement of SIPs, are real-world consequences that adversely affect public health."[4]

The best approach to the SSM SIP Call is for affected states, such as North Carolina, to remove the illegal exemptions from their respective SIPs. Removing the exemptions would restore the effectiveness of emission limits that are designed to protect air quality and satisfy the Clean Air Act's requirements would apply at all times. Removing the exemption would make the regulations of affected states comparable to regulations in those states that were not subject to the SSM SIP Call.

Alternatively, for those source categories that truly cannot meet SIP emission limits during startup and shutdown, states can establish alternative numerical limits that satisfy the other requirements of the Clean Air Act. In these instances, states must establish clear, narrow definitions of "startup" and "shutdown" to ensure these periods

---

[1] Memorandum dated February 4, 2013 to Docket EPA-HQ-OAR-2012-0322 at 23, *available at* www3.epa.gov/airquality/urbanair/sipstatus/docs/ssm_memo_021213.pdf.

[2] EPA Office of Air and Radiation, "Assessment of startup period at coal-fired electric generating units – Revised," at p. 4 (Nov. 2014) (emphasis added), *available at* www3.epa.gov/airtoxics/utility/matsssfinalruletsd110414.pdf.

[3] 80 Fed. Reg. at 33,955–56.

[4] *Id.* at 33,850.

are as short as possible. Any alternative limits must be adopted through the SIP revision process, with the accompanying requirements for public notice and comment. Such limits must not interfere with maintenance of any National Ambient Air Quality Standards ("NAAQS") or Prevention of Significant Deterioration ("PSD") increments.

## II.    THE PROPOSED RULE VIOLATES THE CLEAN AIR ACT AND EPA'S SSM POLICY

### A.   DAQ Has Failed to Demonstrate that the Proposed Reliance on SSM Work Practices Is Appropriate Under These Circumstances.

Work practices compliance options (in lieu of compliance with normal SIP limits during startup and shutdown) such as those included in the Proposed Rule are only appropriate for those limited source categories that truly cannot meet "normal" numerical limits for particular pollutants during startup and shutdown and, even then, only for those limited periods of time when specific source categories cannot accurately measure emissions of particular pollutants.

In the final SSM SIP Call rule, EPA confirmed that "[s]tartup and shutdown are part of the normal operation of a source and should be accounted for in the design and operation of the source. It should be possible to determine an appropriate form and degree of emission control during startup and shutdown and to achieve that control on a regular basis."[5] Likewise, EPA also made clear that, for most sources, "it should be feasible to meet the same emission limitation" during both "steady-state" and startup/shutdown periods.[6] EPA's final policy from the SSM SIP Call provides that a "state can develop special, alternative emission limitations that apply during startup or shutdown *if the source cannot meet the otherwise applicable emission limitation in the SIP*."[7] In many if not most cases, sources should be able to meet otherwise applicable emission limitations at all times, including during periods of SSM. Indeed, EPA has criticized other states' proposed SIP revisions for failing to consider "whether sources are capable of complying with otherwise applicable numeric pollutant emission limits," advising that "EPA does not recommend establishing alternative emission limitations for sources that are capable of meeting their existing emission limitations at all times."[8] The attached report excerpt, prepared by Dr. Ranajit Sahu on behalf of the Sierra Club, details various air pollution control and discusses the operational ranges of the respective controls—illustrating the feasibility of operating pollution controls in a manner in which SIP emission limits can be met.

Nevertheless, DAQ's Proposed Rule would allow for work practice requirements in lieu of allowable emission limit during periods of startup, shutdown, and malfunction. In order to satisfy the requirements the Clean Air Act and EPA's SSM SIP Call, DAQ

---

[5] *Id.* at 33,979.

[6] *Id.*

[7] *Id.* at 33,980 (emphasis added).

[8] Comments on Georgia EPD's Draft SIP Revision to Address the SSM SIP Call, 7.a.

should establish alternative *numerical* limits for source *categories* instead of allowing for the inclusion of work practices as source-specific permit conditions. Even if a category of sources cannot meet allowable emission limits, work practices should only be available for startup and shutdown periods where emissions are not measurable. In the SSM SIP Call, EPA specifically stated that "*[i]n cases in which measurement of emissions during startup and/or shutdown is not reasonably feasible*, it may be appropriate for an emission limitation to include as a component a control for startup and/or shutdown periods other than a numerically expressed emission limitation."[9] Where at all possible, establishing numerical limits in lieu of work practices is required by Clean Air Act § 110(a)(2), which provides that SIPs are to include "*enforceable* emission limitations . . . as may be necessary or appropriate to meet the applicable requirements" of the Act.[10] In the SSM SIP Call, EPA echoed that numerical limits are preferable to work practices in terms of enforceability: "In practice, it may be that numerical emission limitations are the most appropriate from a regulatory perspective (*e.g.,* to be legally and practically enforceable) and thus the emission limitation would need to be established in this form to meet [Clean Air Act] requirements."[11]

DAQ's Proposed Rule does not limit the use of work practice requirements to where emissions are not measurable. At least for power plants, emissions are measurable during startup and shutdown, as shown by the fact that, as part of the Acid Rain program, EPA has required power plants to monitor sulfur dioxide and nitrogen oxide emissions continuously from the moment combustion begins and throughout generation, and has relied upon this data for decades to determine compliance with the requirements of the program.

The work practice compliance options proposed by DAQ appear to apply to virtually all (if not all) sources covered by North Carolina's SIP, despite the fact that many of those sources could in fact comply with normal SIP limits during startup and shutdown. Even assuming sources are unable to meet normal SIP limits during startup and shutdown, absent a showing that emissions are not measureable during that time, DAQ should establish alternative numerical limits rather than relying on work practices.

In addition, work practices are not proper for periods of malfunction. As EPA stated in the SSM SIP Call:

> In contrast to startup and shutdown, a malfunction is unpredictable as to the timing of the start of the malfunction event, its duration and its exact nature. The effect of a malfunction on emissions is therefore unpredictable and variable, making the development of an alternative emission limitation for malfunctions problematic. There may be rare instances in which certain types of malfunctions at

---

[9] *Id.* (emphasis added).

[10] 42 U.S.C. § 7410(a)(2) (emphasis added).

[11] *See* 80 Fed. Reg. at 33,979; *see also id.* at 33,974–75 ("There are many sources for which a numerically expressed emission limitation will be the most appropriate and will result in the most legally and practically enforceable SIP requirements.").

> certain types of sources are foreseeable and foreseen and thus are an
> expected mode of source operation. In such circumstances, the EPA
> believes that sources should be expected to meet the otherwise
> applicable emission limitation in order to encourage sources to be
> properly designed, maintained and operated in order to prevent or
> minimize any such malfunctions.[12]

We agree with this reasoning and also believe that it will be extremely difficult (if not impossible) to develop work practices for any periods of malfunction that meet the Clean Air Act's mandates that SIP limits be enforceable and provide for continuous reductions in emissions. Regarding continuous reductions, it seems hard to believe that sources would suddenly be able to switch to clean fuels during malfunctions.

> B.   The Work Practices Compliance Option in DAQ's Proposed Rule Is Not
> Enforceable.

Apart from the fact that work practices generally are not enforceable, the Proposed Rule does not meet the enforceability requirement of Section 110 of the Clean Air Act for other reasons. First, the Proposed Rule does not require sources to report to DAQ any information to assure that sources are complying with the requirements of the rule. For startups and shutdowns and malfunction events lasting less than four hours, the maintenance of records and provision of data upon request is all that is required. Because there is no way for DAQ to know—without requesting documentation from sources—whether sources are complying with the work practice requirements, there is no way for citizens or EPA to obtain information regarding compliance. Thus, the alternative emission limitation requirements are not practically enforceable by DAQ in enforcement suits. Nor are they enforceable by EPA or citizens in federal court. If DAQ insists on including work practices as a compliance option (which we maintain is not consistent with the requirements of the Clean Air Act or the SSM SIP Call and, therefore, not approvable by EPA or a reviewing court), DAQ should require the work practice compliance information from the Proposed Rule to be reported by sources through, at the least, their quarterly Title V compliance reports.

Second, the Proposed Rule proposal does not establish any time limitations for periods of "startup" or "shutdown." This is extremely problematic. For example, coal-fired power plants could conceivably claim they are in startup or shutdown mode (and thus exempt from the SIP's numerical emissions limits applicable to "normal" operations) all the way up to full load—and for hours and hours. DAQ should establish clear, limited definitions of startup and shutdown. If alternative emission limitations are established for power plants, startup under the North Carolina SIP should end (and thus the normal numerical SIP limits should begin to apply) at the point these plants begin to generate electricity—either for sale over the grid or for any other purpose (including internal use). Similarly, shutdown should only begin when no electricity is generated for sale over the grid or for any other purpose—or when no fuel is being fired in the boiler.

---

[12] 80 Fed. Reg. at 33,979.

Third, there is no indication in paragraph (j)(3) and (5) of the Proposed Rule (Generally Available Work Practices for Start-Up and Shut-Down Operations) of what the dew points are for baghouses or electrostatic precipitators ("ESPs"). Instead, DAQ apparently proposes to leave it completely up to operators to decide when to engage these particulate controls. At the least, full-sized baghouses can and should be operated throughout all of startup. Similarly, properly maintained and properly sized ESPs can also be operated through all of startup. If work practices are proper (again, they are not), DAQ should require pollution controls to be operated at specific time points during startup and shutdown. With respect to power plants, the final Mercury and Air Toxics Standards ("MATS") rule provides examples of startup and shutdown work practices (before these work practices were changed on reconsideration).[13] There, for startup, EPA required all pollution controls (except for dry scrubbers and selective catalytic reduction ("SCR") units) to be operated once plants begin firing their primary fuel (*e.g.*, coal for coal-fired power plants).[14] During shutdown, EPA required EGUs to operate all controls while filing coal, residual oil or solid oil-derived fuel.[15]

Fourth, paragraph (j)(6) of the Proposed Rule includes a work practice stating that SCR units must be operated "if catalyst bed temperature is greater than 400 [degrees Fahrenheit], or as specified by manufacturer." We understand that most (if not all) facilities do not monitor catalyst bed temperatures, rendering this work practice requirement practically unenforceable. The work practice should be keyed off of a flue-gas inlet temperature, which is typically monitored at facilities.

Fifth, the "clean fuels" requirement in paragraph (j)(2) is impermissibly vague. Under this provision, sources must burn the "cleanest permitted fuel, to the extent practicable" during startup, thus, providing operators with discretion as to what fuels to burn and at what point during startup to use "clean" fuels. Arguably, this provision allows power plants to burn coal during startup. At the very least, the Proposed Rule should be revised to define "clean fuels" for different source categories (including natural gas for power plants). For example, the MATS rule defines clean fuels for power plants.

Finally, the Proposed Rule would allow facilities to avoid applicable emission limits by complying with "work practice standards currently in effect for federal rules promulgated since 2009 that address compliance during start-up and shut-down operations," allowing sources to pick and choose from a variety of federal work practices. If DAQ retains its proposed work practices compliance options, it should revise the Proposed Rule to pair specific source categories (based on type, size, and control

---

[13] In the D.C. Circuit Court of Appeals, Sierra Club and other organizations are currently challenging EPA's final action on reconsideration of the startup and shutdown provisions of the MATS rule. Sierra Club maintains that EPA's final (reconsideration) definition of startup (which includes a four-hour exemption from numerical emission limits) and startup work practices do not meet the requirements of the Clean Air Act, including the requirement to achieve continuous reductions.

[14] 77 Fed. Reg. 9,304, 9,493 (Feb. 16, 2012). We do not concede that dry scrubbers and SCR cannot be operated upon generation of electricity. However, under the Proposed Rule, these decisions would improperly be left to the regulated community.

[15] *Id.*

equipment) with those federal rules that cover such categories. EPA itself recognized that the requirements from NSPS and NESHAP are not necessarily appropriate for all SIP-regulated sources.[16] Furthermore, as EPA recognized in the SSM SIP Call, certain older EPA regulations do not meet the requirements of the Clean Air Act because, among other reasons, they have not been updated to assure continuous reductions in emissions.

      C.   <u>The Proposed Rule Impermissibly Fails to Limit Emissions on a Continuous Basis.</u>

As noted above, Section 110(a)(2) of the Clean Air Act requires that SIPs are to include "enforceable emission limitations . . . as may be necessary or appropriate to meet the applicable requirements" of the Act. "Emission limitations" are defined under Section 302(k) of the Act to include work practices, and these must be continuous. More specifically, Section 302(k) defines "emission limitation" as a "requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants *on a continuous basis, including* any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and *any design, equipment, work practice or operational standard promulgated under this chapter.*"[17] The D.C. Circuit Court of Appeals confirmed that exemptions for SSM events conflict with the Act's plain requirement that emission limitations and standards must be continuous.[18]

EPA's Statement of SSM Policy in the final SSM SIP Call reiterates this, making it clear that the only approvable SIP is one that consists of *continuous* emissions limitations:

> The EPA's longstanding interpretation of the CAA is that SIP provisions cannot include exemptions from emission limitations for emissions during SSM events. In order to be permissible in a SIP, an emission limitation must be applicable to the source continuously, *i.e.,* cannot include periods during which emissions from the source are legally or functionally exempt from regulation.[19]

Here, however, the Proposed Rule does not ensure continuous reductions in emissions throughout startup and shutdown. To begin with, the language in the general work practice option only requires clean fuel use to the "extent practicable." As discussed above, under this language, sources could choose to only burn their primary fuel (e.g., coal for coal-fired power plants) during startup and shutdown. For those sources, until the point during startup when their particular pollution controls engage and begin to reduce emissions (or after these controls disengage in shutdown), there is no requirement in the Proposed Rule to limit emissions during startup or shutdown. For example, coal-fired power plants could claim that they are not equipped to burn natural gas or other clean

---

[16] 80 Fed. Reg. at 33,916.
[17] 42 U.S.C. § 7602(k) (emphasis added).
[18] *Sierra Club v. EPA*, 551 F.3d 1019, 1027 (D.C. Cir. 2008).
[19] 80 Fed. Reg. at 33,976.

fuels during startup and could also claim that they cannot begin to operate their particulate matter controls until well into startup (sometimes perhaps after 9 or 10 hours of startup, based on our experience with power plants in Texas).

And for those power plants that do actually choose to burn cleaner fuels during startup, the requirement to burn clean fuels is meaningless past the point that plants start to burn their primary fuel (e.g., coal). This is because most coal-fired power units are not designed to co-fire other fuels after they begin to fire their primary fuel, which is usually when the generation of electricity begins.[20]

Another reason that the Proposed Rule does not achieve continuous reductions (and is not enforceable) is that it does not define what it means to "operate" particulate and other controls in the general work practice option. Many electrostatic precipitators ("ESPs") have multiple fields that all need to be fully operative to achieve high control efficiencies.[21] Under the generally available work practices, ESPs and other pollution control equipment could operate at widely varying performance levels, with some units choosing to "operate" at much lower efficiencies (e.g., by turning on one or two fields) than the equipment is capable of achieving. The requirement to simply turn on particulate control equipment—if that is what DAQ means by "operate"—does nothing to ensure that this equipment is functioning at the levels needed to assure the maximum possible control of particulates. DAQ should revise its rules to include clear definitions of what it means to operate the various controls listed in paragraph (j). Those definitions should, at the least, require particulate controls to operate at near 100% efficiency at a clearly defined time early in startup.

    D.   <u>The Proposed Rule Would Allow for Source-Specific Permit Conditions in lieu of Otherwise Applicable Emissions Limitations, in Violation of the Requirements of the Clean Air Act and EPA's SSM SIP Call.</u>

Any alternative emission limitations must be incorporated through the SIP amendment process, allowing for public notice and comment and EPA approval. Thus, source-specific alternative emission limitations, generally, are not proper. As EPA states in the SSM SIP Call: a "SIP needs to reflect the control obligations of sources, and any revision or modification of those obligations should not be occurring through a separate process, such as a permit process, which would not ensure that 'alternative' compliance options do not weaken the SIP."[22] Moreover, EPA reasoned that:

[E]ven where a specific type of operation may not during startup and/or shutdown be able to meet an emission limitation that applies during full operation, the state should be able to develop appropriate limitations that would apply to those types of operations at all similar types of facilities. The EPA believes that there will be limited, if any, cases where it may be

---

[20] *See* Decl. of R. Sahu, EPA Docket ID No. EPA-HQ-OAR-2009-0234, ¶¶ 10–19.
[21] *See id.* ¶ 11.
[22] *Id.* at 33,915.

8

necessary to develop source-specific emission requirements for startup and/or shutdown.[23]

Here, the Proposed Rule would allow for alternative emission limitations in the form of source-specific permit conditions. Because EPA cannot yet evaluate such to-be-determined permit conditions, there is no way to know whether the source-specific compliance option weakens North Carolina's SIP.[24]

If DAQ maintains this option, any permit condition for a particular source regarding alternative emission limitations should be incorporated into the North Carolina SIP, with public notice and comment and EPA approval. In addition, DAQ should include specific language explaining that source-specific work practice standards could only be available as a very last resort upon a sufficient showing that the listed criteria are met and that such requirements are continuous and enforceable.

E. DAQ Cannot Demonstrate that the Proposed Rule Will Not Violate the NAAQS or PSD Increments.

Under Section 110(l) of the Clean Air Act, EPA cannot approve SIP revisions that would interfere with attainment of the NAAQS or PSD increments: "The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or any other applicable requirement of this chapter."[25] In keeping with this requirement, EPA stated in the SSM SIP Call that: "[a]s part of its justification of the SIP revision, the state [should] analyze[] the potential worst-case emissions that could occur during startup and shutdown based on the applicable alternative emission limitation."[26]

Excess emissions from startup, shutdown and malfunction events have far-reaching impacts on other requirements of the Act.[27] States must rely on assumed continuous compliance with emissions limitations in their modeling exercises to demonstrate attainment and maintenance of ambient air quality standards.[28] In areas that are meeting air quality standards, state plans must include emission limitations designed to ensure that air quality does not worsen.[29] Similarly, in nonattainment areas, nonattainment SIPs must include emission inventories which are comprehensive, accurate, and current of actual emissions and must also include emission statements from

---

[23] *Id.*

[24] *See id.*

[25] 42 U.S.C. § 7410(l).

[26] 80 Fed. Reg. at 33,980.

[27] 78 Fed. Reg. at 12,485.

[28] *See* EPA Memorandum to Docket EPA-HQ-OAR-2012-0322, at 14, n. 41 (Feb. 4, 2013) (*citing*, *inter alia*, Clean Air Act Section 110(a)(2)(A) and (C)).

[29] 42 U.S.C. § 7475(a)(3), 40 C.F.R. § 51.166(k)(1); *see* 78 Fed. Reg. at 12,485.

stationary sources.[30] Also, in nonattainment areas, state plans must include a program that assures reasonable progress toward attainment of ambient air quality standards.[31] Nonattainment NSR permitting requires offsetting of emissions based on permitted emission limits.[32] There is no way to adjust the required offsets should a source exceed its permitted emission limits during periods of SSM because nonattainment NSR permitting occurs prior to construction and the permits do not ever expire. Plans must also protect scenic views in many of America's most treasured public lands.[33]

Where a state establishes SSM limits through permits, assessing the collective impact on the NAAQS or PSD increments becomes difficult if not impossible. Here, DAQ appears not to have considered the potential effect of its proposed alternative emission limitations compliance option on these required demonstrations and planning under the Act.

### III.   CONCLUSION

For the foregoing reasons, North Carolina's proposed SIP revision must be further revised to ensure that it is consistent with the requirements of the SSM SIP Call and Clean Air Act, protects air quality and public health, and is approvable by EPA.

Thank you, and please do not hesitate to contact the undersigned with any questions or to discuss the matters raised either here.

Sincerely,

/s/ Bridget Lee
Bridget Lee
Staff Attorney
Sierra Club
50 F Street, NW, 8th Floor
Washington, DC 20001
(202) 675-6275
bridget.lee@sierraclub.org

---

[30] *See, e.g.*, 42 U.S.C. §§ 7511(a)(1), (3).

[31] 42 U.S.C. § 7501 *et seq.*

[32] *See, e.g.*, 42 U.S.C. § 7511(a)(4).

[33] 42 U.S.C. § 7491(a)(1).



VIA ELECTRONIC MAIL

ATTN: Ms. Cheryl Bradley
Environmental Programs Manager
Department of Environmental Quality
Air Quality Division
PO Box 1677
Oklahoma City, OK 73101-1677
Cheryl.bradley@deq.ok.gov

January 20, 2016

**RE: Comments on proposed amendments to OAC 252:100-09, Excess Emission Reporting Requirements**

Ms. Bradley:

Please accept these comments submitted on behalf of Sierra Club regarding the Oklahoma Department of Environmental Quality's (ODEQ's) proposed amendments to OAC 252:100-9, Excess Emission Reporting Requirements rule. The rule is intended to comply with the "[State Implementation Plan (SIP)] Call to Amend Provisions Applying to Excess Emissions During Periods of Startup, Shutdown and Malfunction [SSM]," as published in the Federal Register by the US Environmental Protection Agency on June 12, 2015 (80 FR 33840). While we find ODEQ's revisions to subsections 9(a), (b), (d), and (e) generally acceptable, they must be removed from the SIP and at most maintained in Oklahoma's state-only rules. Moreover, we have serious concerns regarding the proposed "alternative emissions limitations" provision, subsection 9(c) and recommend revisions consistent with federal law.

### I.   Legal Background

In response to EPA's June 12, 2015 rule - the startup, shutdown, malfunction ("SSM") state implementation plan ("SIP") call rule ("SIP Call"), Oklahoma is required to revise unlawful affirmative defense provisions.

The Clean Air Act employs a cooperative federalism regulatory scheme that establishes nationwide air quality goals and EPA's oversight of individual state plans to meet those goals. Subject to EPA approval, states are responsible for developing state implementation plans and adopting the enforceable source-specific emission limitations and other air quality rules necessary for compliance with the national ambient air quality standards (NAAQS). 42 U.S.C. § 7410(a), (k).

SIPs must include enforceable "emissions limitations," 42 U.S.C. §§ 7410(a)(2)(A), (a)(2)(C), 7602(k), which must apply on a "continuous" basis. 42 U.S.C. § 7602(k); *Sierra Club v. EPA*, 551 F.3d 1019 (D.C. Cir. 2008) (exemptions for SSM events conflict with the Act's plain requirement that emissions standards apply continuously).

When an industrial facility violates its emissions limitations, the Act gives EPA, states, and citizens the right to enforce those standards. The Act gives courts the authority to impose an injunction and the discretion assess penalties for violations, *see* 42 U.S.C. §§7413(b), 7604(a); *see also id.* §7604(f), and it also specifies a list of factors courts must consider when deciding whether to impose penalties. *Id*. §7413(e)(1). Because the Act's citizen suit and civil penalty provisions make the question of what civil penalties are appropriate a question for district courts to decide, the Act does not allow EPA or states to limit through affirmative defenses the amount of civil penalties a court can impose. *See NRDC v. EPA*, 749 F.3d 1055, 1063 (D.C. Cir. 2014) (holding EPA has no authority to create affirmative defense).

The Act requires EPA to review SIPs to ensure they comply with the Act's requirements, 42 U.S.C. § 7410(k)(2)-(4), and also requires EPA to direct states to revise their SIPs through a "SIP Call" if EPA determines an existing SIP "is substantially inadequate to attain or maintain the relevant [NAAQS]…or to otherwise comply with any requirement of [the Act]." *Id.* § 7410(a)(2)(H), (k)(5); *see U.S. Magnesium, LLC v. EPA*, 690 F.3d 1157, 1160 (10th Cir. 2012).

EPA's SSM SIP Call requires 36 states to close longstanding loopholes, including affirmative defenses against penalties, that allow industrial facilities to pollute the air without consequences when those facilities start up, shut down, or experience self-diagnosed "malfunctions." 80 Fed. Reg. 33,840 (June 12, 2015). Consistent with a recent ruling from the U.S. Court of Appeals for the D.C. Circuit, EPA changed its past interpretation that affirmative defense provisions were lawful because such provisions conflict with the Act's explicit grant of authority to federal courts to determine liability and impose penalties for violations. *E.g.*, 80 Fed. Reg. 33,851-53; *see also id.* 33,862-63 (discussing *NRDC v. EPA*, 749 F.3d 1055 (D.C. Cir. 2014)).

EPA also correctly found that SIPs with provisions that exempt emissions during SSM periods from otherwise applicable standards, or that allow polluters to avoid liability for such events, are substantially inadequate to meet Clean Air Act requirements. 80 Fed. Reg. at 33,840. In addition to requiring the 36 states whose SIPs contain these exemptions or affirmative defense provisions to remove these provisions from their SIPs, the SIP Call also revises EPA's policy for SIP provisions addressing excess emissions during SSM events. *Id*. The SIP Call allows states 18 months to submit revised SIPs to EPA, which is the maximum time allowable under the statute. *Id*. at 33,848; 42 U.S.C. § 7410(k)(5).

The SIP Call increases protections for communities against harmful air pollution from industrial facilities. EPA expects that "revision of the existing deficient SIP provisions has the potential to decrease emissions significantly in comparison to existing provisions,… encourage sources to reduce emissions during startup and shutdown and to take steps to avoid malfunctions, should provide increased incentive for sources to be properly designed, operated and maintained in order to reduce emissions at all times, … [and] has the potential to result in significant emission control and air quality improvements." *Id*. at 33,955-56. Importantly, beyond the legal deficiencies in the provisions, "the results of automatic and discretionary exemptions in SIP provisions, and of other provisions that interfere with effective enforcement of SIPs, are real-world consequences that adversely affect public health. *Id*. at 33,850.

With respect to Oklahoma, the SIP Call found that that two provisions in the Oklahoma SIP (OAC 252:100-9-3(a) and OAC 252:100-9-3(b))[1] do not meet CAA requirements. 80 Fed Reg. 33,968.

## II.    ODEQ's Proposed Revisions.

### A.    The proposed revisions to 252:100-9-8(a), (b), (d), and (e) are generally acceptable, so long as those subsections are removed from the SIP.

The Department's proposed revisions to (a) and (b) clarify that the "mitigating factors" described in subsection (b) are limited in application to actions of administrative penalties initiated by the Department, and not to civil actions in federal court or administrative enforcement actions by EPA. Subsection (e) rightly makes clear that the section is not intended to preclude federal court

---

[1] These provisions were subsequently moved to 252:100-9-8.

3

jurisdiction. Although Sierra Club would prefer that ODEQ remove the mitigation factors entirely from ODEQ's rules, we generally find them acceptable so long as they are removed from the SIP.

EPA has found that affirmative defense provisions are contrary to the enforcement structure of the Clean Air Act.  As the EPA explained:

> A judicial decision by the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) in *NRDC* v. *EPA* concerning the legal basis for affirmative defense provisions in the EPA's own regulations caused the Agency to reconsider the legal basis for any affirmative defense provisions in SIPs, regardless of the type of events to which they apply, the criteria they may contain or the types of judicial remedies they purport to limit or eliminate.

*Id.* at 33851. EPA further stated that:

> Affirmative defense provisions by their nature purport to limit or eliminate the authority of federal courts to find liability or to impose remedies through factual considerations that differ from, or are contrary to, the explicit grants of authority in section 113(b) and section 113( e ). These provisions are not appropriate under the CAA, no matter what type of event they apply to, what criteria they contain or what forms of remedy they purport to limit or eliminate.

*Id.* at 33981.

In the SIP Call, EPA thus found that, though a state may retain discretion to use affirmative defense provisions for its own enforcement purposes, a SIP must be "**unequivocally clear** that they do not provide an affirmative defense that sources can raise in a judicial enforcement context or against any party other than the state," and must also be clear that "the assertion of an affirmative defense by the source in a state administrative enforcement context has no bearing on the additional remedies that EPA or other parties may seek for the same violation in federal administrative enforcement proceedings or judicial proceedings." see 80 Fed. Reg. at 33,866.

The proposed revisions to 252:100-9-8(a), (b), (d), and (e) appear to be aimed at clarifying that the so-called "mitigation factors" apply only to state administrative actions, and not on EPA or other parties seeking enforcement in federal administrative or judicial proceedings.

Note, however, that the provisions must be removed altogether from Oklahoma's SIP, even if they are maintained in Oklahoma's regulations. In a November 12, 2015 letter from EPA to the State of Colorado regarding Colorado's proposed SSM rule revisions, attached as Exhibit A, EPA made clear that even if a state revises its rules to address the issues identified in the SIP call, the revisions should not be included in the SIP because they only apply to state administrative actions, and so are not related to "implementation, maintenance, and enforcement of primary and secondary NAAQS." See Exhibit A at 5 ("[T]here does not appear to be an appropriate and rational basis for submitting what may be considered…to be state-only provisions for adoption into the SIP…."). As EPA explains in the letter, "the EPA interprets the CAA to preclude affirmative defense provisions in SIPs and retention of a 'state-only' affirmative defense in a SIP could easily lead to misunderstandings by regulated entities, regulators, the public, and the courts." *Id.* EPA further stated that "the clearest way to make the point about what is state-only versus federally-enforceable would be not to include state-only provisions in the SIP at all." *Id.*

### B. ODEQ's proposed revisions to 252:100-9-8(c), concerning alternative emission limits, are insufficient to comply with the Clean Air Act.

Sierra Club has several serious concerns with the proposed revised subsection 252:100-9-8(c). The key language in the proposed revision as follows: "Emissions in compliance with a federally enforceable alternative emission limit or means of compliance developed for inclusion in the facility's permit for periods of startup and shutdown shall not be considered excess emissions. Under applicable permitting provisions of this chapter, any such alternative provision may not establish an emission limitation less stringent than an applicable emission limitation in the EPA-approved state implementation plan."

As specified below, we have identified several ways in which the proposed language does not comply with EPA's rules.

### 1) Alternative emissions limits must be included in an approved SIP, not merely in permits.

ODEQ proposes to include the following language in the revised 252:100-9-8(c): "Emissions in compliance with a federally enforceable alternative emission limit or means of compliance *developed for inclusion in the facility's permit* for periods of startup and shutdown shall not be

Exhibit 2
126

considered excess emissions." (emphasis added). This language is impermissibly vague and appears to inappropriately allow for the development of alternative emission limits outside of the SIP approval process.

To begin with, it is entirely unclear what "permit" this language refers to.  Further, the SIP Call Rule makes it clear that alternative emissions limits must be included in an approved SIP, not merely in permits. 80 FR at 33915. As EPA explains, the "SIP needs to reflect the control obligations of sources, and any revision or modification of those obligations *should not be occurring through a separate process, such as a permit process*, which would not ensure that "alternative" compliance options do not weaken the SIP." 80 Fed. Reg. 33915 (emphasis added). As a result, "any revisions to obligations in the SIP *need to occur through the SIP revision process*…." 80 Fed. Reg. 33916 (emphasis added). Any alternative emissions limits must therefore comply with the SIP process, including providing the requisite notice and comment period, and all other SIP limit change public participation and other process requirements.

ODEQ must clarify in its proposed rule that any alternative emission limits will be incorporated into its SIP via normal SIP rule change procedures and provide for public participation.

2) <u>**The proposed rule fails to narrowly limit the use of alternative emissions standards as required by law.**</u>

A second major issue with the proposed language in 252:100-9-8(c) is that ODEQ has not adequately circumscribed the availability of alternative emissions limits, as required under the SIP Call.

First, the term "means of compliance," as used in the proposed subsection, is so vague that Sierra Club cannot meaningfully comment on this specific language.  It could be read to refer to "general-duty" or other provisions that do not comply with the law.   In the SSM SIP call, EPA specifically stated that "generic general-duty provisions, such as a general duty to minimize emissions" are not "sufficient as an alternative emission limitation for any type of event . . . ." SSM Rule at 33979.  While the SIP Call allows states to adopt alternatives to numerical limits in some circumstances, such as work practices, those work practices must adhere to other standards laid out in the SIP Call. These include the obligation for all limits to apply on a continuous basis, control and minimize emissions, and require sources to operate pollution controls where technically feasible and comply with best operating practices.

As EPA states in the SIP Call, while the SIP limit during startup and shutdown "may be composed of a combination of numerical limitations, specific technological control requirements and/or work practice requirements,"

> **the emission limitation must limit emissions from the affected source on a continuous basis**. Thus, if there are different numerical limitations or other control requirements that apply during startup and shutdown, those must be clearly stated components of the emission limitation, must meet the applicable level of control required for the type of SIP provisions…and must be legally and practically enforceable.

80 Fed. Reg. at 33913 (emphasis added). Where work practices are used, they "must meet the otherwise applicable CAA requirements (e.g., be a RACT-level control for the source as part of an attainment plan requirement) and the necessary parameters to make it legally and practically enforceable (e.g., have adequate recordkeeping, reporting and/or monitoring requirements to assure compliance." *Id.* at 33916.

EPA also makes clear that startup and shutdown are normal modes of operation "during which the source should be expected to *control and minimize* emissions." *Id.* at 33913 (emphasis added).

Importantly, EPA further states that alternative requirements applicable to the source during startup and shutdown should be **narrowly tailored and take into account considerations such as the technological limitations of the specific source category and the control technology that is feasible during startup and shutdown.**" *Id.* at 33913.

In its SIP Call rule, EPA identifies the criteria by which alternative emissions limits for startup and shutdown should be developed, as follows:

> 1) the alternative emission limitation is "limited to specific, narrowly defined source categories using specific control strategies,"
> 2) use of the control strategy for the source category is "**technically infeasible**" during startup/shutdown,
> 3) the limit requires that the frequency and duration of operation in startup/shutdown mode are "minimized to the greatest extent practicable,"
> 4) the state analyzes the potential worst-case emissions that could occur during startup/shutdown based on the proposed limit,

5) the limit requires that "all possible steps are taken to minimize the impact of emissions during startup and shutdown on ambient air quality,"

6) the limitation requires that "at all times, the facility is operating in a manner consistent with good practice for minimizing emissions and the source uses best efforts regarding planning, design, and operating procedures," and

7) the actions during startup/shutdown are properly documented.

*Id.* at 33914.

Critically, EPA notes that in designing alternative limitations, "the state should consider how the control equipment works in determining what standards should apply during startup and shutdown." *Id.* at 33915. EPA points out that "for many sources, it should be feasible to meet the same emission limitations that applies during steady-state operations also during startup and shutdown." *Id.* at 33915.

The proposed rule changes should be revised to comport with the criteria outlined above. Consistent with the SIP Call, alternative emissions limits should only be available for sources that truly cannot meet the normal SIP limits, upon a showing that use of controls are technically infeasible during that time. Such technical infeasibility cannot include sources with outdated or undersized pollution controls that, if properly designed, could operate during startup or shutdown. Further, as EPA noted in the SSM SIP call, work practices and the like should only be available for those sources that truly cannot measure emissions during startup and shutdown. 80 Fed. Reg. at 33,980. Moreover, the regulations should specify that even where alternative emissions limits or work practices are necessary, they must comply with the other criteria above. Among other things, to be enforceable and appropriately narrowly tailored, alternative numerical limits or work practices must specifically and narrowly define what constitutes periods of "startup" and "shutdown."

Moreover, alternative emissions limits should be established on a category-wide, not plant-specific, basis, except where the specific source is demonstrated to be "truly unique." *Id.* at 33916. As EPA states in the SIP Call,

> even where a specific type of operation may not during startup and/or shutdown be able to meet an emission limitation that applies during full operation, the state should be able to develop appropriate limitations that would apply to those types of operations at all similar types of facilities. The EPA believes that there will be limited, if any, cases where

it may be necessary to develop source-specific emission requirements for startup and/or shutdown. In any event, this is a question that is best addressed by each state in the context of the revisions to the SIP provisions at issue in this action."

*Id.* at 33915.

3) **The proposed rule changes fail to make it adequately clear that, when establishing limits, the state must consider the collective impact of new limits on the NAAQS, PSD increments, and any other ambient standards such as toxics or other standards.**

Any emission limit or narrative standard that newly authorizes emissions must be measured against ambient standards, including NAAQs and PSD increments. As EPA specifies in its SIP Call, the "SIP is a combination of state statutes, regulations, and other requirements that the EPA approves for demonstrating attainment and maintenance of the NAAQS, protection of PSD increments, improvement of visibility and compliance with other CAA requirements." *Id.* at 33915. In the SIP Call rule, EPA repeatedly states that alternative emissions limits must be demonstrated not to cause a violation of other substantive CAA requirements. *See, e.g.*, *id.* at 33916 (alternative limits "must comply with sections 110(k)(3), 110(l), and 193 and any other applicable substantive requirements of the CAA"). As noted above, the state must analyze the worst-case scenario for any alternative emissions limit and show that it will not result in noncompliance with the NAAQS or other CAA standards.  Thus, ODEQ must revise its proposed language to make clear that, as part of establishing alternative requirements for startup and shutdown, the agency will consider the impact of higher SSM emissions on the NAAQS, PSD increments and other requirements.  Importantly, ODEQ must consider the collective impact of higher emissions from all sources that are to receive alternative requirements for startup and shutdown — and not measure the impact of higher limits for individual sources in a vacuum.

We respectfully request that ODEQ revise its proposed rule as outlined above.

Sincerely,

/s/Laurie Williams

Laurie Williams
Staff Attorney
Sierra Club
50 F St NW, 8th Floor

9

Washington, DC
20001
Laurie.williams@sierraclub.org



Sierra Club Environmental Law Program
2101 Webster Street, Suite 1300
Oakland, CA 94612

Sherry Davis, MC 205
Office of Legal Services,
Texas Commission on Environmental Quality
P.O. Box 13087
Austin, Texas 78711-3087

*Submitted Via E-Comments:*
*http://www1.tceq.texas.gov/rules/ecomments/*

> Re: **Comments Regarding TCEQ Rule Project Number 2016-040-101-CE**
> **(Clarification of Affirmative Defense for Certain Excess Emissions), 41 Tex. Reg.**
> **5,343 (July 22, 2016).**

On behalf of more than 22,000 members in Texas, the Sierra Club respectfully submits these comments regarding the above-titled proposed rule. The proposed rule purports to respond to a requirement by the U.S. Environmental Protection Agency ("EPA") that Texas amend those provisions of its Clean Air Act state implementation plan ("SIP") applying to excess emissions during startup, shutdown and malfunction ("SSM"). EPA's June 12, 2015 final rule, or "SIP Call," found that the provisions allowing an affirmative defense to enforcement of clean air violations (found at 30 TAC §101.222(b) - (e)) are "substantially inadequate to meet Federal Clean Air Act (FCAA) requirements." 80 Fed. Reg. 33,839, 33,968-69 (June 12, 2015); 79 Fed. Reg. 55,920, 55,945 (Sept. 17, 2014).

As discussed in the attached comments submitted by the Environmental Integrity Project (EIP), which Sierra Club adopts and incorporates,[1] the Proposed Rule fails to satisfy the requirements of the Clean Air Act or EPA's final policy expressed in the SSM SIP Call and should not be approved.

Power plants and other facilities can emit massive amounts of dangerous pollution during SSM periods. For example, ten permits issued by the Texas Commission on Environmental Quality in 2011 authorize particulate matter emissions from coal-fired power plants during SSM periods up to 7,616 pounds per hour—far higher than allowable emission rates during "normal" operations. These permits do not restrict the number of SSM events or hours during which the higher limits apply.

---

[1] To the extent the EIP comments could be interpreted to suggest that the affirmative defense provision is a *de facto* bar to enforcement, Sierra Club disagrees. Sierra Club otherwise adopts and incorporates the EIP comments.

Based on our review of 2012 emission inventory data, if a plant were to release the amount of particulate pollution allowed by the state during SSM periods during just 80 hours in a year (only about 1% of operating time), SSM emissions would be so high that they would account for between 15% and 66% of what is normally emitted during an entire year of operations. Furthermore, 80 hours is likely a highly conservative estimate of the average duration of SSM periods, particularly for older Texas power plants. An EPA study found that "the average EGU had between 9 and 10 startup events per year during 2011 – 2012, but data from a small number of EGUs indicated significantly more startup events (e.g., the EGUs with the most startup events had over 100 startup events in 2011 and over 80 in 2012.)."[2] EPA found that startups could often last about 9 hours.[3]

The enormous amounts of pollution that are released into communities during SSM periods at power plants and industrial pollution sources like refineries have serious, day-to-day impacts on ordinary Texans.[4] The TCEQ's proposal turns a blind eye to these impacts and will only preserve the status quo. We respectfully urge TCEQ to remove the affirmative defense provisions from the Texas SIP.

Sincerely,

*/s/ Elena Saxonhouse*

Elena Saxonhouse
Senior Attorney
Sierra Club Environmental Law Program
2101 Webster Street, Suite 1300
Oakland, CA 94612
elena.saxonhouse@sierraclub.org
(415) 977-5765

Attachment: EIP Comments

---

[2] EPA Office of Air and Radiation, "Assessment of startup period at coal-fired electric generating units – Revised," at 4 (Nov. 2014) (emphasis added), *available at* www3.epa.gov/airtoxics/utility/matsssfinalruletsd110414.pdf.
[3] *Id.*
[4] *See, e.g.*, EIP Comments, attached hereto, at 3-4; Mary Anne Hitt, *A Victory in the Decades-Long Fight for Environmental Justice in the Gulf and Beyond*, at http://www.sierraclub.org/compass/2015/05/victory-decades-long-fight-environmental-justice-gulf-and-beyond (last visited August 5, 2016); *See* also 80 Fed. Reg. at 33850 ("The EPA notes that the types of SIP deficiencies identified in the Petition [to which the SSM SIP Call responded] are not legal technicalities. Compliance with the applicable requirements is intended to achieve the air quality protection and improvement purposes and objectives of the CAA. The EPA believes that the results of automatic and discretionary exemptions in SIP provisions, and of other provisions that interfere with effective enforcement of SIPs, are real-world consequences that adversely affect public health. Commenters on the February 2013 proposal provided illustrative examples of impacts that these types of SIP provisions have on the communities located near sources that rely on automatic or discretionary exemptions for excess emissions during SSM events, rather than by designing, operating and maintaining their sources to meet the applicable emission limitations.").



707 Rio Grande Street, Suite 200
Austin TX, 78701
p: 512-637-9477  f: 512-584-8019
www.environmentalintegrity.org

August 2, 2016

Sherry Davis, MC 205
Office of Legal Services,
Texas Commission on Environmental Quality
P.O. Box 13087
Austin, Texas 78711-3087

*Submitted Via E-Comments:*
*http://www1.tceq.texas.gov/rules/ecomments/*

## Re:   Comments Regarding TCEQ Rule Project Number 2016-040-101-CE (Clarification of Affirmative Defense for Certain Excess Emissions)

The Environmental Integrity Project appreciates the opportunity to submit comments on the Texas Commission for Environmental Quality's proposed rule, entitled *Clarification of Affirmative Defense for Certain Excess Emissions*, and published in the July 22, 2016 Texas Register. 41 TexReg 5343. The proposed rule is a response to the EPA's June 12, 2015 final rule, or "SIP Call," finding that Texas's affirmative defense provisions (found at 30 TAC §101.222(b) - (e)) are "substantially inadequate to meet Federal Clean Air Act (FCAA) requirements." 80 FedReg 33839 (June 12, 2015). Unfortunately, despite the proposed rule's caption, Texas is proposing to clarify nothing, and instead the proposed rule would only confuse things.

## I.   SUMMARY

Texas seems intent on picking another fight with EPA, and this one has more to do with principle than with the substance. The substantive questions regarding the availability of an affirmative defense for Clean Air Act violations resulting from upsets have been resolved by federal courts, and by EPA's revised policy. For example, there is no argument that the affirmative defense currently in TCEQ's rules only applies to penalties, and not to injunctive relief. Luminant Generation Co. v. U.S. EPA, 699 F.3d 427, 435-36 (5th Cir. 2012) ("For 'unplanned maintenance, startup or shutdown activity,' an affirmative defense against civil penalties would be available if the 'owner or operator proves ... all' of the listed criteria..."); Id. At 440 ("Regardless, even if all nine required criteria are met and the violator establishes the applicability of the approved affirmative defense, injunctive relief is still available." (citing 75 Fed.Reg. at 68,991 n.4)). Moreover, nothing in TCEQ's rules trumps the federal courts' discretion in adjudicating federal actions. Luminant Generation at 440 ("Additionally, the availability of the affirmative defense does not negate the district court's jurisdiction to assess civil penalties ... it simply provides a defense, under narrowly defined circumstances, if and when penalties are assessed.").

EPA's policy regarding exemptions and affirmative defenses for upsets is also clear and unambiguous. The SIP Call, which unambiguously lays out EPA's rationale for its policy, has been finalized and adopted pursuant to the federal Administrative Procedures Act's public notice

and comment procedures and thus has the force and effect of a federal rule. While Texas is well within its right to challenge the SIP Call in federal court, Texas cannot unilaterally choose to ignore the SIP Call, as it is doing with this proposed rule. The proper avenue to stay the effectiveness of the EPA's SIP Call, would be for Texas to seek a stay in federal court. But absent a stay, Texas must comply with the SIP Call.

EPA's SIP Call is narrow, and it would be easy for Texas to meet the federal requirements that EPA and the courts have clearly laid out. To comply with the SIP Call, Texas has at least two easy options:

- TCEQ could remove the affirmative defense provisions, as EPA has recommended. This change would give the state maximum enforcement discretion while allowing the federal Clean Air Act – and not state rules – to guide enforcement in federal actions by EPA and citizens;

- Alternatively, TCEQ could retain the affirmative defense provisions and explicitly make them state-only rules. This change would mean state regulators would continue to be guided by the affirmative defense criteria when deciding whether to pursue enforcement, but that federal courts would not be bound by the TCEQ's affirmative defense rules or decisions.

These regulatory changes would be quite minor and would bring Texas into compliance with federal law by ensuring that the state's affirmative defense does not act as a de facto bar to citizen enforcement. Making these changes would just reflect the law, as articulated in NRDC v. EPA, 749 F.3d 1055 (D.C. Cir. 2014), and EPA's unambiguous policy. Under current law, states have enforcement discretion (and they can even rely on affirmative defenses when making state enforcement decisions), but states cannot tie the hands of federal judges. More to the point, Congress gave citizens the right to take enforcement actions when regulators fail to do so, and so state rules cannot lawfully alter those rights. But rather than amending the state rules to clarify the legal *status quo*, the TCEQ is opting instead for a needless showdown with EPA.

Texas's response to EPA's SIP Call rule is that the state "disagrees" with it. 41 TexReg 5344 ("The commission disagrees with EPA's interpretation that an affirmative defense as to penalties is not available for enforcement of SIP violations.") Texas proposes to leave the affirmative defense provisions intact, and to add a subsection stating that "Subsections (b) – € of this section are not intended to limit a federal court's jurisdiction or discretion to determine the appropriate remedy in an enforcement action." Texas then proposes "delayed applicability," making this new subsection applicable only *after* the state has exhausted its appeal of the EPA's SIP Call. In essence, the State's proposal is to double down on its disagreement with EPA. Rather than following the law, which requires compliance with a duly adopted federal rule (the SIP Call), Texas is refusing to make any change to its rules unless and until a court makes Texas do it.

## II.    UPSETS CAUSE POLLUTION AND CAN MAKE THE AIR UNSAFE

Air pollution from malfunctions and equipment breakdowns, or "upsets," and the startup and shutdown emissions often associated with these events, are far from rare in the State of

Texas.   Based on a review of industry reports from TCEQ's STEERS database, in 2015, 679 industrial sites in more than 100 Texas counties released more than 34,000 tons of air pollutants during 3,421 incidents of mainly malfunctions (and some maintenance events).[1]   Between 2009 and 2012, Texas industrial sources reported nearly 130,000 tons of sulfur dioxide, volatile organic compounds, and nitrogen oxides during upsets.[2]   The actual VOC and $NO_x$ tallies for flares during these events are likely significantly higher than what is reported based on EPA's recent finding that current VOC and $NO_x$ "AP-42" emission factors grossly underestimate releases by a factor of 4 and 42 respectively.

Many industrial plants report upsets so frequently that operating under these conditions can only be viewed as routine.  For example, between 2009 and 2012, two Texas gas plants, the Waha Gas Plant and the Tilden Gas Plant, both reported more than 300 emission events, or roughly two events per week over a four-year period. The Keystone Gas Plant and the Goldsmith Gas Plant, are not far behind, reporting 229 and 240 emission events over the same four year period.  Together these four facilities released over 20,000 tons of VOCs, NOx, and $SO_2$ during these events.  The operators' reports for these events commonly cite the breakdown of a compressor or pump as the underlying cause of the emission event. Pollution from these ongoing so-called "upsets" can be easily avoided through more frequent repair and maintenance, or replacement of this equipment.

Many of these reported emission events could be avoided through better coordination between the facilities that produce, gather, and process natural gas.  For example, the Goldsmith Gas Plant and the facilities that feed it reported more than 7,000 tons of $SO_2$ emissions in 2013. Many of the reported emission events are the result of the Goldsmith Plant being "shut in for repairs" or shutdown "plant turnaround," forcing flaring at the upstream gas producer.  These emissions can be avoided by coordinating the ramp-down of gas production at upstream sites.

But excessive air pollution from upsets is not confined to the oil and gas fields. Refineries and chemical plants along the Gulf Coast are among the state's worst emitters of unauthorized pollution during breakdowns and maintenance.  In 2015, Dow Chemical's Freeport plant, just south of Houston, released 15,717 pounds of the carcinogen benzene during equipment malfunctions and maintenance activity, more than any other facility in the state.  Five of the state's top 10 worst benzene emitters during malfunctions and maintenance are in the working class and largely African American communities in Jefferson County, near the Texas-Louisiana border.  Shell's Deer Park refinery and petrochemical complex in the Houston Ship Channel reported more than 46 tons of toxic (hazardous air pollutants or HAPs) emissions in 2013, more than 12% of the total reported HAP emissions that year.  Almost all of the 46 tons Shell reported resulted from a single event that lasted for 15 days – thus illustrating the severe

---

[1] See, *Breakdowns in Air Quality: Air Pollution from Industrial Malfunctions and Maintenance in Texas*, by Environmental Integrity Project and Environment Texas, April 27, 2016, available at: http://environmentalintegrity.org/wp-content/uploads/Breakdowns-in-Air-Quality.pdf

[2] *See e.g.,* Environmental Integrity Project, *Accident Prone: Malfunctions and "Abnormal" Emission Events at Refineries, Chemical Plants, and Natural Gas Facilities in Texas*, 2009-2011 (2012), available at http://www.environmentalintegrity.org/news_reports/documents/20120718AccidentProneFinal.pdf.

acute exposure risk to fenceline communities from upsets.[3]  In its report for this event, Shell claims the affirmative defense applies.  Emission releases like this can be avoided and minimized with the proper monitoring of valves, as EPA recently proposed for refineries in the revised National Emission Standards for Hazardous Air Pollutants (NESHAP), or by requiring facilities to route these emissions to a flare or other vapor control device, as the Bay Area Air Quality Management District requires.[4]  Thus, this massive release of air pollutants into a heavily populated nonattainment area could have been avoided.

Flares are a common sight for people living near refineries, petrochemical plants, and oil and gas facilities.  Not surprisingly, a significant portion of the reported upset emissions in Texas were routed to a flare before being released to the atmosphere.  Based on EPA's recent review of flare VOC and NOx emission factors, these reported emissions are significantly underestimated: actual VOC emissions are about 4 times higher, and $NO_x$ emissions are more than 42 times higher, than what companies report based on outdated and erroneous emission factors.[5]  Therefore, air pollution from flares – a very common source of SSM emissions – is likely to be much greater than previously estimated.

Year after year, the same industrial plants repeatedly break down and release dangerous air pollution.  For example, the Pasadena Refining System oil refinery east of Houston, currently owned by Brazil's national oil company, chronically releases high levels of unpermitted particulate matter, sulfur dioxide, and volatile organic compounds.  The refinery released 76,000 pounds of particulate matter in a 45-minute period due to an operator error in January 2012, even though the facility's permit allows only 34.8 pounds per hour.  In 2015, the Pasadena Refinery reported 92,994 pounds of PM emissions, making it the state's second highest emitter of unauthorized soot from upsets.[6]

The SIP Call to eliminate Texas's affirmative defense will help deter these types of massive and avoidable emissions by driving industries to fix problems rather than hiding behind affirmative defenses.

---

[3] TCEQ Emission Event Database for 2009-13, at Incident 178612 on January 27, 2013. According to Shell's report, a valve was left in the open position.

[4] *See*, Petroleum Refinery Sector Risk and Technology Review and New Source Performance Standards; Proposed Rule, 79 Fed. Reg. 36879, 36970; BAAQMD Rule 8-28-304.

[5] EPA, DRAFT Review of Test Reports for Emissions Factors Development for Flares and Certain Refinery Operations, 44-45 (Aug. 2014).

[6] Emission Inventory data includes both "emission events" and unpermitted "maintenance, startup, and shutdown" emissions.  The vast majority of emissions are reported under "emission events."

### III.   THE TEXAS AFFIRMATIVE DEFENSE VIOLATES THE FEDERAL CLEAN AIR ACT AND IMPERMISSIBLY HAMPERS CITIZEN ENFORCEMENT

Neither EPA nor the states have the authority under the Clean Air Act to alter the jurisdiction of the federal courts by creating affirmative defenses in state rules. In civil enforcement actions in federal court, whether those actions are brought by EPA or citizens, the Clean Air Act expressly grants the federal district courts jurisdiction to assess penalties for violations. The Act expressly states, and case law confirms, that violations are subject to both federal civil judicial enforcement actions and citizen suits and that, in such suits, the district courts have jurisdiction to award penalties for each violation.

The Clean Air Act specifically lists the types of violations subject to its various enforcement provisions. For federal civil judicial enforcement actions, the list includes violations of "any requirement or prohibition of an applicable implementation plan or permit." 42 U.S.C. § 7413(b). Similarly, for citizen suits, the list includes violations of a Prevention of Significant Deterioration ("PSD") or New Source Review ("NSR") permit or of "any standard, limitation, or schedule established under … any applicable state implementation plan." 42 U.S.C. § 7604(a)(1) & (f). SIP or related permit violations are, therefore, clearly subject to the federal civil and citizen suit enforcement provisions of the Act. See Train v. Natural Resources Defense Council, Inc., 421 U.S. 6092 at n. 27 (1975); Trustees for Alaska v. Fink, 17 F.3d 1209, 1210 n.3 (9th Cir. 1994) ("Having 'the force and effect of federal law,' the EPA-approved and promulgated Alaska SIP is enforceable in federal courts"), quoting Union Electric Co. v. EPA, 515 F.2d 206, 211 n.17 (8th Cir. 1975), aff'd, 427 U.S. 246 (1976)); Her Majesty the Queen in Right of the Province of Ontario v. City of Detroit, 874 F.2d 332, 335 (6th Cir. 1989) ("If a state implementation plan … is approved by the EPA, its requirements become federal law and are fully enforceable in federal court.").

The federal CAA is also clear that in civil judicial enforcement actions and citizen suits, the district court "shall have jurisdiction" to award penalties. 42 U.S.C. § 7413(b) (district court "shall have jurisdiction … to assess such civil penalty…"); 42 U.S.C. § 7604(a) (district court "shall have jurisdiction … to apply any appropriate civil penalties …"). The only exception to the courts' authority to award penalties in civil judicial enforcement actions is for noncompliance with administrative subpoenas or with certain monitoring and inspection requirements, "where the violator had sufficient cause to violate or fail or refuse to comply with such subpoena or action." 42 U.S.C. § 7413(e)(1). The only exception to the courts' authority to award penalties in citizen suits is for actions against the EPA Administrator for the failure to perform a nondiscretionary duty. 42 U.S.C. § 7604(a).

Section 113(e) of the federal CAA, which is expressly applicable to civil judicial enforcement actions and citizen suits, lists the criteria the district court must consider in assessing penalties and explicitly states that "[a] penalty may be assessed for each day of violation." 42 U.S.C. § 7413(e)(1) & (2). The plain language of the law grants district courts authority to award penalties for each day of violation for every violation subject to the Clean Air Act's federal civil judicial and citizen suit enforcement provisions, with only the limited exceptions identified above.

5

Because assessing penalties is expressly reserved to the federal district courts, neither EPA nor the states have the authority to adopt rules limiting the district courts' penalty assessment authority. American Petroleum Institute v. U.S. EPA, 52 F.3d 1113, 1119 (D.C. Cir. 1995) ("EPA cannot rely on its general authority to make rules necessary to carry out its functions when a specific statutory directive defines the relevant functions of EPA in a particular area," citing Sierra Club v. EPA, 719 F.2d 436, 455 (D.C. Cir. 1983), cert. denied, 468 U.S. 1204 (1984)); Adams Fruit Co., Inc. v. Barrett, 494 U.S. 638, 645 (1990); Texas v. United States, 497 F.3d 491, 501–503 (5th Cir. 2007); Kelley v. EPA, 15 F.3d 1100 (D.C. Cir. 1994).

The D.C. Circuit agreed with this reasoning, holding that an affirmative defense for private civil suits exceeds EPA's statutory authority because, under Sections 113(e)(1) and 304(a) of the Clean Air Act, the decision whether to award penalties is for a court, and not the regulators, to decide. *See*, Natural Resources Defense Council v. EPA, 749 F.3d 1055 (D.C. Cir. 2014).

We agree with EPA that the D.C. Circuit's reasoning applies squarely to the question of whether the Act allows states to establish affirmative defenses in their regulations (i.e., through the SIP process).

## IV.    THE AFFIRMATIVE DEFENSE FRUSTRATES CLEAN AIR ACT ENFORCEMENT IN TEXAS

Affirmative defenses in SIPs frustrate enforcement of the Act and create extra-statutory hurdles for citizens seeking to clean up illegal pollution. Texas, a state that has implemented an EPA-approved affirmative defense in its SIP, provides an example of how affirmative defenses operate in the real world. In theory, the Texas affirmative defense, which replaced an illegal blanket exemption, was a step in the right direction. As explained above, the Fifth Circuit upheld EPA's original approval of the affirmative defense only to the extent that the affirmative defense was limited to penalties only, and would neither bar citizen enforcement nor tie the hands of a federal judge. But in practice, the affirmative defense operated as a *de facto* exemption and a bar against citizen enforcement.

For example, a U.S. district court in Texas relied on TCEQ's determinations that a source met the affirmative defense factors, and equated those TCEQ determinations with a finding of "no violation" – effectively, a shield against enforcement. As the plaintiff in that lawsuit repeatedly pointed out to the district court, the affirmative defense language in the Texas SIP plainly provides that it applies to claims in enforcement actions "other than claims for administrative technical orders and actions for injunctive relief." See, e.g., 30 Tex. Admin. Code § 101.222(e) (affirmative defense for opacity events resulting from unplanned maintenance, startup or shutdown activity). Both EPA and the Fifth Circuit relied on the plain language in the state rule when they reviewed and approved these provisions into the Texas SIP. For example, the Fifth Circuit cited with approval EPA's determination that the Texas affirmative defense provisions did not "preclude citizen suits under the Act," but rather merely provided an "affirmative defense [that] may be raised in defense of a claim brought by EPA, the State or a private citizen" and that . . . "even where an affirmative defense is successfully raised in defense to an action for penalties, it does not preclude other judicial relief that may be available, such as injunctive relief or a requirement to mitigate past harm or to correct the non-compliance at

issue." Luminant Generation Co. LLC v. EPA, 714 F.3d 841, 855 (5th Cir. 2013); see also id. at 853 ("Regardless, even if all nine required criteria are met and the violator establishes the applicability of the approved affirmative defense, injunctive relief is still available") (citing 75 Fed.Reg. at 68,991 n.4).

While the limited nature of the affirmative defense appeared clear to EPA and the Fifth Circuit when they assured the public that the Texas affirmative defense would not thwart citizen enforcement, TCEQ's practices allow industries to treat the narrow defense to penalties as a blanket exemption. In practice, as long as a Texas source reports the excess emissions, the state has generally determined that all of the affirmative defense criteria were met and that, therefore, there were "no violations." In so doing, the State has effectively treated the affirmative defense as a blanket (no violation) exemption. The following example demonstrates how one Texas district court relied on the state's improper legal conclusion that meeting the affirmative defense factors equates to "no violations:"

> "It does seem to the Court that what the plaintiff seeks is for this Court to overrule the extensive and complete findings of the Texas Commission on Environmental Quality which is designed to and does regulate facilities such as Big Brown the defendant in this case. I don't think that's normally an appropriate function of federal courts and certainly – it's certainly something I decline to do and it's something that should only be done in extraordinary circumstances. It would be the finding of the Court that plaintiff has not proved by a preponderance of the evidence that the defendant has violated the Clean Air Act."

Vol. 3 of Trial Transcript, at 574, Sierra Club v. Energy Future Holdings Corp. et al., Civil Action No. W-12-cv-108 (W.D. Tex. 2014). In its final written order on the merits, the court added more reasons for denying the plaintiff's claims on the merits, but continued to heavily rely on the TCEQ's purported findings on the affirmative defense and liability. The court also held that penalties were not appropriate, again relying heavily on TCEQ's findings on the affirmative defense. 2014 WL 2153913, at *12-13.

## V.    CONCLUSION

In many ways we have come a long way in Texas, from the bad old days when blanket "upset exemptions" allowed companies to pollute the air with relative impunity. Historically, as long as companies reported the upset to the state air regulators, Texas excused the violation. More than a decade ago, Texas replaced its upset exemption with an affirmative defense. Despite clear regulatory language and assurances from EPA, the State, and the Fifth Circuit Court of Appeals that the affirmative defense could be asserted *only* as to penalties, and not as a bar to injunctive relief, the affirmative defense provisions have nonetheless proven to be problematic.

As intended by the federal Clean Air Act, the threat of enforcement action, including penalties, for violations of emission limits serves as a very real incentive for industries to invest in the maintenance, management, and technologies needed to reduce emissions during startup, shutdown and maintenance and to prevent upsets — and thereby protect public health.

So, it seems almost absurd that TCEQ should choose to fight EPA on this SIP Call rather than to make a small and quite innocuous rule change.

In the supplemental notice of the proposed SIP Call, EPA states:

> [A] state that receives a SIP call that includes a requirement to remove an affirmative defense for excess emissions would retain its ability to apply discretion in its enforcement program. Such enforcement discretion could be exercised case-by-case, or the SIP may include a provision that directs state personnel in the exercise of enforcement discretion. The criteria in an enforcement discretion provision could resemble the criteria previously recommended by the EPA for an affirmative defense provision for malfunctions. The enforcement discretion provision cannot apply to anyone other than state personnel. For example, the enforcement decisions of state personnel cannot define what is or is not a violation and cannot purport to limit or bar the exercise of enforcement discretion by the EPA or other parties pursuant to the citizen suit provision.

79 Fed. Reg. 55920, 55927 (Sept. 17, 2014). We agree with EPA and urge TCEQ to comply with the SIP Call.

Respectfully submitted,

*Ila m. Le*

_____

**Environmental Integrity Project**

Ilan Levin
707 Rio Grande, Suite 200
Austin, Texas 78701
ilevin@environmentalintegrity.org
(512) 637-9479

8



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

**JUL 2 8 2016**

Mr. William F. Durham, Director
West Virginia Department of Environmental Protection
Division of Air Quality
601 57th Street SE
Charleston, West Virginia 25304

Dear Mr. Durham:

Thank you for your June 29, 2016 letter requesting comment on the following seven West Virginia Department of Environmental Protection proposed air quality rules: 45 C.S.R. 1, 45 C.S.R. 8, 45 C.S.R. 13, 45 C.S.R. 14, 45 C.S.R. 16, 45 C.S.R. 25, and 45 C.S.R. 34.

The U.S. Environmental Protection Agency's comments are enclosed.

If you have any questions, please do not hesitate to contact me or have your staff contact Ms. Irene Shandruk, for 45 C.S.R. 1, at 215-814-2166, or shandruk.irene@epa.gov or Ms. Amy Johansen, for the remaining rules, at 215-814-2156, or johansen.amy@epa.gov.

Sincerely,

David L. Arnold,
Acting Division Director

Enclosure

Enclosure

## EPA's Comments on West Virginia's Proposed Air Quality Rules for 2017 Legislative Session

### 45 C.S.R. 1 - Alternative Emission Limitations during Startup, Shutdown, and Maintenance Operations

1. Please explain provision 45-1-3.3. The wording is vague and it is unclear why only RACT is mentioned. Perhaps it should say that the alternative emission limitation (AEL) shall otherwise meet applicable West Virginia and Clean Air Act requirements.

2. Please clarify the meaning and intent of provision 45-1-7. It is unclear how the AEL could be more stringent than an otherwise applicable limitation. If the AEL is less stringent, based on this provision, the AEL would not apply to sources during startup/shutdown/malfunction when the sources cannot meet the otherwise applicable emission limitations.

3. To the extent that West Virginia intends to establish AELs for periods of startup/shutdown/malfunction, such limitations must be submitted to EPA for approval into West Virginia's state implementation plan (SIP) for SIP compliance purposes. That is, if the AEL is done via permit or enforcement order, the permit or order must be approved by EPA into West Virginia's SIP to ensure that the limitations are enforceable by EPA.

4. Please define "zero process weight rate" to make the definition of "maintenance operation" clearer.

### 45 C.S.R. 13 – Permits for Construction, Modification, Relocation and Operation of Stationary Sources of Air Pollutants, Notification Requirements, Administrative Updates, Temporary Permits, General Permits, Permission to Commence Construction, and Procedures for Evaluation

1. Please explain why 45-13-5.8 is being removed. By removing this provision there appears to be no limit on the timeframe in which the Secretary shall complete review of any application for an existing stationary source operating permit.

2. It should be noted that on December 29, 2015 (80 FR 81234), EPA proposed "Revisions to the Public Notice Provisions in Clean Air Act Permitting Programs," which will remove mandatory requirements to provide public notice of a draft air permit, as well as certain other program actions, through publication in a newspaper and would instead allow for electronic noticing (e-notice) of these actions. EPA suggests West Virginia

review that proposed rule as well as the final rule, once published, noting that the proposal is subject to change upon going final.

3. West Virginia is making changes to Public Review Procedures in 45-13-8 and is to be commended for moving to electronic public noticing; however, please explain why West Virginia is removing requirements to public notice applications for operating permits in provision 45-13-8.3.

## 45 C.S.R. 14 – Permits for Construction and Major Modification of Major Stationary Sources for the Prevention of Significant Deterioration of Air Quality

1. Please explain the changes made to provision 45-14-2.45. It is unclear why "under the CAA" is being removed.

2. Please explain your changes to the definition of "PAL permit" in provision 45-14-2.54.

3. The edits made to 45-14-11.5 are confusing and unclear. It appears the same thing is being said twice. Please clarify.

4. In the provisions under 45-14-17 for Public Review Procedures, it appears West Virginia will continue to use legal advertisement in a newspaper of general circulation, but are moving to electronic notice under 45-13. Once EPA finalizes "Revisions to the Public Notice Provisions in Clean Air Act Permitting Programs," EPA would recommend one consistent public noticing method, unless there are specific instances where the public would be better served using a CAA approved alternative (i.e., newspaper).


SIERRA
CLUB

August 1, 2016

*Via E-mail to dep.comments@wv.gov*

West Virginia Department of Environmental Protection
Division of Air Quality
ATTN: Public Information Office
601 57th Street SE
Charleston, WV 25304

**Re:     Comments on West Virginia's Proposed Rule for Alternative Emission
           Limitations during Startup, Shutdown and Maintenance Operations**

To Whom It May Concern:

        On behalf of our West Virginia members and supporters, the Sierra Club
respectfully submits these comments regarding the proposed rule for alternative emission
limitations during startup, shutdown and maintenance operations ("Proposed Rule"),
developed by the West Virginia Division of Air Quality ("DAQ") in response to a request
by the U.S. Environmental Protection Agency ("EPA") that West Virginia amend those
provisions of its Clean Air Act state implementation plan ("SIP") applying to excess
emissions during startup, shutdown and malfunction ("SSM").

        Despite EPA's request (hereinafter referred to as the "SSM SIP Call"), the
regulatory amendments that West Virginia has proposed retains SIP provisions that allow
for automatic and discretionary exemptions from otherwise applicable emission
limitations during SSM. Given this and the other defects identified below, the Proposed
Rule fails to satisfy the requirements of the Clean Air Act or EPA's final policy from the
SSM SIP Call. Significant changes to the Proposed Rule must be made in order for EPA
approval to be appropriate.

## I.     BACKGROUND

        Power plants and other facilities can emit massive amounts of particulate matter
and other pollutants during SSM periods. For example, ten permits issued by the Texas
Commission on Environmental Quality in 2011 authorize particulate matter emissions
from power plants during SSM periods up to 7,616 pounds per hour—far higher than
allowable emission rates during "normal" operations. These permits do not restrict the
number of SSM events or hours during which the higher limits apply. But if the allowable
limits are reached for just 80 hours per year (about 1% of operating time), emissions of

particulates during SSM periods would account for between 15% and 66% of total annual emissions, based on our review of 2012 emission inventory data.

EPA has found that SSM events historically have caused disproportionate, and enormous, pollution. As part of the SSM SIP Call rulemaking, EPA stated: "[I]n connection with the EPA's issuance of a SIP call to address an exemption for excess emissions during malfunctions in Utah, the EPA illustrated the practical consequences of such exemptions by noting the large amount of additional emissions during malfunctions at individual sources, *e.g.*, one malfunction that was estimated to emit 11,000 pounds of $SO_2$ over a 9-hour period when the applicable limit was 3,200 pounds per day."[1] Furthermore, EPA has found that power plants are likely to emit these large amounts of SSM pollution on multiple occasions during a year: the "average EGU [electric generating unit] had between 9 and 10 startup events per year during 2011-2012, but data from a small number of EGUs indicated significantly more startup events (e.g., the EGUs with the most startup events had *over 100 startup events* in 2011 and *over 80* in 2012)."[2]

Because facilities subject to the Clean Air Act can emit massive amounts of particulate matter, sulfur dioxide and other harmful air pollution during SSM periods, strong SIP provisions governing emissions during these periods are needed to protect downwind communities. Accordingly, EPA has directed thirty-six states to correct specific provisions in their SIPs that are inconsistent with governing law. EPA expects that revisions made in response to its SSM SIP Call could "decrease emissions significantly in comparison to existing provisions, . . . encourage sources to reduce emissions during startup and shutdown and to take steps to avoid malfunctions, . . . provide increased incentive for sources to be properly designed, operated and maintained in order to reduce emissions at all times, . . . [and] result in significant emission control and air quality improvements."[3] Importantly, beyond the legal deficiencies in the existing provisions, "the results of automatic and discretionary exemptions in SIP provisions, and of other provisions that interfere with effective enforcement of SIPs, are real-world consequences that adversely affect public health."[4]

The best approach to the SSM SIP Call is for affected states, such as West Virginia, to remove the illegal exemptions from their respective SIPs. Removing the exemptions would restore the effectiveness of emission limits that are designed to protect air quality and satisfy the Clean Air Act's requirements would apply at all times. Removing the exemption would make the regulations of affected states comparable to regulations in those states that were not subject to the SSM SIP Call.

---

[1] Memorandum dated February 4, 2013 to Docket EPA-HQ-OAR-2012-0322 at 23, *available at* www3.epa.gov/airquality/urbanair/sipstatus/docs/ssm_memo_021213.pdf.

[2] EPA Office of Air and Radiation, "Assessment of startup period at coal-fired electric generating units – Revised," at p. 4 (Nov. 2014) (emphasis added), *available at* www3.epa.gov/airtoxics/utility/matsssfinalruletsd110414.pdf.

[3] EPA, State Implementation Plans; Response to Petition for Rulemaking; Restatement and Update of EPA's SSM Policy Applicable to SIPs; Findings of Substantial Inadequacy; and SIP Calls to Amend Provisions Applying to Excess Emissions During Periods of Startup, Shutdown and Malfunction; Final Rule, 80 Fed. Reg. 33,840, 33,955–56 (June 12, 2015) (codified at 40 C.F.R. Part 52).

[4] *Id.* at 33,850.

Alternatively, for those source categories that truly cannot meet SIP emission limits during startup and shutdown, states can establish alternative numerical limits that satisfy the other requirements of the Clean Air Act. In these instances, states must establish clear, narrow definitions of "startup" and "shutdown" to ensure these periods are as short as possible. Any alternative limits must be adopted through the SIP revision process, with the accompanying requirements for public notice and comment. Such limits must not interfere with maintenance of any National Ambient Air Quality Standards ("NAAQS") or Prevention of Significant Deterioration ("PSD") increments.

## II.   THE PROPOSED RULE VIOLATES THE CLEAN AIR ACT AND EPA'S SSM SIP CALL AND POLICY.

### A. DAQ Has Failed to Eliminate or Correct Provisions of its SIP Identified by EPA as Substantially Inadequate to Meet Clean Air Act Requirements.

As part of its June 2015 final action on SSM SIPs, EPA found that certain provisions of West Virginia's SIP are substantially inadequate to meet the requirements of the Clean Air Act and called for West Virginia to submit corrective SIP revisions by November 22, 2016. Specifically, EPA found inadequate the provisions in the West Virginia SIP that allowed for automatic exemptions from emission limitations, standards, and monitoring and recordkeeping requirements for excess emission during SSM events—W. Va. Code R. §§ 45-2-9.1; 45-7-10.3; 45-40-100.8—and those that that provide exemptions from the otherwise applicable SIP emission limitations on account of an "unavoidable shortage of fuel," "any emergency situation or condition creating a threat to public safety or welfare," "unavoidable malfunctions of equipment," or "routine maintenance"—W. Va. Code R. §§ 45-2-10.1; 45-3-7.1; 45-5-13.1; 45-6-8.2; 45-7-9.1; 45-10-9.1; 45-21-9.3.[5]

However, in response to EPA's SSM SIP Call, West Virginia has proposed to revise its SIP to include a new rule governing the establishment of alternative emission limitations during period of startup, shutdown, and maintenance (not malfunction), but to leave unchanged the provisions identified above. Those SIP provisions providing for automatic or discretionary exemptions from emission limitations must be amended to eliminate such exemptions.

### B. The Proposed Rule Would Allow for Source-Specific Alternative Emission Limitations, in Violation of the Requirements of the Clean Air Act and EPA's SSM SIP Call.

Any alternative emission limitations must be incorporated through the SIP amendment process, allowing for public notice and comment and EPA approval. Thus, source-specific alternative emission limitations, generally, are not proper. As EPA states in the SSM SIP Call: a "SIP needs to reflect the control obligations of sources, and any revision or modification of those obligations should not be occurring through a separate

---

[5] *Id.* at 33,961.

process, such as a permit process, which would not ensure that 'alternative' compliance options do not weaken the SIP."[6] Moreover, EPA reasoned that:

> [E]ven where a specific type of operation may not during startup and/or shutdown be able to meet an emission limitation that applies during full operation, the state should be able to develop appropriate limitations that would apply to those types of operations at all similar types of facilities. The EPA believes that there will be limited, if any, cases where it may be necessary to develop source-specific emission requirements for startup and/or shutdown.[7]

Here, the Proposed Rule would allow only for alternative emission limitations in the form of source-specific permit conditions. Because EPA cannot yet evaluate such to-be-determined permit conditions, there is no way to know whether the source-specific compliance option weakens West Virginia's SIP.[8]

If DAQ maintains this option, any permit condition for a particular source regarding alternative emission limitations should be incorporated into the West Virginia SIP, with public notice and comment and EPA approval. In addition, DAQ should include specific language explaining that source-specific work practice standards could only be available as a very last resort upon a sufficient showing that the listed criteria are met and that such requirements are continuous and enforceable.

### C. DAQ Has Failed to Demonstrate that the Proposed Reliance on SSM Work Practices Is Appropriate Under These Circumstances

Work practices compliance options (in lieu of having to meet normal SIP limits during startup and shutdown) such as those included in the Proposed Rule are only appropriate for those limited source categories that truly cannot meet "normal" numerical limits for particular pollutants during startup and shutdown and, even then, only for those limited periods of time when specific source categories cannot accurately measure emissions of particular pollutants.

In the final SSM SIP Call rule, EPA confirmed that "[s]tartup and shutdown are part of the normal operation of a source and should be accounted for in the design and operation of the source. It should be possible to determine an appropriate form and degree of emission control during startup and shutdown and to achieve that control on a regular basis."[9] Likewise, EPA also made clear that, for most sources, "it should be feasible to meet the same emission limitation" during both "steady-state" and startup/shutdown periods.[10] EPA's final policy from the SSM SIP Call provides that a

---

[6] *Id.* at 33,915.

[7] *Id.*

[8] *See id.*

[9] *Id.* at 33,979.

[10] *Id.*

"state can develop special, alternative emission limitations that apply during startup or shutdown *if the source cannot meet the otherwise applicable emission limitation in the SIP*."[11] (The attached report excerpt, prepared by Dr. Ranajit Sahu on behalf of the Sierra Club, details various air pollution controls and discusses the operational range and startup/shutdown characteristics of the respective controls.)

Here, DAQ's Proposed Rule would allow for work practice requirements in lieu of allowable emission limit during periods of startup, shutdown, and maintenance. In order to satisfy the requirements the Clean Air Act and EPA's SSM SIP Call, DAQ should establish alternative *numerical* limits for source *categories* instead of allowing for the inclusion of work practices as source-specific permit conditions. Even if a category of sources cannot meet allowable emission limits, work practices should only be available for periods where emissions are not measurable. In the SSM SIP Call, EPA specifically stated that "*[i]n cases in which measurement of emissions during startup and/or shutdown is not reasonably feasible*, it may be appropriate for an emission limitation to include as a component a control for startup and/or shutdown periods other than a numerically expressed emission limitation."[12] Where at all possible, establishing numerical limits in lieu of work practices is required by Clean Air Act § 110(a)(2), which provides that SIPs are to include "*enforceable* emission limitations . . . as may be necessary or appropriate to meet the applicable requirements" of the Act.[13] In the SSM SIP Call, EPA echoed that numerical limits are preferable to work practices in terms of enforceability: "In practice, it may be that numerical emission limitations are the most appropriate from a regulatory perspective (*e.g.*, to be legally and practically enforceable) and thus the emission limitation would need to be established in this form to meet [Clean Air Act] requirements."[14]

DAQ's Proposed Rule does not limit the use of work practice requirements to where emissions are not measurable. At least for power plants, emissions are measurable during startup and shutdown, as shown by the fact that, as part of the Acid Rain program, EPA has required power plants to monitor sulfur dioxide and nitrogen oxide emissions continuously from the moment combustion begins and throughout generation, and has relied upon this data for decades to determine compliance with the requirements of the program.

The work practice compliance options proposed by DAQ appear to apply to virtually all (if not all) sources covered by West Virginia's SIP, despite the fact that many of those sources could in fact comply with normal SIP limits during startup and shutdown. Even assuming sources are unable to meet normal SIP limits during startup and shutdown, absent a showing that emissions are not measureable during that time, DAQ should establish alternative numerical limits rather than relying on work practices.

---

[11] *Id.* at 33,980 (emphasis added).

[12] *Id.* (emphasis added).

[13] 42 U.S.C. § 7410(a)(2) (emphasis added).

[14] *See* 80 Fed. Reg. at 33,979; *see also id.* at 33,974–75 ("There are many sources for which a numerically expressed emission limitation will be the most appropriate and will result in the most legally and practically enforceable SIP requirements.").

D. The Work Practices Compliance Option in DAQ's Proposed Rule Is Not Enforceable.

Apart from the fact that work practices generally are not enforceable, the Proposed Rule does not meet the enforceability requirement of Section 110 of the Clean Air Act for other reasons. First, the Proposed Rule does not require sources to report to DAQ any information to assure that sources are complying with the requirements of the rule. All that is required is the maintenance of records and provision of data upon request. Because there is no way for DAQ to know—without requesting documentation from sources—whether sources are complying with the work practice requirements, there is no way for citizens or EPA to obtain information regarding compliance. Thus, the alternative emission limitation requirements are not practically enforceable by DAQ in enforcement suits. Nor are they enforceable by EPA or citizens in federal court. If DAQ insists on including work practices as a compliance option (which we maintain is not consistent with the requirements of the Clean Air Act or the SSM SIP Call and, therefore, not approvable by EPA or a reviewing court), DAQ should require the work practice compliance information from the Proposed Rule to be reported by sources through, at the least, their quarterly Title V compliance reports.

Second, the Proposed Rule proposal does not establish any time limitations for periods of "startup" or "shutdown." This is extremely problematic. For example, coal-fired power plants could conceivably claim they are in startup or shutdown mode (and thus exempt from the SIP's numerical emissions limits applicable to "normal" operations) all the way up to full load—and for hours and hours. DAQ should establish clear, limited definitions of startup and shutdown. If alternative emission limitations are established for power plants, startup under the West Virginia SIP should end (and thus the normal numerical SIP limits should begin to apply) at the point these plants begin to generate electricity—either for sale over the grid or for any other purpose (including internal use). Similarly, shutdown should only begin when no electricity is generated for sale over the grid or for any other purpose—or when no fuel is being fired in the boiler.

E. DAQ Cannot Demonstrate that the Proposed Rule Will Not Violate the NAAQS or PSD Increments.

Under Section 110(l) of the Clean Air Act, EPA cannot approve SIP revisions that would interfere with attainment of the NAAQS or PSD increments: "The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or any other applicable requirement of this chapter."[15] In keeping with this requirement, EPA stated in the SSM SIP Call that: "[a]s part of its justification of the SIP revision, the state [should] analyze[] the potential worst-case emissions that could occur during startup and shutdown based on the applicable alternative emission limitation."[16]

---

[15] 42 U.S.C. § 7410(l).

[16] 80 Fed. Reg. at 33,980.

Excess emissions from startup, shutdown and malfunction events have far-reaching impacts on other requirements of the Act.[17] States must rely on assumed continuous compliance with emissions limitations in their modeling exercises to demonstrate attainment and maintenance of ambient air quality standards.[18] In areas that are meeting air quality standards, state plans must include emission limitations designed to ensure that air quality does not worsen.[19] Similarly, in nonattainment areas, nonattainment SIPs must include emission inventories which are comprehensive, accurate, and current of actual emissions and must also include emission statements from stationary sources.[20] Also, in nonattainment areas, state plans must include a program that assures reasonable progress toward attainment of ambient air quality standards.[21] Nonattainment NSR permitting requires offsetting of emissions based on permitted emission limits.[22] There is no way to adjust the required offsets should a source exceed its permitted emission limits during periods of SSM because nonattainment NSR permitting occurs prior to construction and the permits do not ever expire. Plans must also protect scenic views in many of America's most treasured public lands.[23]

Where a state establishes SSM limits through permits, assessing the collective impact on the NAAQS or PSD increments becomes difficult if not impossible. Here, DAQ appears not to have considered the potential effect of its proposed alternative emission limitations compliance option on these required demonstrations and planning under the Act.

### III.   CONCLUSION

For the foregoing reasons, West Virginia's proposed SIP revision must be further revised to ensure that it is consistent with the requirements of the SSM SIP Call and Clean Air Act, protects air quality and public health, and is approvable by EPA.

---

[17] 78 Fed. Reg at 12,485.

[18] *See* EPA Memorandum to Docket EPA-HQ-OAR-2012-0322, at 14, n. 41 (Feb. 4, 2013) (*citing, inter alia*, Clean Air Act Section 110(a)(2)(A) and (C)).

[19] 42 U.S.C. § 7475(a)(3), 40 C.F.R. § 51.166(k)(1); *see* 78 Fed. Reg. at 12,485.

[20] *See, e.g.*, 42 U.S.C. §§ 7511(a)(1), (3).

[21] 42 U.S.C. § 7501 *et seq.*

[22] *See, e.g.*, 42 U.S.C. § 7511(a)(4).

[23] 42 U.S.C. § 7491(a)(1).

Thank you, and please do not hesitate to contact the undersigned with any questions or to discuss the matters raised either here.

Sincerely,

/s/ Bridget Lee

Bridget Lee
Staff Attorney
Sierra Club
50 F Street, NW, 8th Floor
Washington, DC 20001
(202) 675-6275
bridget.lee@sierraclub.org

# USPS Tracking®

Tracking    /    FAQs >

Track Another Package +

 **Track Packages Anytime, Anywhere**   Get the free Informed Delivery® feature to receive automated notifications on your packages   **Learn More**

**Tracking Number:** 70210350000228260525

Remove ✕

Your item was delivered to an individual at the address at 7:47 am on May 14, 2021 in WASHINGTON, DC 20460.

**Status**

✅ **Delivered, Left with Individual**

May 14, 2021 at 7:47 am
WASHINGTON, DC 20460

**Get Updates** ⌄

Delivered

| Text & Email Updates | ⌄ |
|---|---|
| Tracking History | ⌄ |
| Product Information | ⌄ |

**See Less** ⌃

Sierra Club et al. v. EPA Complaint
Exhibit B

August 2, 2021

Michael S. Regan, Administrator
U.S. Environmental Protection Agency
Office of the Administrator, Mail Code: 1101A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460
regan.michael@epa.gov

*Via Certified Mail and Email*

      **Re:**     **Correction to May 10, 2021 60-Day Notice of Intent to Sue the U.S. EPA
Regarding the 2015 SSM SIP Call Rule**

Dear Administrator Regan:

      On May 10, 2021, Sierra Club, Environmental Integrity Project ("EIP"), and Natural Resources Defense Council ("NRDC") submitted a 60-Day Notice of Intent to Sue the U.S. Environmental Protection Agency for Failure to Perform Nondiscretionary Duties to Implement the 2015 SSM SIP Call Rule under the Clean Air Act. Exhibit 1 to the Notice of Intent provided two tables that listed the "States That Did Not Respond to the 2015 SIP Call" and the "States with Submitted SIP Proposals but No Final Rule." On July 8, 2021, the Environmental Protection Agency ("EPA") informed Sierra Club, EIP, and NRDC that New Jersey—which was listed in Exhibit 1 and in the Notice of Intent as failing to respond to the 2015 SSM SIP Call— had submitted a responsive SIP revision to the EPA on November 30, 2017. EPA also provided Sierra Club, EIP, and NRDC with a copy of New Jersey's submitted revision letter and accompanying materials, which had not been included in EPA's prior response to the above-listed organizations' Freedom of Information Act request regarding SIP submittals.

      In light of this new information, Sierra Club, EIP, and NRDC are providing an updated version of Exhibit 1 that is correctly alphabetized and reflects that New Jersey did respond to the 2015 SIP Call. We are submitting this correction out of an abundance of caution to ensure that the record in this matter is as accurate as possible. However, this correction does not change the 60-day pre-litigation notice period triggered by our May 10 letter because the original letter "apprised EPA of its putative obligations under the Act and accorded it ample opportunity to take whatever steps it saw as appropriate" before litigation commences. *Ctr. for Biological Diversity v. E.P.A.*, 794 F. Supp. 2d 151, 156 (D.D.C. 2011); *see also San Francisco BayKeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1155 (9th Cir. 2002) (finding notice sufficient under the Clean Water Act's similar notice provision where it "provide[d] enough information that the defendant [could] identify and correct the problem").

      Sierra Club, EIP, and NRDC appreciate EPA bringing this issue to our attention. We continue to welcome the opportunity to discuss the basis for the May 10, 2021 Notice Letter and explore options for resolution of these claims without litigation. If that is of interest to EPA, please contact the undersigned counsel.

Thank you for your prompt attention to this matter.

Sincerely,

/s/ Louisa Eberle
Louisa Eberle
Sierra Club
1536 Wynkoop Street, Suite 200
Denver, CO 80202
(415) 977-5753
louisa.eberle@sierraclub.org

Andrea Issod
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5544
andrea.issod@sierraclub.org

*Counsel for Sierra Club*

/s/ Patton Dycus
Patton Dycus
Environmental Integrity Project
315 W. Ponce de Leon Avenue, Suite 842
Decatur, GA 30030
(404) 446-6661
pdycus@environmentalintegrity.org

*Counsel for Environmental Integrity Project*

/s/ Emily Davis
Emily Davis
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
(415) 875-6100
edavis@nrdc.org

*Counsel for Natural Resources Defense Council*

# Exhibit 1

Table 1: States That Did Not Respond to the 2015 SIP Call

| State/County | Submitted Proposal to EPA? (Y/N) |
|---|---|
| Alabama | No |
| Arkansas | No |
| CA – San Joaquin | No |
| District of Columbia | No |
| Illinois | No |
| North Carolina - Forsyth | No |
| Ohio | No |
| Rhode Island | No |
| South Dakota | No |
| Tennessee - Shelby (Memphis) | No |
| Washington – EFSEC | No |
| Washington - SWCAA | No |

Table 2: States with Submitted SIP Proposals but No Final Rule

| State/County | Submitted Proposal to EPA (Y/N) | Date of Submitted SIP Proposal | Federal Register Notice |
|---|---|---|---|
| Alaska | Yes | 1/5/2017 | N/A |
| Arizona | Yes | 11/17/2016 | Approval of Arizona Air Plan Revisions, Arizona Department of Environmental Quality and Maricopa County Air Quality Department, 82 FR 13084 (Mar. 09, 2017) |
| Arizona - Maricopa | Yes | 11/18/2016 | Approval of Arizona Air Plan Revisions, Arizona Department of Environmental Quality and Maricopa County Air Quality Department, 82 FR 13084 (Mar. 09, 2017) |
| California – Eastern Kern | Yes | 12/6/2016 | Approval of California Air Plan Revisions, Eastern Kern Air Pollution Control District and Imperial County Air Pollution Control District, 82 FR 20295 (May 01, 2017) |
| California - Imperial | Yes | 3/28/2016 | Approval of California Air Plan Revisions, Eastern Kern Air Pollution Control District and Imperial County Air Pollution Control District, 82 FR 20295 (May 01, 2017) |
| Colorado | Yes | 11/21/2016 | N/A |
| Delaware | Yes | 11/26/2016 | N/A |
| Florida | Yes | 11/22/2016 | N/A |
| Georgia | Yes | 11/17/2016 | N/A |
| Indiana | Yes | 11/14/2016 | N/A |
| Kansas | Yes | 11/22/2016 | N/A |
| Kentucky | Yes | 11/17/2016 | N/A |
| Louisiana | Yes | 11/22/2016 | N/A |
| Maine | Yes | 05/21/2019 | N/A |
| Michigan | Yes | 2/7/2017 (Commitment to comply w/ SIP Call submitted on 11/15/2016) | N/A |
| Minnesota | Yes | 11/22/2016 | N/A |
| Missouri | Yes | 11/28/2016 | N/A |
| Mississippi | Yes | 11/17/2016 | N/A |
| Montana | Yes | 7/6/2016 | Montana Administrative Rule Revisions: 17.8.334, 82 FR 16770 (Apr. 06, 2017) |
| New Jersey | Yes | 11/30/2017 | N/A |
| New Mexico | Yes | 10/13/2016 | N/A |
| North Carolina* | Yes | 11/22/2016 | N/A |
| North Dakota | Yes | 10/27/2016 | N/A |
| NM - Albuquerque-Bernalillo | Yes | 10/17/2016 | N/A |

| Oklahoma | Yes | 11/7/2016 | N/A |
| South Carolina | Yes | 11/4/2016 | N/A |
| Tennessee | Yes | 11/18/2016 | N/A |
| Texas* | Yes | 11/18/2016 | N/A |
| Virginia | Yes | 8/1/2016 | N/A |
| Washington | Yes | 10/25/2019 | N/A |
| West Virginia | Yes | 6/29/2016 | N/A |

** *States that submitted multiple proposals*

# USPS Tracking®

Tracking  /  FAQs >

**Track Another Package** +

**Track Packages Anytime, Anywhere**

Get the free Informed Delivery® feature to receive automated notifications on your packages

**Learn More**

Remove ✕

**Tracking Number:** 70210350000156730916

Your item was delivered to an individual at the address at 8:04 am on August 6, 2021 in WASHINGTON, DC 20460.

**Status**

✓ **Delivered, Left with Individual**

August 6, 2021 at 8:04 am
WASHINGTON, DC 20460

**Get Updates** ∨

**Delivered**

| Text & Email Updates | ∨ |
| --- | --- |
| Tracking History | ∨ |
| Product Information | ∨ |

**See Less** ∧